UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL | ) | |
| UNION 719 PENSION FUND, Individually | ) | |
| and On Behalf of All Others Similarly | ) | |
| Situated, | ) | |
| | ) | 1:08-cv-1041-SEB-DML |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ZIMMER HOLDINGS, INC., DAVID C. | ) | |
| DVORAK and JAMES T. CRINES, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING MOTION TO DISMISS**

This cause is before the Court on Defendants' Motion to Dismiss The

Consolidated Complaint [Docket No. 39], filed on February 23, 2009; and Defendants'

Motion for Oral Argument [Docket No. 48], filed on May 26, 2009.  In the Motion to

Dismiss, Defendants contend that the consolidated Complaint cannot withstand scrutiny

under the heightened pleading requirements applicable to securities fraud litigation.  For

the reasons detailed in this entry, Defendants' Motion to Dismiss is <u>GRANTED</u>, and

Defendants' Motion for Oral Argument is <u>DENIED</u>.

### *Factual Background*

Investors in Zimmer Holdings, Inc. ("Zimmer"), a publicly traded medical device

manufacturer with its principal place of business in Warsaw, Indiana, have filed this

purported class action alleging that corporate and individual officer malfeasance was responsible for Zimmer's stock-price decline in 2008.  The class period asserted by Plaintiff extends between January 29, 2008 and July 23, 2008.  Compl. ¶ 161.

Zimmer designs, develops, manufactures, and markets reconstructive orthopedic implants, including joint, dental and spinal implants, trauma products, and related orthopedic surgical products ("OSPs").  Lead Plaintiff, Plumbers and Pipefitters Local Union 719 Pension Fund ("Plaintiff"), filed a Consolidated Class Action Complaint alleging that Zimmer, its Chief Executive Officer David C. Dvorak ("Dvorak"), and its Chief Financial Officer James T. Crines ("Crines") (collectively, "Defendants") made fraudulent misrepresentations by omitting from public statements material information relating to two of Zimmer's revenue sources: (1) OSPs manufactured at Zimmer's Dover, Ohio ("Dover") facility; and (2) a hip replacement product referred to as the Durom Acetabular Component ("Durom Cup").[1]  Plaintiff's Complaint includes a detailed recitation of manufacturing and production-related issues that allegedly hampered these two revenue sources in 2008 as well as an itemization of Defendants' suspect and allegedly misleading public statements.

## I.  Issues at the Dover Facility

The Complaint chronicles the nature and timing of production problems at Dover,

---

[1] Taken together, the OSPs manufactured and the Durom Cup at Dover accounted for approximately six percent of Zimmer's global business.  Compl. ¶ 20.

relying primarily on the statements of various confidential witnesses.  Confidential

Witness 2 ("CW2"), who worked as a Manager of Microbiology at Zimmer for more than

a year until his departure on January 30, 2008, stated that he and other Zimmer employees

were made aware during a monthly management meeting held prior to January 2008 that

manufacturing problems were occurring at the Dover facility.  Compl. ¶ 59.  Confidential

Witness 14 ("CW14"), who joined Zimmer in 1991 and retired in October 2008 as

Corporate Vice President of Regulatory Affairs, averred similarly that Zimmer

management, including senior management, was aware in early 2008 that problems were

occurring at the Dover plant.

These problems related primarily to the recall of at least one of the OSPs

manufactured at Dover.  As asserted by Confidential Witness 1 ("CW1"), the Director of

Quality Assurance and Regulatory Affairs at the Dover facility between January 2004 and

April 2008, Zimmer was notified in November 2007 of "silicone spotting," apparently a

form of contamination, on the "Pulsavac Gun,"[2] a product manufactured at the Dover

facility.  Compl. ¶ 56.[3]  According to CW1, because of this production problem, the

Pulsavac Gun was recalled in either November or December of 2007.  Id.

CW1 further asserts that the production problems associated with the Pulsavac

_____

[2]The Pulsavac Plus Wound Debridement System Fan Spray Gun.  Compl. ¶ 56.

[3]CW14 stated that he became aware of a contamination issue with a product manufactured at the Dover facility in late 2007 or early 2008.  According to CW14, these issues were also brought to the attention of Defendant Dvorak by the quality assurance department at Zimmer.  Compl. ¶¶ 102-103.

Gun prompted an inspection of the Dover facility by the Food and Drug Administration ("FDA"), which, according to both CW1 and CW2, commenced sometime in January 2008. Compl. ¶ 57. CW1 further recounted his belief at the time that, based on its inspection, the FDA would issue "483 Observations"[4] to Zimmer. Compl. ¶¶ 57, 58.[5]

The Complaint includes observations by numerous confidential witnesses who worked at Zimmer distributors and recalled that certain products manufactured at the Dover facility were not available for distribution in late 2007 or early 2008. Confidential Witness 4 ("CW4"), a customer service and billing representative at a Zimmer distributor, averred that by December 2007 customers were complaining that certain Zimmer OSP products were on backorder. Compl. ¶ 68.

A number of other sources cited in the Complaint recalled that OSPs became unavailable sometime in early 2008. Confidential Witness 5 ("CW5") stated that soon after he began working as a receptionist at a Zimmer distributor in February 2008 his supervisor informed him that certain products were unavailable because of contamination problems at the Dover facility. Compl. ¶¶ 70, 71. Confidential Witness 6 ("CW6"), an Inventory Coordinator at a Zimmer distributor between November 2006 and July 2008,

---

[4]"483 Observations," according to the FDA's Compliance Program Guidance Manual, are issued when the results of an FDA inspection "document . . . deficiencies of a quantity and/or type to conclude that there is a minimal probability . . . that the establishment will produce nonconforming and/or defective finished devices." § 7382.845 Inspection of Medical Device Manufacturers Part VA)(1)b).

[5]Confidential Witness 3 ("CW3"), the general manager of the Dover facility for four and a half years until his departure in January 2008, corroborated substantial portions of the information imparted by CW1 and CW2. Compl. ¶ 63.

recounted that he first overheard his supervisor discussing the unavailability of OSPs

manufactured at the Dover facility in or around January or February 2008.  Compl. ¶ 74,

75.  Confidential Witness 7 ("CW7"), a Junior Sales Representative at a Zimmer

distributor, also recalled that products manufactured at the Dover facility became

unavailable beginning in February 2008.  Compl. ¶ 78.[6]  Confidential Witness 9 ("CW9"),

a sales representative at a Zimmer distributor from May 2006 to May 2008, learned from

his supervisor in late February or early March 2008 that an inspection had been conducted

at the Dover facility and that OSP products manufactured there were unavailable.  Compl.

¶ 34.

Based on the foregoing confidential witness averments, Plaintiff alleges that

Defendants clearly were aware during the specified class period of substantial production

problems as well as the recall of at least one OSP and the fact of the FDA inspection, all

occurring at the Dover facility.


## II.  Issues with the Durom Cup

Plaintiff's Complaint also details issues related to the Durom Cup reflecting the

concerns of Dr. Lawrence Dorr, a prominent hip surgeon and onetime paid consultant for

Zimmer.  On July 29, 2008, the *New York Times* published an article entitled "The

Evidence Gap: A Call for a Warning System on Artificial Joints," which detailed certain

---

[6]Confidential Witness 8 ("CW8"), who worked for two Zimmer distributors between
September 2001 and August 2008, corroborated the statements of CW6 and CW7.  Compl. ¶ 79.

adverse experiences Dr. Dorr had encountered in using the Durom Cup.  Reportedly, a

few of Dr. Dorr's patients, in whom he had implanted a Durom Cup hip replacement,

"were in agony" following completion of that procedure.  Compl. ¶ 131.  According to

the article, Dr. Dorr "first told the device's manufacturer, Zimmer Holdings, [in 2007]

about his concerns but nothing happened," and, when Dr. Dorr "saw one of Zimmer's

engineers at a meeting, [he] told her that [she] should pull this cup because [it was]

crippling patients."  Id.

Dr. Dorr first publicly "sounded an alarm" on April 22, 2008 in a letter to the

members of the American Association of Hip and Knee Surgeons ("AAHKS"), in which

he described problems he had experienced implanting the Durom Cup.  Id.  Out of 165

Durom Cup hip replacements he had performed, according to the letter at least ten, and as

many as fourteen patients required post-operation revision.  Compl. ¶ 27, 32, 44.

The Complaint references Dr. Dorr's concerns as well as similar concerns

expressed by other surgeons,[7] again relying  on the averments of confidential witnesses.

Confidential Witness 11 ("CW11"), who worked for Zimmer for more than twenty years

until his departure in January 2008, had numerous communications with Dr. Dorr in his

role as a Senior Vice President of Sales.  According to CW11, Dr. Dorr relayed certain

negative experiences he had with the Durom Cup to Zimmer at least one year prior to

---

[7]Beyond the concerns expressed by Dr. Dorr, the Complaint also cites a May 18, 2008 analyst report describing an unidentified surgeon who "relayed certain concerns he had about the Durom cup to the company early in Durom's launch."  Compl. ¶ 41.  The Complaint references a statement made by Defendant Crines that Zimmer was aware sometime in 2007 that a few surgeons in France had expressed similar concerns.  Compl. ¶ 46.

writing his April 2008 letter to the AAHKS.  Compl. ¶ 92.  CW14, the Vice President of

Regulatory Affairs, corroborates the fact that Dr. Dorr advised Zimmer of his concerns

with the Durom Cup sometime prior to sending the April 2008 letter to AAHKS.

According to both CW11 and CW14, Zimmer normally "paid attention" to concerns

raised by surgeons and thus took Dr. Dorr's concerns as particularly serious.  Compl. ¶¶

92, 104.

   Throughout 2008, Dr. Dorr's concerns apparently began to impact the perceptions

and confidence of other surgeons relating to implants of the Durom Cup.  As a sales

representative at a Zimmer distributor, Confidential Witness 9's ("CW9") responsibilities

included regular substantive contact with doctors, see Compl. ¶¶ 75, 95, from which he

recalled that, in 2008, a few surgeons had inquired whether they should continue using

the Durom Cup.  Compl. ¶ 85.  CW9 asserts that, in response to such concerns from

surgeons, a Zimmer representative nonetheless advised him to continue selling the Durom

Cup as usual.  See Compl. ¶¶ 99-101.

   In addition to the concerns of Dr. Dorr and certain other surgeons, the Complaint

recites fourteen instances occurring between December 2007 and July 2008 when

complaints were lodged with the FDA regarding the Durom Cup.  Compl. ¶ 105.  These

complaints pertained to both post-operation pain experienced by patients receiving the

Durom Cup as well as to a loosening of the device after implantation.  Id.

   These complaints to the FDA, in conjunction with the concerns expressed by

surgeons and the averments of confidential witnesses establish, according to the

Complaint, that Defendants were necessarily aware of serious problems affecting the Durom Cup prior to and throughout 2008.

### III. Defendants' Allegedly Misleading Statements

According to Plaintiff, numerous statements made by Defendants between January and July 2008 were fraudulent, not because of what they affirmatively asserted, but based on matters critically omitted.  Specifically, Plaintiff contends that Defendants repeatedly provided false stock guidance to the market through press releases and other public statements in which they deliberately omitted or downplayed problems with OSPs and the Durom Cup with the intention of artificially inflating the value of Zimmer stock.

It is alleged that the first of these statements was contained in a January 29, 2008 Zimmer press release announcing the Company's financial results for the fourth quarter as well as the full year of 2007, which included the following averments: (1) "Full year 2008 net sales are expected to be approximately 10 to 11% over 2007"; (2) "Adjusted diluted earnings per share for the full year 2008 are expected to be $4.20 to $4.25"; and (3) "The guidance reflects the expected costs for a number of ongoing infrastructure and operating initiatives . . . [and] enhancements to . . . quality systems."  Compl. ¶ 106. During a conference call held the same day, a financial analyst and Defendant Dvorak engaged in the following dialogue related to quality systems at the Dover facility:

> Q:     Do you currently have any issues with the FDA, any warning letters, that usually takes a few months for those to be posted, that they may have been issued or 483'd?

A:      We don't have any warning letters at this point.

Compl. ¶ 108.

The following day, January 30, 2008, Defendant Crines reiterated Zimmer's growth expectation data in a public presentation at the Wachovia Healthcare Conference, Compl. ¶ 110, where Crines also stated, with regard to the Durom Cup, the following: "Some of the feedback that we're getting from the field would indicate that it is a bit challenging to implant, and there are some things we can do in the way of surgical technique training that ought to help."  Compl. ¶ 111.  Despite these concerns, the positive guidance reported by Defendants in late January 2008 resulted in a Zimmer stock price increase, from $68.08 to $77.03 per share.

On March 18, 2008,  at the Cowen and Company Health Care Conference, Crines made another presentation, which included the following statement relating to the Durom Cup: "We also, as we look at our hip portfolio, recognize and would acknowledge that we have some challenges and opportunities . . So there are some things that we need to do in terms of providing training to orthopedic surgeons and some things that we can do . . . to address some design differences."  Compl. ¶ 114.  Crines further stated, presumably in reference to the Dover facility, that "the company has recently undertaken a major investment initiative to upgrade manufacturing quality systems."  Id.

An April 3, 2008 Zimmer press release stated that "Zimmer Holdings, Inc. announced today that it has taken a number of actions to improve quality systems at its Dover, Ohio facility."  Compl. ¶ 115.  The press release further provided:

> The Company recently conducted a review of quality systems at the Dover, Ohio OSP facility and initiated voluntary product recalls of certain OSP products manufactured at the Dover facility that the Company has determined do not meet internal quality standards. In addition, the Company has voluntarily and temporarily suspended production and sales of certain OSP products manufactured at the Dover facility . . . These actions are expected to adversely impact 2008 OSP revenues by $70 to $80 million.

Id. In conclusion, Defendants stated that "[a]dditional detail on the expected impact will be provided during the Company's first quarter investor conference call on April 24, 2008." Id.

On April 24, 2008, Zimmer issued another press release announcing the company's financial results for the first quarter of 2008 with the following elaborations: (1) "The Company updated its full year 2008 sales guidance and reaffirmed its earnings guidance. Reported sales for 2008 are expected to increase by 10 to 11% over the prior year"; (2) "Full year 2008 adjusted diluted earnings per share are expected to be in the same range as previously issued guidance of $4.20 to $4.25"; and (3) "These estimates include impact of previously announced actions at the Company's Ohio-based Orthopaedic Surgical Products operation . . . The Company expects this impact to be offset by reductions in planned operating expenses, share repurchases and other actions." Compl. ¶ 116. During a conference call conducted later that day, Dvorak stated, "While we're clearly disappointed by the OSP situation, we believe the actions we've taken demonstrate the seriousness with which we take quality systems matters and we're

10

keeping the FDA informed of all of our actions." Compl. ¶ 117.[8]  Soon after these

disclosures, Zimmer's stock declined from $75.95 to $72.87 per share.  Compl. ¶ 149.

On May 6, 2008, during a presentation at the Deutsche Bank Securities Inc. Health

Care Conference, Crines again elaborated upon the Durom Cup issue: "[A]s I'm sure you

know, there have been questions raised by one surgeon in particular in the U.S.

concerning high failure rates that he's experienced with about 165 patients. . . .  At this

point I can tell you that we take these issues very seriously."  Compl. ¶ 120.  Crines told

financial analysts of the following as well:

> I will tell you that this device, this construct, has been in the market here in the
> U.S. since the second half of 2006.  There are many surgeons that have had
> very good clinical results with this device . . . .  So what was reported in this
> letter from this particular surgeon at this point I can tell you is somewhat
> isolated - it would appear to be somewhat isolated to this particular surgeon's
> experience.   I will also tell you that we did receive somewhat similar
> indications in the European market in the early part of 2007 with a couple of
> surgeons in France.  We were able to trace their experiences to issues with the
> technique that [they] were using . . . So we were able to address that particular
> issue with surgical technique training.

Id.[9]

During a conference call following this May 6, 2008 presentation, Crines made

---

[8]Crines repeated Zimmer's guidance during this call: "These actions are expected to
negatively impact 2008 adjusted earnings per share by $0.18 to $0.20 including $.07 related to
inventory charges, idle plant costs, and other nonrecurring expenses . . . We expect this impact to
be offset by reductions in planned operating expenses, share repurchases, and other actions."
Compl. ¶ 116.

[9]Analysts at Cowen & Company noted on May 5, 2008 that Zimmer "was caught off
guard by the distribution of the letter based on our discussion.  The company pointed us towards
Swedish and Australian registry data which demonstrate a generally low revision rate for Durom
at 3 years."  Compl. ¶ 36.

two other announcements: (1) that Zimmer planned to investigate the Durom Cup complaints: "We're going to have a team of very senior people working with Dr. Dorr to get an understanding of what may have contributed to the failures that he has experienced"; and (2) that Zimmer had "no plans at this stage to recall [the Durom Cup]." Compl. ¶ 121.

On May 12, 2008, Zimmer filed its First Quarter 2008 Form 10-Q, which reiterated that Defendants were investigating the high revision rates for the Durom Cup; admitted that "sales of [the Durom Cup] during the remainder of 2008 may be adversely affected as a result of certain reports of unusually high rate of revision"; and indicated that the "matter could result in product liability lawsuits and claims, safety alerts or product recalls which, regardless of their outcome, could have material adverse effects on our business and reputation." Compl. ¶ 122.  Following this news, Zimmer stock dropped from $69.56 to $66.85.[10]

On July 22, 2008, Zimmer issued another press release, announcing that, after "a comprehensive review of clinical experience and product conformance to specifications in the U.S. and Europe," Zimmer was:

> temporarily suspending marketing and distribution of the Durom® Acetabular Component (Durom Cup) in the U.S. on a voluntary basis, while the Company updates labeling to provide more detailed surgical technique instructions to surgeons and implements its surgical training program in the U.S.  The Durom

---

[10]Defendants later detailed the nature of their investigation into Durom Cup problems in a presentation given at the William Blair & Company Growth Stock Conference on June 18, 2008. Compl. ¶ 124.

12

Cup will continue to be marketed without interruption outside the U.S. Compl. ¶ 127.[11]  The press release also stated that Zimmer was "revising its guidance" and that "[a]djusted diluted earnings per share for the full year [were] expected to be in a range of $4.05 to $4.10, as compared prior guidance of $4.20 to $4.25."  Id.[12]  Zimmer's stock declined on July 22, 2008, from $70.88 to $66.01.  Compl. ¶ 128.[13]

According to Plaintiff, throughout the class period, class members were harmed by the decline in Zimmer stock, which was valued at $68.08 on January 28, 2008; reached a high of "more than $79 per share" in early April 2008; and closed at $66.01 on July 23, 2008.  Compl. ¶¶ 146, 155.  Plaintiff's Complaint alleges that Defendants' wrongdoing caused this stock price decline, stating that:

> During the Class Period . . . defendants misrepresented to investors Zimmer's guidance, operations, financial and business conditions by (1) failing to disclose material flaws in the quality systems at the Company's Dover, Ohio

[11]The press release further stated: "While the Company believes the likelihood of currently implanted patients requiring revision is low, Zimmer has sent a letter to U.S. surgeons advising them to stop implanting the Durom Cup, until the updated labeling is issued providing more detailed surgical technique instructions and they receive training."  Compl. ¶ 127.

[12]This press release was preceded by one day by a Credit Suisse analyst report detailing a survey taken of United States surgeons' experiences with the Durom Cup.  Of sixty-one surgeons surveyed, thirty-three had stopped using the device.  Seventeen of these cited Dr. Dorr's letter as a reason for halting use of the Cup, while eighteen cited their own negative experiences with it.  Compl. ¶ 49.

[13]On the following day, July 23, 2008, Defendants held a conference call with financial analysts in which Dvorak stated the following: "As we communicated last night, we have completed an extensive investigation into the performance of the Durom Cup here in the United States . . . . While many US surgeons have had success with the Durom Cup since its launch, a subset have experienced elevated revision rates . . . We will update labeling to provide more detailed surgical technique instructions to surgeons and prepare to implement a comprehensive surgical technique training program for the US."  Compl. ¶ 129.

> manufacturing facility and the resulting product recall and halt in production
> of its OSPs at the Dover facility; and (2) concealing known problems with its
> Durom Cup product, including that patients receiving the Durom Cup
> disproportionately experienced cup loosening and required additional
> corrective surgery. Defendants' false representations and omissions artificially
> inflated Zimmer's stock price and operated as a fraud or deceit on Class-Period
> purchasers of Zimmer securities.

Compl. ¶ 145.

## *Legal Analysis*

Plaintiff's Complaint asserts violations of §§ 10(b) and 20(a) of the Securities

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5

promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R.

§ 240.10b-5.  Compl. ¶ 161.  The standards of review applicable to such claims are drawn

from Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

## I.  *Section 10(b) and Rule 10b-5*

Section 10(b) of the Securities Exchange Act states, in relevant part, that:

> It shall be unlawful for any person, directly or indirectly . . . [t]o use or
> employ, in connection with the purchase or sale of any security registered on
> a national securities exchange . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as the [SEC] may
> prescribe as necessary or appropriate in the public interest or for the protection
> of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b-5, promulgated pursuant to Section 10(b), makes it

14

unlawful:

    (a)    To employ any device, scheme, or artifice to defraud,

    (b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. As the Supreme Court recently reiterated in Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., Rule 10b-5 encompasses only conduct already prohibited by § 10(b) of the Exchange Act, and a private right of action for § 10(b) violations is implied in the words of the statute and regulation. 552 U.S. 148, 155 (2008).

    In order to successfully assert a violation of § 10(b), a plaintiff must allege (and ultimately prove) the following six elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. Id. (citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

## II. Rule 12(b)(6), Rule 9(a), and the PSLRA

    A motion to dismiss filed pursuant to Rule 12(b)(6) – including one in which the

pleading standards are heightened by Rule 9(b) and the PSLRA – requires the Court to treat all well-pleaded facts as true and draw all reasonable inferences from those facts in favor of the plaintiff.  See Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008) (citing Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 506-07 (7th Cir. 2007)).  Federal Rule of Civil Procedure 9(b) governs pleading requirements in fraud actions generally, providing that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed.R.Civ.P. 9(b). This mandated heightened pleading requirement responds "to the great harm to the reputation of a business firm or other enterprise a fraud claim can do."  Borsellino, 477 F.3d at 507 (internal quotation marks omitted).  Therefore, a plaintiff "'claiming fraud . . . must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate.' . . . A complaint alleging fraud must provide . . . 'the who, what, when, where, and how.'"  Id. (quoting Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999)).

        In addition to these particularity requirements of Rule 9(b), the PSLRA further heightens the pleading standard for plaintiffs alleging securities fraud claims.  The Act requires that, if a plaintiff alleges that the defendant either made an untrue statement of material fact or failed to state a material fact necessary in order to keep statements from being misleading, the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  In addition, a plaintiff must, "with respect to each act or omission, . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

### III.  Standing to Challenge Post-Purchase Statements

Before reviewing the sufficiency of Plaintiff's claim pursuant to § 10(b) and Rule 10b-5, we first shall address Defendants' additional contention that the lead plaintiff in this case does not have standing to bring a § 10(b) claim based on statements made after May 2, 2008.  The asserted putative class period in this case extends for the six-months between January 29, 2008 and July 23, 2008; Lead Plaintiff, Plumbers and Pipefitters Local Union 719 Pension Fund, made its final purchase of Zimmer stock on May 2, 2008, more than two months prior to the end of the alleged class period.

Defendants' contention that the lead plaintiff therefore lacks standing to bring claims based on statements made after its final purchases of Zimmer stock relies on the holding in Roots Partnership v. Lands' End, Inc., 965 F.2d 1411 (7th Cir. 1992).  In Roots, the Seventh Circuit held that "post-purchase statements cannot form the basis of Rule 10b-5 liability, because the statements could not have affected the price at which plaintiff actually purchased [the security]."  Id. at 1420.  Further, a plaintiff who has no claim of his or her own based on post-purchase statements "cannot defeat dismissal by purporting to represent the interests of [later] purchasers."  Id.  See also Davis v. SPSS,

17

Inc., 385 F.Supp.2d 697, 705-06 (N.D. Ill. 2005) (relying on Roots in holding that, on a

motion to dismiss, a plaintiff cannot establish liability based on post-purchase statements

because such statements could not have caused the plaintiff's claimed loss); Zerger v.

Midway Games, Inc., 2009 WL 3380653, at *4 (N.D. Ill. Oct. 19, 2009).

   Plaintiff responds arguing that the timing of its stock purchases, relative to the

alleged misrepresentations, bears not on its standing to assert this claim, but rather on the

typicality of Plaintiff's claim in seeking to represent the putative class – an inquiry that,

Plaintiff asserts, is premature at this stage (as no motion for class certification has yet

been filed).  According to Plaintiff, Defendants' statements and omissions were all part of

a "common course of conduct," and that, in such a situation, a lead plaintiff need not be

identically situated to each class member.

   This Court has previously rejected an argument identical to this being advanced by

Plaintiff.  In a prior, similar case, we held that:

> [t]hough the law of other jurisdictions may indeed permit a plaintiff, in some
> cases, to bring a § 10(b) claim based in part on post-purchase statements, e.g.,
> Crowell v. Ionics, Inc. 343 F.Supp.2d 1, 13 (D.Mass. 2004), the Seventh
> Circuit's pronouncement to the contrary in Roots appears to us to be
> unequivocal; moreover, district courts in our circuit have applied Roots even
> in the face of an alleged common course of conduct.  See, e.g., In re Discovery
> Zone Sec. Litig., 169 F.R.D. 104, 112 (N.D. Ill. 1996) (following "the sound
> post-purchase rule established by the Seventh Circuit in Roots").

In re Guidant Corp. Sec. Litig., 536 F.Supp.2d 913, 916 (S.D. Ind. 2008) (Barker, J.).

Accordingly, we retain serious doubts regarding Plaintiff's standing to allege § 10(b)

claims based on alleged misstatements or omissions occurring after Plaintiff's final, May

2, 2008, purchase of Zimmer stock.  However, given our remaining decisions on the

pending motion to dismiss, we shall presume standing and move on to address the merits

of Plaintiff's claims relating to the sufficiency of the alleged misstatements and omissions

occurring during the entire class period.


## IV.  *Plaintiff's Allegations Related to the Dover Facility*

The first allegation in the Complaint asserts that Defendants failed to disclose

material information regarding "quality systems problems" and product recalls associated

with the Dover facility, which omissions rendered a series of statements by Defendants

false and misleading.


### A.  *January 2008 Statements*

The PSLRA requires a plaintiff "to first identify each false or misleading statement

- that is, the plaintiff must identify statements or omissions that are demonstrably capable

of being true or false, as well as the speaker, location, and time the statement was made."

In re Harley-Davidson, Inc. Securities Litig., — F.Supp.2d ----, 2009 WL 3233754, at

*12 (E.D. Wis. Oct. 8, 2009).  Plaintiff begins by identifying Zimmer's January 29, 2008

press release, in which Defendants announced that Zimmer was optimistic about 2008

prospects, with expected "top line sales growth" of 10 to 11% and "earnings per share in

a range of $4.20 to $4.25," all of which took into consideration "expected costs for a

number of ongoing infrastructure and operating initiatives . . . [and] enhancements to . . .

19

quality systems."  Compl. ¶ 106; see also Compl. ¶ 110.  Plaintiff also cites the following

colloquy between a financial analyst and Dvorak occurring during a conference call held

on that same date (January 29, 2008):

> Q:   Do you currently have any issues with the FDA, any warning letters,
>       that usually takes a few months for those to be posted, that they may
>       have been issued or 483'd?
> A:   We don't have any warning letters at this point.

Compl. ¶ 108.

These references, and Plaintiff's citation to other statements made on these dates,

incorporate the who, when, and where of Defendants' January 2008 statements related to

the Dover facility, thereby providing the requisite particularity.


*B. The Materiality of Defendants' Omissions*

Plaintiff contends that Defendants' statements were misleading by omitting the

following information: (1) that Zimmer "had recalled OSPs manufactured at the Dover

facility as late as Dember 2007"; (2) that "the FDA performed a week-long inspection"

and "subsequently issued several 483" Observations; (3) that, by "the end of January,

production had been halted at the Dover facility" and "OSPs from the Dover facility were

on backorder and OSP sales were declining"; and (4) that "the Dover facility was

antiquated."  Compl. ¶ 112.[14]  Plaintiff bears the burden under Rule 9(b) and the PSLRA

---

[14]Despite asserting these "specific" bases of falsehood under the heading "Reasons Why
January Statements Were Materially False and Misleading," Plaintiffs have, to a large degree,
employed a "puzzle pleading" method, which improperly "plac[es] the burden on the Court to

(continued...)

of establishing the materiality of this omitted information.  <u>Stoneridge</u>, 552 U.S. at 155.

"Whether a fact is material and whether a statement omitting it is misleading are closely intertwined.  The more important a fact would be to investors, the more likely its omission will mislead them."  <u>Anderson v. Abbott Labs.</u>, 140 F.Supp.2d 894, 903 (N.D. Ill. 2001).  An omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976); <u>see also</u> <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 232 (1988) (noting that this standard has been expressly adopted for claims arising under Rule 10b-5).  Statements or omissions are not material where they "present or conceal . . . insignificant data that . . . simply would not matter to a reasonable investor."  <u>Parnes v. Gateway 2000, Inc.</u>, 122 F.3d 539, 547 (8th Cir. 1997).  A determination that the content of an omission was immaterial is an "insuperable bar to relief" and an indication that the claim "is properly dismissed."  <u>See</u> <u>In re Amdocs Ltd. Sec. Litig.</u>, 390 F.3d 542, 547 (8th Cir. 2004).

---

[14](...continued)

sort out the alleged misrepresentations and then match them with the corresponding adverse facts.  This method is deficient under the pleading standards."  <u>In re Alcatel Sec. Litig.</u>, 382 F.Supp.2d 513, 534 (S.D.N.Y. 2005) (dismissing a complaint for lack of particularity in which Plaintiffs listed "lengthy quotations from various releases by [Defendants] . . . [followed by] a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false.").

1. The Materiality of the Pulsavac Gun Recall

The Complaint asserts, based on the averments of confidential witnesses, that the Pulsavac Gun was recalled prior to January 2008 because of a contamination problem that had arisen.  See Compl. ¶ 56 (stating that CW1 knew in November 2007 that the Pulsavac Gun, manufactured at Dover, was undergoing contamination problems); ¶ 103 (stating that CW14 became aware of the contamination issue at Dover in late 2007 or early 2008). As discussed in Part IV.C., infra, Defendants acknowledged this fact when they informed the market on April 24, 2008 that the Pulsavac Gun was recalled in December 2007. Compl. ¶ 118.  Despite Defendants' announcement of this recall as well as the recall of other OSPs in April 2008, Plaintiff maintains that Defendants had a duty to make an earlier disclosure of this information, to wit, in January 2008.

A "firm generally has no independent duty to disclose all information that might influence the price of its stock." In re Guidant Corp. Sec. Litig., 536 F.Supp.2d at 927; see also Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 760 (7th Cir. 2007).  In other words, the law does not impose upon publicly traded companies "a system of continuous disclosure."  Gallagher v. Abbott Laboratories, 269 F.3d 806, 808 (7th Cir. 2001) ("[F]irms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose.").

Plaintiff has not pleaded facts or circumstances that would have given rise to a duty on the part of Defendants to disclose this information at all, never mind at an earlier time.  The Complaint does not include facts indicating that the recall of the Pulsavac Gun

22

and other OSPs had serious ramifications for Zimmer's revenue,[15] reputation, or something else that would "matter to a reasonable investor."  Parnes, 122 F.3d at 547. Plaintiff's failure to sufficiently allege that Defendants possessed material information about product recalls prior to their January 2008 public statements undermines the sufficiency of Plaintiff's claim in this regard and requires its dismissal.

2.  The Materiality of Information Related to the FDA Inspection

The Complaint also alleges that Defendants wrongfully omitted material information relating to the January 2008 FDA inspection and the subsequent issuance of 483 Observations.  The substance of Plaintiff's particularized allegations in this context includes the following: (1) at least two confidential witnesses recalled that the FDA inspection of the Dover facility began sometime in January 2008; (2) one witness indicated that the inspection was likely the result of Zimmer's voluntary recall of the Pulsavac Gun; (3) at least one witness believed that senior management at Zimmer was aware of this inspection; and (4), according to one witness, at the end of the inspection, "it was very clear that the Dover facility would receive 483 Observations and possibly [a] warning letter."  Compl. ¶¶ 57-65.  In order to properly plead the materiality of this information, the Complaint must allege with sufficient particularity that the inspection

---

[15]The Complaint indicates that the Pulsavac Gun was one of many OSPs manufactured at Dover, all of which, when taken together with the Durom Cup, constituted a total of six percent of Zimmer's revenue in 2007 and 2008.  Compl. ¶ 20.  Plaintiff offers no convincing rationale for information of such relative insignificance as this triggering a duty of immediate disclosure.

resulted in significant negative consequences which were known to Defendants.

The Complaint attempts to outline the negative consequences of the inspection by referencing the fact that the inspection generated 483 Observations.  Compl. ¶ 57.  However, the Complaint fails to allege specifically that the FDA actually issued these Observations prior to January 29, 2008.  Instead, the Complaint relies solely on an averment by one confidential witness, who stated that he "expected" 483 Observations to issue after the inspection.  See Compl. ¶¶ 57, 58.  This single reference does not sufficiently demonstrate that the anticipated issuance of the 483 Observations constituted a material, negative consequence to Zimmer or that Zimmer was aware of it at the time of the challenged January 2008 statements.[16]

Even if we were to assume that the Complaint successfully pleads that the 483 Observations had actually been issued by January 29, 2008, Plaintiff has not included any averment as to the materiality of the FDA inspection and Observations.  483 Observations are by no means inherently adverse or material.  Anderson, 140 F.Supp.2d at 902.  They may be issued based on a wide variety of conditions, including record-keeping deficiencies and a host of other inadequacies, clerical and otherwise.[17]  See FDA Investigations Operations Manual § 5.2.3.2.1; See, e.g., Fujisawa Pharm. Co., Ltd v. Kapoor, 16 F.Supp.2d 941, 943 (N.D. Ill. 1998) (noting that 483 Observations are merely

---

[16]Moreover, as Defendants hasten to point out, none of Plaintiff's allegations specifies that the FDA inspection actually ended in January, only that it began sometime in January.

[17]By contrast, "warning letters" are issued when an inspection reveals "major deficiencies" at a facility.  FDA Compliance Program Guidance Manual § 7382.845(A)(1)(a).

a preliminary finding); Anderson, 140 F.Supp.2d at 902 (finding that a company had no

duty to disclose a warning letter because there was no allegation that the finding was

significant and comparing this insignificance to earlier 483 Observations); Yanek v. Staar

Surgical, 388 F.Supp.2d 1110 (C.D. Cal. 2005) (holding that omission of knowledge

about 483 Observations was actionable where the Complaint pleaded with particularity

that the observations had, in fact, been issued, the significant substance of those

observations, and the defendants' knowledge of the observations).[18]  Here, the Complaint

provides no information regarding the specifics of the 483 Observations allegedly issued

following the Dover inspection, which deficiency provides as an alternative basis to

conclude that Plaintiff has failed to satisfy the pleading requirements as to the materiality

of the FDA inspection and its consequences.[19]

        Simply put, Plaintiff has not pleaded with the requisite particularity that the FDA

_____

        [18]Plaintiff requests that the Court take judicial notice of seven exhibits, including excerpts
from Zimmer's SEC filings, the FDA Investigations Operations Manual, the website of the
AAHKS, and the website of the FDA Center for Devices and Radiological Health.  Although
Defendants originally opposed Plaintiff's request, their opposition has now been withdrawn.
Plaintiff's request is therefore granted, given that a court in considering a motion to dismiss in
the securities fraud context must assess the Complaint in its entirety, along with all documents
incorporated therein by reference as well as those subject to judicial notice.  Schleicher v.
Wendt, 529 F.Supp.2d 959, 962 n.3 (S.D. Inc. 2007) (Hamilton, J.); Construction laborers
Pension Trust v. Neurocrine Biosciences, Inc., 2008 WL 2052733, at *6 (S.D. Cal. May 13, 2008
) (holding that it was proper to take judicial notice of FDA policies and procedures).

        [19]Because "half-truths" are often actionable in the securities fraud context, See Schlifke
v. Seafirst Corp., 866 F.2d 944 (7th Cir. 1989), Plaintiff's claim focuses in part on Dvorak's
allegedly circuitous answer to an analyst's compound question about both 483 Observations and
warning letters.  See Compl. ¶ 108.  However, as with Defendants' other challenged statements,
this claim fails because the Complaint does not include any particularized allegation(s) as to the
materiality of the 483 Observations.

inspection of the Dover facility resulted in any significant action that was material and that Defendants were obligated to disclose publicly to investors and would-be investors and which Defendants possessed at the time of their January 2008 statements.  Therefore, Plaintiff's claim in the Complaint based on Defendants' omission of this information from their public disclosures must be dismissed.  See Amdocs, 390 F.3d at 547.

3.  The Materiality of the Alleged Halt in Production at Dover

Plaintiff also alleges that there was a halt in production of certain OSPs at the Dover facility, which resulted in an accumulation of backorders and declining sales, and thus constituted additional material information that Defendants possessed and wrongfully omitted from their stock guidance announcements.  According to the Complaint, CW1 asserted that, "after the FDA auditor left in January 2008, production of disposable OSPs was completely shut down at Dover."  Compl. ¶ 58.  CW4, a customer service and billing representative at a Zimmer distributor, stated that, by late 2007, customers were complaining that certain OSP products were unavailable.  Compl. ¶66. Several other employees of Zimmer distributors averred that Zimmer OSPs became unavailable in February or March of 2008.  See Compl. ¶¶ 70, 71, 74, 75, 78, 79.

Plaintiff's pleading of the cessation of production, reflecting the statements of these confidential witnesses, fails to allege with particularity that Defendants were in possession of material information at the time they issued their January 2008 statements. Plaintiff's claim of materiality emanates from the suggestion that, in early 2008, all

production at a major Zimmer manufacturing facility came to a screeching halt. However, a close analysis of Plaintiff's pleading relating to the timing, nature, and significance of these events reveals a critical lack of necessary detail.

For example, the pleading fails to allege with particularity which OSPs had been stalled in production.  It remains entirely unclear from the Complaint what CW1 meant by his/her reference to "disposable" products, and the only information provided by other confidential witnesses vaguely references that "certain products" were unavailable.  Such a vague allegation does not establish the existence of a major stoppage in production.[20] Without some detail as to the nature and magnitude of the cessation of production, the Complaint falls short of the necessary particularity regarding the materiality of Defendants' alleged omissions.  Borsellino, 477 F.3d at 507.

In addition, it is difficult if not impossible to ascertain based on the confidential witnesses' assertions when, precisely, production of the OSPs was actually halted. CW1's statement does not specify the precise time after the auditor left when production shut down.  Moreover, CW4's averment that "certain OSPs" were on backorder in late 2007 is inconsistent with assertions of other confidential witnesses, who stated that these problems actually began months later.  E.g., Compl. ¶ 83.

The Complaint's averments relating to the halt in production are further weakened by the pleading's almost complete reliance upon vague and inconsistent confidential

---

[20]This is especially true in light of the fact that all Dover OSPs and the Durom Cup combined comprised only six percent of Zimmer's business in 2007-2008.  See Compl. ¶ 20.

27

witness assertions.  "[A]llegations from confidential witnesses must be discounted . . .

[and] [u]sually that discount will be steep."  <u>Higginbotham v. Baxter Intern., Inc.</u>, 495

F.3d 753, 757 (7th Cir. 2007).  While we do not entirely discount these allegations, we

note nonetheless that, as laid out in the Complaint, they are inconsistent, uncorroborated,

and vague as to the timing and significance of the alleged cessation of production at

Dover.  As a result, these claims provide a wholly inadequate basis for establishing that

Defendants were aware of material production problems at the Dover facility in January

2008 which they failed to disclose.  Plaintiff's claim relating to the halt in production must

therefore be dismissed for its failure to "describe with [at least] some particularity what

. . . [it is] referring to."  <u>Premier Capital Mgmt., L.L.C. v. Cohen</u>, 2003 WL 21960357, at

*4 (N.D. Ill. Aug. 15, 2003).


4.  The Materiality of "Antiquated Facilities" at Dover

        Finally, the Complaint lacks support for its allegation that the Dover facility was

"antiquated."  Plaintiff cites the testimony of CW2 and CW14 that they were aware, prior

to Defendants' January 30, 2008 statements, that "quality problems" existed at Dover and

that "Zimmer's general approach [was] not to spend money correcting quality defect

issues." Compl. ¶¶ 60-61.  These assertions are simply too vague and attenuated to

withstand the heightened pleading requirements which the Complaint must satisfy.

Lacking the necessary particularity as to the when, where, what, and how the Dover

facility was "antiquated" and afflicted with "quality problems," and as to Defendants'

28

knowledge of or failure to properly disclose those facts, this part of Plaintiff's claim must also be dismissed.  See, e.g., City of Austin Police Retirement System v. ITT Educational Services, Inc., 388 F.Supp.2d 932, 944 (S.D. Ind. 2005) (Hamilton, J.).

For the foregoing reasons, Plaintiff's claims based on Defendants' January 2008 statements must and shall therefore be dismissed.


C.  *Defendants' Statements Made in March and early April 2008*

Plaintiff contends, separately, that statements made by Defendants between January and April 3, 2008, were misleading.  On March 18, 2008, Crines allegedly stated: "[The company has recently undertaken a major investment initiative to upgrade manufacturing quality systems." Compl. ¶ 114.  On April 3, 2008, Defendants elaborated on this announcement, revealing that Zimmer had "conducted a review of quality systems at the Dover . . . facility and initiated voluntary product recalls" and "voluntarily and temporarily suspended production and sales of certain OSP products manufactured at the Dover facility."  Compl. ¶ 115.  Defendants further stated that "[t]hese actions are expected to adversely impact 2008 OSP revenues by $70 to $80 million," and that "[a]dditional detail on the expected impact will be provided during the Company's first quarter investor conference call on April 24, 2008."  Id.

Plaintiff contends that Defendants should at some earlier time have alerted the market as to the fact that conditions at Dover were deteriorating.  Plaintiff cites the previously referenced confidential witnesses' assertions to substantiate its allegation that

throughout this period OSPs manufactured at Dover were becoming increasingly unavailable to distributors and customers.  <u>See</u> Compl. ¶¶ 57-71.  However, as we noted previously, "firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."  <u>Gallagher v. Abbott Labs.</u>, 269 F.3d 806, 808 (7th Cir. 2001).  As discussed in Part IV.B.3 of this ruling, <u>supra</u>, the vague pronouncements of the confidential witnesses do not establish with particularity the unavailability of the OSPs in early 2008 or the materiality of that fact, assuming it has been properly asserted.  These witnesses, all of whom allegedly were employees of Zimmer distributors, lack sufficiently detailed information or knowledge of the product unavailability to support Plaintiff's claim that Defendants should have previously disclosed the anticipated financial impact of quality systems improvements.

Further, as discussed in Part IV.D, <u>infra</u>, Defendants' April 24, 2008 statements revealed that they were in the process of investigating these issues during early 2008.  <u>See</u> Compl. ¶¶ 22, 118.  It is difficult to see how Defendants' decision to investigate quality systems problems further before fully disclosing them in April was improper, never mind actionable.  <u>Higginbotham</u>, 495 F.3d at 760-61 ("Taking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.").

The Complaint lacks any claim that Defendants had a duty to disclose such information.  More critical is the fact that the allegations included in the Complaint simply do not support - in fact, they refute - Plaintiff's contention that Defendants omitted

"known financial impact to investors of the OSP recall and Dover quality systems deficiencies."  Compl. ¶ 119.  According to other factual assertions, Defendants appear to have clearly informed the market on March 18, 2008 that Zimmer was funneling large amounts of capital into making quality systems improvements and, further, Zimmer publicly announced on April 3, 2008 that its "actions [were] expected to adversely impact 2008 OSP revenues by $70 to $80 million."  Nothing in the Complaint claims or otherwise shows that Defendants had reason to believe that the cost-saving measures would be unsuccessful.[21]

Thus, Plaintiff has failed to adequately plead that Defendants failed in their duty to disclose more information than what they provided in their March 18 and April 3, 2008 statements.

## D.  Defendants' Statements Made After April 3, 2008

Finally, Plaintiff contends that Defendants' statements made after April 3, 2008 and extending through to the end of the class period on July 23, 2008 omitted material information.  On April 24, 2008, Zimmer "updated its full year 2008 sales guidance and

---

[21]Plaintiff attempts to show that Defendants should have known that such measures would fail by referencing Zimmer's later stock price decline.  This Court has repeatedly held that such an argument is an impermissible exercise in pleading "fraud by hindsight."  E.g., In re Brightpoint, Inc. Securities Litig., 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001) (Hamilton, J.); see also Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993) (holding that "fraud by hindsight" is not actionable and that temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent).

reaffirmed its earnings guidance," stating that "diluted earnings per share are expected to

be in the same range as previously issued guidance of $4.20 to $4.25" and that "[t]hese

estimates include impact of previously announced actions at the Company's Ohio-based

Orthopaedic Surgical Products operation . . . The Company expects this impact to be

offset by reductions in planned operating expenses, share repurchases and other actions."

Compl. ¶ 116.[22]

> In the conference call held later that day, Dvorak stated,
>
> [W]e had identified a particular recall problem and acted upon that promptly,
> and obviously the problem was much deeper than what we knew at the time
> of the [January] call.  So work was under way, but the scope of that issue had
> not been defined as of the first quarter call.  And so we've reported out on the
> magnitude of that issue as soon as it was defined.

See Compl. ¶ 118.  Dvorak also confirmed that the Pulsavac Gun had been voluntarily

recalled in December 2007, and stated further that:

> There were other recalls subsequent to that event, and as we were rescoping
> those issues, we got deeper and deeper and became more and more concerned
> with some of the fundamental quality systems there, ultimately leading to the
> decision that we announced earlier this month. . . . There was an inspection;
> there were some observations.  We had a third party come in and essentially
> do a wall-to-wall review.

Compl. ¶ 22.

> Dvorak concluded: "While we're clearly disappointed by the OSP situation, we

believe the actions we've taken demonstrate the seriousness with which we take quality

_____

[22]Defendants also reiterated that Zimmer was maintaining its guidance, "after taking into
account the negative financial impact we'll experience as a result of lost sales, inventory losses,
and remediation costs in our OSP business."  Compl. ¶ 117.

systems matters and we're keeping the FDA informed of all of our actions."  Compl. ¶ 117.[23]

Plaintiff essentially contends that the positive stock guidance provided by Defendants as set forth in these statements falsely reassured investors as to the value of Zimmer stock.  According to Plaintiff, Defendants had a duty to disclose, either in the April 24 statement or at some later point, that the Dover issues were serious.  However, this portion of Plaintiff's claim is lacking for the same reasons we determined that Plaintiff's allegation related to Defendants' March and early April 2008 statements was deficient: namely, that the allegations establish that Defendants were, in fact, sufficiently forthcoming and that no material information was withheld by them.

According to the Complaint, and Defendants' submissions, it is clear that Defendants provided fairly extensive information to the market in their April 24 statements by describing the nature and extent of issues occurring at the Dover facility, including the inspection, product recalls, and FDA Observations as well as Zimmer's internal investigation.  Defendants appear to have been appropriately forthcoming, and timely in making their disclosures.  See Higginbotham, 495 F.3d at 760-61. Further, Plaintiff has not identified anything specific that Defendants should have disclosed, alleging only that Zimmer's subsequent stock decline "proved" that Defendants had been hiding material information.  Plaintiff's reliance on Zimmer's subsequent stock decline

---

[23]Although Defendants made general public statements after April 24, 2008, none related to the issues at the Dover facility.

impermissibly pleads "fraud by hindsight." E.g., In re Brightpoint, Inc. Securities Litig., 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001) (Hamilton, J.); see also Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993) .

"Often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false." City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1260 (10th Cir. 2001) (quoting Grossman v. Novell, Inc., 120 F.3d 1112, 1124 (10th Cir. 1997). Plaintiff alleges no convincing basis to support the conclusion that Defendants' statements were false or materially misleading "when made." Id. This deficiency in the Complaint constitutes an "insuperable bar to relief." Amdocs, 390 F.3d at 547.

Accordingly, Defendants' motion to dismiss shall be granted as to Plaintiff's claims relating to the circumstances which allegedly existed at the Dover facility.


## V.  Plaintiff's Durom Cup Allegations

Plaintiff includes in the Complaint a claim based on the omission of information relating to alleged ongoing problems with the Durom Cup, which allegedly rendered Defendants' statements, including its positive stock guidance, misleading.

A.  *Adequacy of Alleged Misleading Statements*

As with its allegations pertaining to problems at the Dover facility, Plaintiff's Complaint successfully identifies Defendants' allegedly misleading "statements or omissions" relating to the Durom Cup, "as well as the speaker, location, and time the statement[s were] made."  Harley Davidson, — F.Supp.2d ----, 2009 WL 3233754, at *12.

However, unlike our analysis of the statements relating to the Dover facility which was organized chronologically, we shall review together all of the challenged Durom Cup statements and the materiality of their omissions.  The Complaint first details a January 30, 2008 conference call, during which Crines admitted that Zimmer had received feedback indicating that the Durom Cup was presenting implantation problems for some surgeons.  Compl. ¶ 111.  Thereafter, during a March 18, 2008 health care conference, Crines acknowledged "challenges and opportunities" with the Durom Cup and reported that Zimmer had instituted a plan to provide "training to orthopedic surgeons."  Compl. ¶ 114.

On May 6, 2008, at another health care conference, Crines stated that, although "many surgeons . . . have had very good clinical results with [the Durom Cup] . . . there have been questions raised by one surgeon in particular in the U.S. concerning high failure rates that he's experienced with about 165 patients," concerns which Crines said Zimmer was taking "very seriously."  Compl. ¶ 120.  Crines further acknowledged that a few French surgeons had experienced implantation problems with the Durom Cup in

2007.  Id.  In a subsequent conference call, Crines announced that Zimmer planned to

investigate the Durom Cup complaints in collaboration with Dr. Dorr and that Zimmer

had "no plans at this stage to recall [the Durom Cup]."  Compl. ¶ 121.

Soon thereafter, on May 12, 2008, Defendants announced that "sales of [the

Durom Cup] during the remainder of 2008 may be adversely affected as a result of certain

reports of unusually high rate of revision" and remarked that the "matter could result in

product liability lawsuits and claims, safety alerts or product recalls which, regardless of

their outcome, could have material adverse effects on our business and reputation."

Compl. ¶ 122.

The allegations in the Complaint satisfy Plaintiff's obligation to specify the

location, speaker, and time of each of the allegedly misleading statements made by

Defendants relating to the Durom Cup during the class period.


*B. Materiality of the Omitted Durom Cup Issues*

According to Plaintiff, "the above-statements were each materially false and

misleading because defendants knew months prior to the issuance of Zimmer's statements

of severe problems with the Durom Cup which would decrease sales and increase

expenses."  Compl. ¶ 113.  Defendants rejoin that the information allegedly available to

them regarding the propensity of the Durom Cup for presenting implantation problems for

certain surgeons in the United States was not statistically significant and therefore not

material.  As explained, we are of the opinion that the Complaint fails to allege that

Defendants were in possession of material information about the Durom Cup at any point during the class period specified in this case.

1.  Materiality in the Medical Device Context

"Medical device and drug manufacturers need not disclose isolated reports of harm suffered by users of their products until those reports provide statistically significant evidence that the ill effects may be caused by - rather than randomly associated with - use of the products and are sufficiently serious and frequent to affect future earnings."  In re Medtronic Inc., Securities Litig., 618 F.Supp.2d 1016, 1023 (D. Minn. 2009) (citations omitted).  Although the Seventh Circuit has not laid out a preferred approach for determining the materiality of omissions of alleged drug and medical device flaws, two decisions handed down by other courts of appeals provide helpful guidance for resolving this issue.

In Oran v. Stafford, the Third Circuit addressed a securities fraud class action in which the plaintiffs claimed that a drug maker "made material misrepresentations and omissions regarding the safety of the drugs while failing to disclose several studies linking the drugs to heart-valve damage."  226 F.3d 275, 279-80.  According to those plaintiffs, the drug maker was aware that several cardiologists had documented heart valve abnormalities in numerous patients, and had received "hundreds of adverse reaction reports" from patients.  Id. at 279.  The drug maker did not immediately release these reports but eventually conceded in a stock guidance announcement that concerns

37

persisted about the drug.  Id. at 280.

The plaintiffs in Oran argued that the drug maker's public statements about the safety, effectiveness, and commercial viability of the drug were misleading, but the Oran Court held that the defendant's omission of information relating to problems with the drug did not render the statements materially misleading because the "plaintiffs never clearly explain[ed] how the accumulation of additional anecdotal data [i.e. the documented cardiologist and patient concerns], short of statistical significance, would have added anything to the disclosures already made."  Id. at 284.

Another oft-cited decision, In re Carter-Wallace, Inc. Securities Litigation, also involved the alleged omission by a drug manufacturer of reports that one of its drugs had led to several deaths.  150 F.3d 153 (2d Cir. 1998).  There, the Second Circuit held that the manufacturer's statements omitting this information were not "materially misleading" and would not be "until [the manufacturer] had information that [the drug] had caused a statistically significant number of . . . deaths and therefore had reason to believe that the commercial viability of [the drug] was threatened."  Id.  As that court later explained, "until a connection between [the drug] and any illness could be made, we would not expect [the manufacturer] to abandon its product on what, at the time, would have been speculation."  In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 42 (2d Cir. 2000).

These two decisions advance the view that materiality in the medical device and drug contexts depends to a large degree on the statistical significance, or conclusiveness, of the negative information available to the manufacturer.  We shall apply this approach

as well in the matter before us, mindful that "[t]he determination of materiality requires

delicate assessments of the inferences a 'reasonable shareholder' would draw from a

given set of facts and the significance of those inferences to him." Siracusano v. Matrixx

Initiatives, Inc., — F.3d ----, 2009 WL 3448282, at *10 (9th Cir. Oct. 28, 2009) (quoting

Basic Inc. v. Levinson, 485 U.S. 224, 236 (1988)).


2.  Plaintiff has not Alleged that Defendants Possessed Material Information

        Plaintiff's Complaint specifies the following support for its claim that the issues

relating to the Durom Cup were material: (1) Dr. Dorr's statements, cited in the *New York

Times* and mentioned by at least two confidential witnesses, accusing the Durom Cup of

having serious flaws, which problems he had reported to Zimmer; (2) concerns expressed

by a few unidentified surgeons, one in the United States and at least two in France; (3)

fourteen complaints relating to the Durom Cup that were filed with the FDA prior to early

2008; (4) Defendants' decision in July 2008 to suspend marketing of the Durom Cup; and

(5) various averments of confidential witnesses to the effect that supervisors, sales

representatives, and senior officers had been made aware of Dr. Dorr's concerns prior to

early 2008.  Compl. ¶¶ 27, 32, 44, 57-65, 85, 88, 92, 95, 100, 101, 105.[24]

        Accepting as true all allegations contained in the Complaint, we nonetheless

_____

[24]Plaintiff contends that the significant impact of Dr. Dorr's concerns on Zimmer stock value when they were first revealed to the market supports an inference that his concerns were significant.  Compl. ¶¶ 34, 121, 150.  However, as we have previously noted, proof of fraud by hindsight based on *post hoc* market reactions is not sufficient.  Brightpoint, 2001 WL 395752, at *3, 18-20.

conclude that Plaintiff has not pleaded with sufficient particularity that, at any time prior to Zimmer's decision to suspend marketing of the of the device in July 2008, <u>see</u> Compl. ¶ 127, Defendants possessed material information relating to problems with the Durom Cup.

a.  Concerns of Dr. Dorr and Other Surgeons

Although Dr. Dorr reported that he had experienced an unusual rate of revision with the Durom Cup, market analysis conducted concurrent to and following receipt of Dr. Dorr's letter casts doubt as to the accuracy of Dr. Dorr's concerns and experiences. <u>See, e.g.</u> Compl. ¶ 150 (Deutche Bank May 4, 2008 Company Alter at 1 ("[I]t's unclear if other surgeons have experienced this problem.")); Compl. ¶ 120 ("There's independent registry data - as an example, the Swedish registry that's tracking over 200 patients and out three and a half years is reporting 99.5% survivorship with this device.").[25]  Even as late as June 2008, analysts were issuing reports reflecting a general perception that Dr. Dorr's findings were inconclusive.  Compl. ¶ 47 (Thomas Weisel Partners June 26, 2008 Analyst Report at 5 ("We have spoken with a handful of surgeons on the topic and overwhelmingly the response has been that Durom is a technically demanding implant

---

[25]Plaintiff contends that the studies conducted in Europe were not relevant to the Durom Cup issues in the United States because of technical differences in use of the device in Europe. However, Defendants were not under any obligation to ascertain and report the inadequacy of such a scientific study.  <u>See, e.g.</u>, <u>Nathenson v. Zonagen, Inc.</u>, 267 F.3d 400, 420 (5th Cir. 2001). Because Plaintiff does not allege that Defendants "fabricated or otherwise disbelieved" this study, their contention in this respect is unavailing.  <u>Medtronic</u>, 618 F.Supp.2d at 1029 (citing <u>In re Sepracor, Inc. Sec. Litig.</u>, 308 F.Supp.2d 20, 36 (D. Mass. 2004)).

and that Dr. Dorr's results are likely an anomaly.")). Compl. ¶¶ 34-35.  This substantially

countervailing data, which was available to Defendants at the time they made their

statements about the product to the public, diminished the significance of the surgeons'

concerns and rendered them immaterial.  In re Elan Corp. Sec. Litig., 543 F.Supp.2d 187,

210 (S.D.N.Y. 2008) ("Even if scientists suspected that [the device] might cause severe

adverse events and Defendants knew of these suspicions, these facts would not have

required Defendants to conclude that these effects were real before such a relationship

was established using accepted statistical methods and standards of proof.").[26]

Defendants' belief that the concerns related to the Durom Cup were not significant

is further evinced by their reaction to Dr. Dorr's letter to the AHHKS.  As one financial

analyst put it, "Our sense is that [Zimmer] was caught off guard by the distribution of the

letter based on our discussion.  The company pointed us towards Swedish and Australian

registry data which demonstrate a generally low revision rate for Durom at 3 years."

Compl. ¶ 36.

Moreover, Plaintiff's reliance on the concern(s) expressed by the other,

unidentified surgeon in the United States is misplaced.  Although this surgeon reportedly

stated that he had experienced a few issues with the Durom Cup, he also stated that he

had nonetheless implanted it over 200 times and planned "to continue using the cup

---

[26]This rationale applies equally to Plaintiff's allegation that Defendants' June 18, 2008
announcement that Zimmer "had no indication that there [were] any issues with patient safety,"
Compl. ¶ 124, was false.  Any indication of safety problems was, at best, inconclusive at that
time.

broadly in his practice."  See Compl. ¶ 44 (June 25, 2008 Cowen & Co. Analyst Rep. at

1-2, 4 (Ex.8)).  His continued use of the Durom Cup diminished the likelihood that he or

the Defendants believed that the problem he had encountered was significant.

     As for alleged complaints made by the French surgeons, the Complaint offers little

factual detail, and certainly does not satisfy the particularity requirement to establish that

the complaints of a few surgeons amounted to some level of "statistical significance."

Furthermore, Plaintiff ignores the reasonable explanation offered by Defendants as to the

nature of these complaints. Although Crines acknowledged that "a couple of surgeons in

France" experienced problems in 2007, he explained that Zimmer was "able to trace these

experiences to issues with the technique that [they] were using."  Compl. ¶ 120.  The facts

set forth in the Complaint thus make clear that this problem - one that Zimmer had

previously addressed - was, indeed, not significant.

     Plaintiff has not asserted facts to demonstrate that the concerns expressed by Dr.

Dorr and other surgeons were statistically significant or in any way conclusive.  These

allegations in the Complaint do not suffice to establish the materiality of Defendants'

omissions.

b.  Patient Complaints to the FDA

     Plaintiff's reliance on the fact of there having been fourteen FDA complaints is

also entirely inconclusive.  For such an allegation to properly assert that such problems

amounted to a material issue requiring disclosure, the Complaint must include facts

indicating that such complaints, in number and type, were an anomaly.  Gaines v. Guidant

Corp., 2004 WL 2538374, at *10 (S.D. Ind. Nov. 8, 2004) ("At the very least, Plaintiffs

would need to muster some facts concerning the rate of complications for patients

undergoing conventional surgery.").  Because Plaintiff has not alleged any facts

substantiating that the FDA complaints about the Durom Cup were anomalous or at all

out of the ordinary, this allegation does not support a finding of materiality.

The nature and infrequency of these reports fall short of establishing their

statistical significance, and does not advance Plaintiff's efforts to plead the materiality of

the information possessed by Defendants.  See Oran, 226 F.3d at 279-80 (holding that

hundreds of such reports were statistically insignificant on the facts presented in that

case).  Therefore, even assuming the truthfulness of these facts, they do not support a

conclusion that a material problem existed.

c.  Defendants' Suspension of Durom Cup Marketing

Finally, Plaintiff seems to suggest in the Complaint that Defendants' voluntary

decision to suspend the marketing of the Durom Cup in the United States confirmed

Defendants' belief, held throughout the class period, that the product was flawed.  Once

again, Plaintiff's argument is based on a claim of fraud by hindsight, which of course is

impermissible.  See Brightpoint, 2001 WL 395752, at *3.  Nothing in the Complaint

demonstrates that Defendants knew at any time prior to July 2008 that they would

subsequently suspend marketing of the Durom Cup.  Based on the facts as alleged in the

Complaint, it is clear that at no point prior to the July 2008 decision to suspend marketing of the Durom Cup were Defendants in possession of material information that they were required to disclose. Gaines, 2004 WL 2538374, at *10 ("Although the facts asserted by Plaintiffs do indicate that [the product] presented certain complications, that fact alone is not sufficient to support a securities fraud action.").[27]

In fact, from our review it appears that Defendants did not hide the Durom Cup issues from the market. They referred to surgeon complaints as early as January 30, 2008 and in nearly every public statement made during the class period. That they did not evaluate and detail each peripheral facet of their experience with the Durom Cup is not grounds for securities fraud liability. E.g., Anderson, 140 F.Supp.2d at 903 (holding that a firm is not required "to disclose every tangentially related fact that might interest investors, only those that are sufficiently important"). Contrary to Plaintiff's contention that firms have an absolute duty to disclose all information material to stock prices as soon as such news comes into their possession, "[t]he securities laws do not impose such an obligation of absolute and instantaneous disclosure." Gaines, 2004 WL 2538374, at *17.

Here, the Complaint simply does not allege with the requisite particularity that Defendants were aware of a "statistically significant" problem with the Durom Cup, nor

---

[27]Furthermore, based on the facts alleged, the suspension was voluntary and was expressly tied to the need for physician training. Nothing in this allegation avers that the Durom Cup was actually flawed.

does it point to any other indicia of materiality.  Because Plaintiff's allegations do not

demonstrate that the "undisclosed information was a serious threat to [Zimmer's] earnings

so as to require disclosure," Medtronic, 618 F.Supp.2d at 1026 (quoting Elan, 543

F.Supp.2d at 210), Defendants' challenged statements are not actionable, and the

Complaint's claims related to the Durom Cup must therefore be dismissed.


## VI.  The Complaint's Allegation of Scienter

In addition to its other failures and omissions, the Complaint also fails to include

particularized facts sufficient to create a "strong inference" of scienter.  As previously

noted, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind."  15 U.S.C. §

78u-4(b)(2).  See also Higginbotham, 495 F.3d 753, 756 (7th Cir. 2007) (describing the

requisite scienter under the PSLRA as "an intent to deceive, demonstrated by knowledge

of the statement's falsity or reckless disregard of a substantial risk that the statement is

false"); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (defining

scienter as "a mental state embracing intent to deceive, manipulate, or defraud") (citation

omitted)).  Recklessness may be considered "an extreme departure from the standards of

ordinary care . . . to the extent that the danger was either known to the defendant or so

obvious that the defendant must have been aware of it."  Makor Issues & Rights, Ltd. v.

Tellabs, Inc., 513 F.3d 702, 704 (7th Cir. 2008) (quoting In re Scholastic Corp. Sec.

Litig., 252 F.3d 63, 76 (2nd Cir. 2001)).  However, in analyzing "forward-looking"

45

statements, the Seventh Circuit requires actual knowledge of falsity, rather than "[mere] indifference to the danger that a statement is false."  Id.

In Tellabs, the Supreme Court reversed the Seventh Circuit's previous interpretation of the term "strong inference" – which held that the scienter requirement would be met if a complaint "allege[d] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent," 551 U.S. at 313 – ruling that it did not capture the strict demands of the PSLRA.  In that regard, the Supreme Court reasoned:

> It does not suffice that a reasonable fact-finder plausibly could infer from the complaint's allegations the requisite state of mind.  Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.  *To qualify as "strong" within the intendment of [the PSLRA], we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.*

Id. at 313-14 (emphasis added).

In determining scienter, "courts must consider the complaint in its entirety," as well as judicially noticed documents and documents incorporated by reference into the complaint; "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Id. at 323.  "Many factors can be relevant in evaluating allegations of scienter depending on the circumstances."  Schleicher v. Wendt, 529

46

F.Supp.2d 959, 971 (S.D. Inc. 2007) (Hamilton, J.).  Plaintiff contends that four

allegations in the Complaint reinforce a strong inference of scienter in this case: (1)

Defendants' knowledge based on their executive positions at Zimmer; (2) the link

between Defendants' compensation and Zimmer's earnings; (3) Defendants' Sarbanes-

Oxley Certification; and (4) Zimmer's stock repurchases.  We address each in turn below.


A.  *Defendants' Knowledge as Executives at Zimmer*

"One of the classic fact patterns giving rise to a strong inference of scienter is that

defendants published statements when they knew facts or had access to information

suggesting that their public statements were materially inaccurate."  Florida State Bd. of

Admin. v. Green Tree Financial Corp., 270 F.3d 645, 665 (8th Cir. 2001).  Plaintiff's

primary scienter allegation conforms to this pattern: according to the Complaint, a strong

inference of scienter may be drawn from Defendants' knowledge of problems at Dover

and with the Durom Cup.  Plaintiff's allegations in this regard include, first, that

Defendants' knowledge may be inferred from their executive positions, and, second, that

Defendants' actual knowledge may be based on the recitals of certain confidential

witnesses.

Plaintiff's first argument, that knowledge may be inferred from Dvorak and

Crines's executive positions, is unavailing.  Although, as Plaintiff points out, "[o]fficers

of a company can be assumed to know of facts critical to a business's core operations or

to an important transaction that would affect a company's performance,"  Schleicher, 529

47

F.Supp.2d at 974, "[a] pleading of scienter may not rest on the inference that defendants must have been aware of [information] based on their positions within the company." Abrams, 292 F.3d at 432. Indeed, "respective positions within the company prove nothing about fraud or knowledge thereof but rather are exactly the type of generalized allegations the court must disregard under the" PSLRA. In re Patterson, Inc. Sec. Litig., 479 F.Supp.2d 1014, 1032 (D. Minn. 2007) (citations omitted). Plaintiff has not alleged that the Durom Cup and OSPs were "critical" to Zimmer's "core operations," so no inference of scienter may be permissibly drawn from Defendants' positions in the company.

Plaintiff must allege facts indicating that Defendants were actually aware of some serious problem. Plaintiff relies upon the following three confidential witness statements: CW14's assertion that he believed the problems were brought to Dvorak's attention by the quality assurance department at Zimmer, Compl. ¶¶ 102-103; CW2's recollection that he heard about problems at Dover in a management meeting, Compl. ¶ 59; and CW11's general assertion that Dr. Dorr communicated his concerns to Zimmer. Compl. ¶ 92. Plaintiff also cites the statement in the *New York Times* article that Dr. Dorr had informed a Zimmer engineer of his negative Durom Cup experience sometime in 2007. Compl. ¶ 131.

However, none of these allegations suffices to meet the PSLRA's demanding pleading requirements regarding scienter. Plaintiff must allege actual knowledge by the defendant, not some second-hand belief that such knowledge existed, see Austin, 388

F.Supp.2d at 949, and Plaintiff has alleged no such first-hand actual knowledge.  Second, as

discussed concluded in Parts IV and V, <u>supra</u>, even if Defendants had been made aware

by Dr. Dorr and quality assurance that these problems were occurring, the information

given to them or otherwise available to them was isolated and immaterial.  Because the

Complaint does not specify any contact or communication between any confidential

witness and any of the Defendants, nor does it include any allegation that any individual

Defendant had been actually aware of any material information, Plaintiff cannot rely on

Defendants' implied knowledge to establish a strong inference of scienter.[28]


### B.  Defendants' Compensation Structure

Plaintiff also attempts to plead scienter based on Defendants' individual

compensation structures, describing in detail the link between Dvorak's and Crines's

salaries and Zimmer's overall earnings.  <u>See</u> Compl. ¶¶ 135-137.  "[M]otive and

opportunity are generally relevant to a fraud case, and a showing of unusual or heightened

motive will often form an important part of a complaint that meets the . . . standard."

<u>Green Tree</u>, 270 F.3d at 660; <u>see also</u> <u>In re JPMorgan Chase & Co. Sec. Litig.</u>, 2007 WL

4531794 (N.D. Ill. Dec. 18, 2007).  However, "motives generally held by all corporate

officers and directors are insufficient to establish a strong inference of scienter."

--------------------------------------------------

[28]For these same reasons, Plaintiff also fails to establish Zimmer's corporate scienter.
<u>See</u> <u>Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.</u>, 365 F.3d 353, 366 (5th Cir. 2004)
(holding that, in determining corporate scienter, a court must look to the scienter of individual
corporate officers).

Medtronic, 618 F.Supp.2d at 1036-37; see also " Schleicher, 529 F.Supp.2d at 972 (holding that a plaintiff "cannot adequately allege scienter based merely upon factors that would be true for nearly all corporate executives").  In other words, "merely pleading 'that a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate value or earnings.'" Horizon Asset Management Inc. v. H & R Block, Inc., 580 F.ed 755, 766 (8th Cir. 2009) (quoting Kushner v. Beverly Enterprises, Inc., 317 F.3d 820 (8th Cir. 2003).

Plaintiff has not alleged that Defendants were, in fact, motivated by their compensation structure to obfuscate;  neither was there anything "unusual" about Defendants' situations that would give rise to a finding that they had a heightened motive to act with scienter in their public statements regarding stock values or the soundness of their products.  Therefore, Plaintiff cannot rely on this as a basis for establishing the required strong inference of scienter.  See, e.g. Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (holding that scienter cannot be pleaded on the basis that "defendants were motivated to defraud the public because an inflated stock price would increase their compensation").[29]

---

[29]Similarly, Plaintiff's barebones allegation that Defendants were motivated to withhold the information to benefit Zimmer is unavailing.  See Schleicher, 529 F.Supp.2d at 972 (citing Cutsforth v. Renschler, 235 F.Supp.2d 1216, 1250 (M.D. Fla. 2002) (holding that an "allegation that defendants fraudulently inflated the stock price to benefit the company has no force since it would seem to apply to just about every case")).

*C. Defendants' Sarbanes-Oxley Certifications*

Thirdly, Plaintiff contends that an inference of scienter may properly be drawn from Zimmer's 2007 Form 10-K and Sarbanes-Oxley Act of 2002 § 302 certifications, by which Defendants certified that Zimmer's financial statements and guidance contained no untrue assertions.  ¶¶ 138-141.  An error in a Sarbanes-Oxley certification is insufficient by itself to support an inference of scienter.  Ley v. Visteon Corp., 543 F.3d 801, 812 (6th Cir. 2008).  "[I]f an allegation that a mandatory Sarbanes-Oxley certification was later proved to be inaccurate is sufficient to give rise to the requisite strong inference, 'scienter would be established in every case where there was an accounting error or auditing mistake by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.'"  In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 248 (8th Cir. 2008) (quoting Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 555 (5th Cir. 2007)); see also Roth v. OfficeMax, Inc., 527 F.Supp.2d 791 (N.D. Ill. 2007).  Plaintiff's argument in this respect is also lacking.

The allegation must include a link between the error and intentional falsity on Defendants' part.  Plaintiff provides no such convincing rationale.  Without such a link, Defendants' Sarbanes-Oxley certifications cannot be viewed as creating a strong inference of scienter.  Ley, 543 F.3d at 812.

D. *Considerations Diminishing an Inference of Scienter*

Besides the inadequacy of the three afore-discussed bases for inferring scienter (the knowledge of Zimmer executives, their compensation structures, and the Sarbanes-Oxley certifications), at least three other considerations weigh significantly against an inference of scienter on the part of Defendants.  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  Tellabs, 551 U.S. at 323.  The first such opposing inference arises from the relative insignificance of the products involved in this case, which, when combined, accounted for a mere six percent of Zimmer's worldwide business during the period in question.  Moreover, Zimmer's decision to suspend marketing of the Durom Cup in the United States lasted for less than one month, causing a revised earnings per share prediction of less than five percent.  The "small scale" of these claims strongly weighs against an inference of scienter.  Schleicher, 529 F.Supp.2d at 971 (citation omitted).

A second opposing inference arises from the investigations conducted by Zimmer into developments pertaining to the Durom Cup and the Dover facility.  The fact of these investigations as well as their thoroughness bely Plaintiff's claim that Defendants sought to downplay and hide the problems when they occurred relating to these two revenue sources.  The inference against scienter becomes even more "cogent and . . . compelling" given the fact that Defendants made a timely disclosure of the results of these investigations.  Tellabs, 551 U.S. at 315; see also Higginbotham, 495 F.3d at 760.

52

Finally, the evidence discloses, without controversy, that Zimmer engaged in an extensive stock repurchase program during the class period.  In the months leading up to July 2008, Zimmer repurchased 8.8 million shares of its own stock at an average price of $72.64 per share.  See Compl. ¶ 132.  Plaintiff attempts to construe this action as proof of Defendants' malicious intent, arguing that the stock repurchase was intended to further inflate Zimmer stock further, but we view such an inference as that as contrary both to controlling legal principles and common sense.  "[S]tock repurchase programs actually _negate_ a finding of scienter."  In re Tibco Software, Inc., 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006); Mathews v. Centex Telemanagement, Inc., 1994 WL 269734, at *8 (N.D. Cal. June 8, 2994) ("It would have made no sense to purchase [the] stock if defendants knew the prices to be inflated.").  Plaintiff's inability to establish that Defendants' actions were deceitful or contrary to common sense, based on Zimmer's stock repurchase program, negates any inference of scienter.  See DiLeo v. Ernst & Young, 901 F.2d 624, 629 (7th Cir. 1990) ("One who believes that another has behaved irrationally has to make a strong case.").

Plaintiff's allegations, considered individually and together, do not support the required strong inference of scienter.  Defendants' executive positions at Zimmer, the relative economic insignificance of the OSPs and the Durom Cup to Zimmer's overall business, the lack of an allegation or evidence supporting showing Defendants' access to, or actual knowledge of, material information, Defendants' compensation structure, and Zimmer's stock sales and repurchases, jointly or severally fall short of establishing a

53

reasonable or strong inference of scienter.  See Green Tree, 270 F.3d at 660.  The

Complaint's failure in this regard provides an alternative basis for its dismissal.


## VII.  Motion for Oral Argument

Defendants requested oral argument for the purpose of clarifying the issues before

the Court.  Because the written submissions by the parties were adequately developed, the

Court was able to make the necessary rulings without need of oral arguments.


## VII.  Conclusion

Having carefully considered the parties' arguments relating to the sufficiency of

Plaintiff's Complaint, we are persuaded that it does not satisfy the particularity

requirements of either Rule 9(b) and the PSLRA.  Accordingly, Defendants' Motion to

Dismiss is GRANTED.  Defendants' Motion for Oral Argument is also DENIED.  A final

judgment without prejudice shall issue in accordance with this opinion.  Plaintiff is

allowed 45 days within which to seek leave to amend its Complaint to conform to these

rulings.  Failure to do so within the allotted time shall result in the entry of final judgment

with prejudice.

IT IS SO ORDERED.

Date: _12/01/2009_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Sayad Ashar Ahmed
COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
aahmed@csgrr.com

Matthew Thomas Albaugh
BAKER & DANIELS - Indianapolis
matthew.albaugh@bakerd.com

Jill M. Baisinger
MORGAN LEWIS & BOCKIUS LLP
jbaisinger@morganlewis.com

Luke  Brooks
COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
LukeB@csgrr.com

Troy S. Brown
MORGAN LEWIS & BOCKIUS LLP
tsbrown@morganlewis.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

James H. Ham III
BAKER & DANIELS - Indianapolis
jhham@bakerd.com

Karen Pieslak Pohlmann
MORGAN LEWIS & BOCKIUS LLP
kpohlmann@morganlewis.com

Willow E. Radcliffe
COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
wradcliffe@csgrr.com

Marc J. Sonnenfeld
MORGAN LEWIS & BOCKIUS LLP
msonnenfeld@morganlewis.com

Paul A. Wolfla
BAKER & DANIELS - Indianapolis
paul.wolfla@bakerd.com