UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: ZIMMER HOLDINGS, INC., SECURITIES, DERIVATIVE AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | ) ) ) ) ) | Master File No. 1:09-ml-06000-SEB-DML MDL No. 2055 |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| PLUMBERS AND PIPEFITTERS LOCAL UNION 719 PENSION FUND AND CARPENTERS PENSION FUND OF WEST VIRGINIA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) ) | 1:08-cv-1041 SEB-DML |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE |
| ZIMMER HOLDINGS, INC., DAVID C. DVORAK AND JAMES T. CRINES, | ) ) ) | FEDERAL SECURITIES LAWS |
| Defendants. | ) ) ) | CLASS ACTION DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................1

II. JURISDICTION AND VENUE ........................................................................7

III. THE PARTIES.....................................................................................................7

IV. CONFIDENTIAL WITNESSES CONFIRM DEFENDANTS' FRAUDULENT CONDUCT .................................................................................................9

V. MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD....................................................................................35

    A. In January 2008 Defendants Issued False Guidance, Touted Its Quality Systems, Minimized Severe Issues with Its Durom Cup by Concealing Defective Quality Systems and Clinical Failure of Its Durom Cup Hip and Misled Investors in Response to Direct Question Regarding FDA Investigation Issues................................................................................36

    B. Reasons Why Defendants' January 2008 Statements Were Knowingly Materially False and Misleading When Issued......................................41

        1. 2008-09 Guidance Based On Quality System Deficiencies, FDA Issues and 483 Observations....................................................41

        2. Guidance Impaired By Durom Cup Defects...............................55

    C. In March and April 2008, Defendants Misled Investors by Issuing False Guidance; Announcing Zimmer's Quality System Upgrades, Subsequent Recalls and Suspension of OSPs, as Well as Challenges with the Durom Cup, Without Revealing the FDA Observations at Dover, the Known Defects with the Durom Cup or the Full Financial Impact of These Adverse Events on Zimmer ...............................................................70

    D. Reasons Why Defendants' March and April 2008 Statements Were Knowingly Materially False and Misleading.........................................74

        1. Guidance Based on Quality Deficiencies ...................................74

        2. Guidance Based on a Defective Durom Cup ..............................77

    E. Defendants Deliberately Misled Investors in May and June 2008 About Zimmer's Financial Condition and the Timing and Scope of Warnings About the Durom Cup, Including the Known Patient Safety Risks .....79

    F. Reasons Why Defendants' May and June 2008 Statements Were Knowingly Materially False and Misleading.........................................83

**Page**

G.      The End of the Class Period..................................................................................89

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER............................................................98

VII.   LOSS CAUSATION/ECONOMIC LOSS .....................................................................102

VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE
       MARKET DOCTRINE ...............................................................................................107

IX.    NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS'
       STATEMENTS.............................................................................................................108

X.     CLASS ACTION ALLEGATIONS ...............................................................................109

XI.    CLAIMS .......................................................................................................................109

XII.   PRAYER FOR RELIEF ...............................................................................................111

XIII.  JURY DEMAND ..........................................................................................................112

**Page**

## I.    INTRODUCTION

1.    Court-appointed lead plaintiff Plumbers and Pipefitters Local Union 719 Pension Fund and plaintiff Carpenters Pension Fund of West Virginia bring this federal securities class action pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 on behalf of themselves and all persons who purchased or otherwise acquired the common stock of Zimmer Holdings, Inc. ("Zimmer" or the "Company") between January 29, 2008 and July 22, 2008 (the "Class Period"), against Zimmer and its Chief Executive Officer ("CEO") David C. Dvorak ("Dvorak") and Chief Financial Officer ("CFO") James T. Crines ("Crines").

2.    Zimmer designs, develops, manufactures and markets reconstructive orthopedic implants, including hip implants and orthopedic surgical products ("OSPs") related to its implants. Under the intense scrutiny of analysts and the investing public as a result of disappointed investors in 2007, defendants announced on January 29, 2008 false and misleading guidance of adjusted earnings per share ("EPS") of $4.20 to $4.25 for 2008 and false double-digit sales growth for 2008/2009, which exceeded analyst expectations and drove Zimmer's stock price up from $68.08 to $77.03, an increase of 13% for the day.  Defendants, however, knew the guidance could not be met because of substantial revenue losses and expenses stemming from Zimmer's defective U.S. hip replacement product, the Durom Acetabular Component ("Durom Cup"), and the halt of production of OSPs at Zimmer's Dover, Ohio ("Dover") facility.

3.    Analysts openly challenged the soundness of defendants' guidance on a conference call held the same day.  In response, defendants repeatedly assured investors that their guidance was solid, telling the market that: (i) their guidance was based on an "assessment of the market and the opportunities and risks that could impact [Zimmer's] performance;" (ii) the goals were not

Page

aspirational but goals they expected to "meet or exceed;" (iii) defendants had gone "through an extremely methodical process to put [the] 2008 plan together;" and (iv) defendants "had the opportunity to go through a very detailed review of [Zimmer's] business unit and corporate operating plans" before issuing the guidance.  Defendants also falsely touted to the market Zimmer's investment in and commitment to "quality systems" specifically telling the market that "investing today in the infrastructure needed to serve the health care market of the future will generate attractive returns in the years to come."  Defendants' repeated affirmation of the reasonableness of Zimmer's guidance underscores the extent of their scheme to defraud investors.

4.     Instead of the "quality systems" that defendants led investors to believe would generate solid returns, defendants knew at least five days before their statements as evidenced by percipient witnesses and an FDA Establishment Inspection Report ("the FDA Report"), a copy of which is attached hereto as Exhibit A, that their failure to invest in Zimmer's antiquated systems had already resulted in multiple recalls and production halts of OSPs as a result of an FDA inspection of Zimmer's Dover facility.[1]  The FDA Report unequivocally demonstrates that defendants knew of "significant deficiencies" in Zimmer's quality systems, which had led to 483 observations (*i.e.* findings that the products were injurious to health) [2] by the FDA prior to January 29, 2008; the very

---

[1]     Under federal regulations a recall "is a firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers. . . ." 21 C.F.R. §7.3(g).  Recalls which are initiated by a manufacturer (*i.e.*, voluntary) involve products which are "subject to legal action, e.g. seizure."  21 C.F.R. §7.46.

[2]     A 483 observation is the FDA's mechanism for notifying "top management" of "significant objectionable conditions, relating to products and/processes, or other violations of the FD&C Act and related Acts (see IOM 5.2.3.2) which were observed during the inspection."  FDA Inspections Operations Manual at 216-17, attached hereto as Ex. D.  Observations are a result of FDA findings of a product or conditions which would cause a product to be "adulterated or rendered injurious to health."  *Id.* at 217.

Page

systems defendants were telling the market on January 29 would generate "attractive returns." Numerous witnesses and defendants' own belated admissions confirm defendants' possession of material adverse information about the defective systems at Dover, and the adverse financial impact they would have on Zimmer, prior to defendants' statements.  Thus, defendants knew that they could not achieve the announced guidance and that Zimmer's earnings and growth expectations would be negatively impacted in 2008 by a minimum of $0.18-$0.20 EPS or revenue of $70-$80 million, and Zimmer would lose customers to other competitors who did not have defective products.

5.     Defendants' knowledge of the severe deficiencies in Zimmer's quality systems that were observed by the FDA and had already prompted multiple recalls, including the recall of Zimmer's highest volume OSP, the Pulsavac Plus Wound Debridement System Fan Spray Gun ("Pulsavac Gun"), as well as production halts, at the time of their statements is established by the following facts: (i) defendant Dvorak deliberately chose not to invest in quality systems because of the need to minimize expenses to generate earnings as a result of the failure to meet financial targets; (ii) defendant Dvorak and other top Zimmer corporate management had a live feed transcript of Zimmer's communications with the FDA during the inspection from Dover transmitted to their office computers which informed them of 483 observations given throughout the inspection; (iii) defendant Dvorak hired a specialist to avoid expected FDA warning letters which he was concerned Zimmer might receive; (iv) defendant Dvorak was updated at least every other day, if not daily, about the FDA inspection of its systems at Dover by an unprecedented audit team assembled by Zimmer's corporate office; and (v) the observations and communications of significant deficiencies in the quality systems at Dover, including 483 observations by the FDA led Zimmer to recall multiple additional products to appease the FDA.

6.      The egregious nature of defendants' efforts to conceal Zimmer's antiquated and deficient systems is highlighted by defendant Dvorak's outright lie in response to inquires regarding the state of Zimmer's quality systems.  On the January 29, 2008 conference call, defendants were directly asked by an analyst whether Zimmer had any "issues with the FDA, any warning letters . . . or [483 observations]," defendant Dvorak responded falsely, "[w]e don't have warning letters at this point."  Defendant Dvorak's response was deliberately misleading in the face of a direct question about 483 observations regarding deficiencies in Zimmer's quality systems.  483 observations are issued by the FDA only when it finds "significant objectionable conditions."  Dvorak was updated regularly by the direct reports he received as well as by real-time transcripts informing him of the FDA's 483 observations, and the resulting recalls and halted product production – the very FDA issues and observations he denied in the face of a direct question.  Indeed, when analysts later learned of the recalls at Dover, they questioned the lack of disclosures by defendants on the January 29 conference call and described the Dover quality system deficiencies as a "major headwind" for the Company.

7.      Likewise, defendants knew months prior to their January 29, 2008 reported guidance of double-digit sales growth and adjusted EPS of $4.20-$4.25, that they could not rely on sales of Zimmer's U.S. Durom Cup to generate earnings or growth because they were warned about substantial defects by Zimmer's multi-million dollar consultant, Dr. Lawrence Dorr, who collaborated in development of the Cup and who Zimmer cites as a Clinical Technology Reference for implanting the Cup.  Despite this knowledge, defendants misleadingly minimized any concerns about the Durom Cup by giving half-truth assurances to investors on January 30, 2008 that there were "some challenges" with respect to surgical technique related to the Durom Cup.  At the time, defendants were well aware that the warnings of Dr. Dorr regarding defects with the Durom Cup,

Page

because of his prominence and expertise (which they relied on), would result in decreased sales of the Cup and harm to the Company's reputation, as well as impacting its bottom line.

8.      Dr. Dorr informed his colleagues on April 22, 2008 of the unusually negative clinical experiences that he and others had encountered with the Durom Cup and Zimmer's refusal to pull it from the market despite having done no investigation of his warnings and having done no clinical trials; which defendants would later claim they took "seriously."  Only when Dr. Dorr told his fellow surgeons that he and his colleagues had encountered patient pain and an unusually high revision rate with the Durom Cup and he believed it to be defective based on his considerable experience and expertise, did defendants create a "crisis team" to handle the situation – a team charged with finding support for defendants' claim that the product was not defective and that the problem was with surgeon technique.  Importantly, no "crisis team" was formed or any other action taken in 2007 when Dr. Dorr informed defendants of the same negative clinical experiences and recommended that Zimmer recall the Durom Cup and were deflecting surgeon inquiries about problems with the Cup. In fact, Zimmer throughout 2007 told other surgeons that it had not received any complaints about the U.S. Durom Cup, despite the fact that they had.  Having not acted for months upon receiving the substantial warnings about defects with the Durom Cup, which defendants admit were "very" serious and witnesses aver should have been investigated promptly, defendants' announcement of an investigation in May 2008 only serves to corroborate the importance of the information defendants knew but concealed in 2007 to Zimmer's business and finances.

9.      Defendants' scheme to defraud investors *by leading them to believe that Zimmer's products and operations would generate solid returns and growth when, in fact, they knew of material defects in its operations and products* continued; defendants' first priority being to "meet or exceed" guidance.  On March 18, 2008, well after the FDA inspection at Dover, product recalls

and a complete shutdown of the manufacturing of these products, defendants falsely announced that it had "undertaken a major investment initiative to upgrade manufacturing quality systems . . . to take full advantage of the growth opportunities that we see in [the] market. . . ."  This statement was utterly false.  Defendants concealed the internally known significant quality deficiencies at its Dover facility observed by the FDA two months earlier.   Additionally, as detailed by four separate witnesses and at least two surgeons, defendants were also well aware of unusually high rates of revision surgery required by the Durom Cup and that two surgeons (Drs. Dorr and William Long) had told Zimmer the product was defective.  Thus, when defendants told investors on March 18, 2008 that the Durom Cup had "some challenges and opportunities" and that Zimmer was going to "address some design differences" with respect to the Durom Cup, the statements were deliberately misleading because they omitted material information known to defendants.

10.     Similarly, defendants' April 2008 statements were also false and misleading because they omitted critical information required to provide investors with an accurate picture of Zimmer's financial condition and earnings potential.  For example, defendants, on April 24, 2008, reaffirmed Zimmer's prior guidance issued on January 29, 2008 of adjusted EPS of $4.20 to $4.25 and sales growth of 10%-11%, while also announcing an $0.18-$0.20 EPS hit related to the quality deficiencies at its Dover facility, falsely claiming that the issues with respect to the facility were not known on January 29, 2008 and that Zimmer would achieve the January 29, 2008 guidance as a result of offsetting factors.  In fact, defendants knew of the Dover quality deficiencies prior to January 29, 2008 and that the Company's guidance could not be met as a result of the OSP issues and the reported Durom Cup defects.  Defects which had been reported by Dr. Dorr to the Company in 2007 and to other doctors two days prior to the conference call, and that would cause sales of the Durom Cup and Zimmer's corresponding market share to plummet.  Indeed, there already was a

**Page**

noticeable 75% drop in sales of the Durom Cup by this time, as reported by a confidential witness and corroborated by analysts.  Not until July 22, 2008 would defendants lower earnings by $0.15 to $4.05-$4.15 and sales growth from 10-11% to 8.5-9.5% and announce the suspension (*i.e.*, recall) of the U.S. Durom Cup.  On this news, Zimmer's stock decreased to $66.01, more than 17% below its Class Period high.

## II.    JURISDICTION AND VENUE

11.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

12.    Venue is proper here pursuant to §27 of the Exchange Act.  Acts and transactions giving rise to the violation of laws complained of occurred in this District.

## III.    THE PARTIES

13.    Lead plaintiff Plumbers and Pipefitters Local Union 719 Pension Fund purchased Zimmer common stock as described in the certification attached hereto and filed with the Court on August 5, 2008 and was damaged thereby.

14.    Plaintiff Carpenters Pension Fund of West Virginia purchased Zimmer common stock as described in the certification attached hereto and was damaged thereby.

15.    Defendant Zimmer is headquartered in Warsaw, Indiana.  Zimmer designs, develops, manufactures and markets reconstructive orthopedic implants, including joint, dental and spinal implants, trauma products and related OSPs designed to aid in orthopedic surgical procedures.  The Company's primary customers include musculoskeletal surgeons, neurosurgeons, oral surgeons, dentists, hospitals, distributors, healthcare dealers and, in their capacity as agents, healthcare purchasing organizations or buying groups.  Zimmer markets and sells its products through three principal channels: (1) directly to healthcare institutions, such as hospitals, or direct channel

Page

accounts; (2) stock distributors and healthcare dealers; and (3) directly to dental practices and dental laboratories.  During the Class Period, Zimmer had over 200 million shares of common stock outstanding, which traded in an efficient market on the New York Stock Exchange under the symbol ZMH.

16.     Defendant Dvorak was President and CEO of the Company during the Class Period. He joined Zimmer in December 2001 as Senior Vice President ("SVP"), Corporate Affairs and General Counsel.  Dvorak was appointed Corporate Secretary in February 2003.  From October 2003 to December 2005, Dvorak served as Executive Vice President ("EVP"), Corporate Services, Chief Counsel and Secretary, as well as Chief Compliance Officer.  From December 2005 to April 2007, Dvorak served as Group President, Global Businesses and Chief Legal Officer.  Dvorak was appointed as CEO and to the Board of Directors of Zimmer on May 1, 2007.  Dvorak has a Bachelor of Science in Business Administration (Finance) and a J.D.  Prior to joining Zimmer, Dvorak was SVP, General Counsel and Secretary for STERIS Corporation, an Ohio-based leader in medical sterilization and contamination prevention products and services.  He also practiced law at two law firms with a focus on corporate law, securities and mergers and acquisitions.  Defendant Dvorak signed Zimmer's 2007 Form 10-K and the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications attached to Zimmer's 2007 Form 10-K and 1Q08 Form 10-Q filed with the SEC during the Class Period.

17.     Defendant Crines was EVP, Finance and CFO of the Company during the Class Period.  From October 2003 to December 2005, Crines served as SVP, Finance/Controller and Information Technology and from July 2001 to October 2003, he served as Vice President ("VP"), Finance/Controller.  Crines was appointed EVP, Finance and CFO of Zimmer on May 1, 2007. From December 2005 to April 2007, Crines served as SVP, Finance, Operations and Corporate

Page

Controller and Chief Accounting Officer.  Defendant Crines is a CPA and has over 20 years of experience in corporate, operations, finance, and accounting, including five years as an auditor with Zimmer's independent auditor, PricewaterhouseCoopers LLP.  Defendant Crines signed Zimmer's 2007 Form 10-K and 1Q08 Form 10-Q as well as the attached Sarbanes-Oxley certifications for each of those forms filed with the SEC during the Class Period.

18.     Defendants Dvorak and Crines, by reason of their stock ownership and positions with and relations to Zimmer as officers, as well as their conduct alleged herein, were control persons of Zimmer.  Zimmer in turn controlled defendant Dvorak and Crines.

## IV.   CONFIDENTIAL WITNESSES CONFIRM DEFENDANTS' FRAUDULENT CONDUCT

19.     Confidential Witness ("CW") 1 was a Director of Quality Assurance ("QA") and Regulatory Affairs at the Zimmer facility in Dover, Ohio from January 2004 through April 1, 2008.  CW1 was the top QA person at the Dover facility.  From October 1, 2007, CW1 reported to the VP of Quality, Mike Carter ("Carter"), who then reported to SVP of Research and Development Cheryl Blanchard ("Blanchard").  Blanchard reported to Zimmer's CEO Ray Elliot ("Elliot"), and after Elliot left Blanchard reported to Zimmer's CEO, defendant Dvorak.

20.     CW1 indicated that shortly after VP Carter joined Zimmer (October 2007), CW1 attended a quality meeting in Warsaw in which quality trends at Dover were discussed.  Defendant Dvorak's direct reports, VPs of Quality Mike Hawkins ("Hawkins") and Carter, were present at the meeting.  The meeting was held to introduce Carter to the individuals responsible for quality at the various Zimmer divisions and to update him on the quality status of said divisions.  CW1 indicated

**Page**

that he presented slides at the meeting which included charts and graphs that depicted the quality

trends at Dover.  Carter was unhappy with the presentation according to CW1.[3]

21.      CW1 indicated that the OSPs division tracked quality trends using an Excel

spreadsheet that had quality data for every product line.  The charts and graphs were automatically

populated from the Excel spreadsheet data and then imported into PowerPoint slides.  The slides

would depict information about complaints received, the nature of the complaint and any corrective

action taken.  It would also include the impact of any design changes on the quality of a product.

CW1 explained that European standards require objective evidence that quarterly reviews have taken

place and that upper management was aware of the outcome of the meetings.

22.      CW1 elaborated that prior to the FDA inspection discussed below,  in January 2008,

the trend data for Dover indicated declining quality across many products.  CW1 explained that

Zimmer's former CEO Elliot's business plan for Zimmer was to focus on new product development

while cutting costs (including money spent on existing products) by 10% each year and that

declining quality across many products was a direct result of this plan.  CW1 further explained that

defendant Dvorak was directly responsible for the OSP division, including Dover, prior to becoming

CEO and he was aware of the cost reduction plan and resulting decline in the quality of products at

Dover.  CW1 stated that to abide by the plan, there were 5 to 6 design changes to the Pulsavac

product in 2007 in an effort to lower production costs.  The products suffered.  CW1 discussed the

quality issues with Hawkins and Carter prior to the first recall of the Pulsavac in late 2007 discussed

in ¶36 and separately presented the information in the PowerPoint slide presentation in October

2007.

_____

[3]      The use of the words "he," "his" and "him" in connection with CWs is not meant to be
gender specific and shall also be meant to pertain to the female gender.

Page

23.     CW1 indicated that in November 2007, Zimmer's Marketing Department notified him of a customer complaint on silicone spotting on Zimmer's Pulsavac Plus Wound Debridement System Fan Spray Gun ("Pulsavac Plus"), a product manufactured at its Dover facility.  CW1 contacted the customer to inquire about the problem.  CW1 explained the Pulsavac gun is similar to a water pistol, used to clean out wounds during surgery.  CW1 further explained that silicone, which was used to lubricate the pump gun, was leaking from the product onto the packaging.  CW1 said that the product was recalled in November or December 2007.  The FDA Report confirms it was recalled in December 2007.  Ex. A at 18.  CW1 said that the decision to recall the Pulsavac Plus was made by Zimmer's corporate headquarters, including VP of Quality, Carter.  CW1 explained that he was involved in compiling the paperwork which was filed with the FDA indicating the problem with the Pulsavac Plus.  CW1 stated that while the recall paperwork was assembled, customers were not notified of an impending recall.  CW1 further stated that the marketing department listed the distributors placing orders as a backorder on the computer system.

24.     A week-long FDA inspection of the Dover facility occurred in January 2008.  Ex. A at 2.  CW1 explained that Zimmer was provided one week's notice by the FDA before the inspection.  CW1 stated that the January 2008 inspection was likely triggered by the prior Pulsavac Plus recall because of silicone spotting.  Immediately after learning about the inspection, CW1 said that Zimmer's corporate office sent a team specifically to handle the audit.  Never in his career at Zimmer had there been such a team assembled by the corporate office for inspection.  The head of the team was Andrew Parker (based at Zimmer's Warsaw, Indiana headquarters).  CW1 stated that the team from corporate headquarters coached employees at the Dover facility on what to say to the FDA auditor.  The General Manager ("GM") of the Dover facility, Ken Coonce, who had been a long time employee of Zimmer, was dismissed in the middle of the FDA's inspection.

Page

25.     CW1 indicated that at the end of the week-long (January 7-11) audit, it was very clear that the Dover facility would receive 483 observations and possibly another warning letter.  CW1 elaborated that FDA inspector Mary Storch communicated with CW1 and other individuals at Dover as well as Zimmer's headquarters throughout the FDA inspection.  Inspector Storch followed FDA policy and ***notified the Company that it would be receiving 483 observations as issues were noted by the inspector, well before the close of the FDA investigation and issuance of the FDA report***.

26.     CW1 explained that Zimmer initiated the recall of its Pulsavac 2 and 3 products in response to observations made by the FDA inspector and indicated that the decision to recall the additional products was an attempt to soften the ultimate severity of decisions by the agency.  The recommendation to recall the products was made by VP of Quality, Carter (who previously worked for Abbott Labs) and the Associate Director of Global Regulations, Dale Miller.  CW1, who reported to Carter, indicated that Carter kept Dvorak apprised of the FDA inspection at Dover and that based on his communications with Carter, Interim VP of Quality, Mike Hawkins and one of Hawkins' direct reports, Dvorak was updated of the FDA inspection at least every other day.

27.     CW1 also explained that ***communications with the FDA*** inspector, Storch, during her visits ***were transcribed and transmitted via live feed to Zimmer's headquarters*** as well as a Dover conference room so that appropriate records could be pulled from that conference room.  CW1 explained that in addition, Carter, Hawkins, Miller (when not at the Dover audit), Parker (after his first week spent in Dover) as well as others received the live feed on their computers at Warsaw company headquarters.  CW1 indicated that ***defendant Dvorak also had access to the live feed on his office computer***.

28.     Further, CW1 reiterated that Zimmer knew it would be receiving 483s prior to the closeout meeting (held according to the FDA Report on January 29, 2008) and that Dvorak would have been aware that the 483s had been observed.

29.     CW1 explained that the Pulsavac products are commodity products meaning if customers cannot get them, they will turn to other suppliers.  CW1 indicated that Zimmer's Pulsavac products had the majority of the market share at approximately 60 to 70 percent prior to the recalls. However, CW1 indicated that most customers went to Stryker as a result of the quality issues and likely have not returned to Zimmer since the products are commodities that can be acquired elsewhere, depleting Zimmer's market share.

30.     CW1 also learned subsequent to the FDA inspection that information regarding the Hemovac Infection Control Kits, the "Hemovac Kit" (a non-powered suction device intended to provide vacuum for drainage of surgical wounds) was withheld by Zimmer's corporate office from the FDA inspector.  CW1 explained that years prior to January 2008, Zimmer had received horrid complaints about this kit malfunctioning.  As a result, CW1 investigated and compiled a report of the complaints which were provided to the VP of Quality (at the time, Jim Simpson).  At that time, the Hemovac product was not recalled and the additional customer complaints were not provided to the FDA.  CW1 could not locate this report during the January 2008 FDA inspection and thus did not have all the information regarding the complaints or investigation to provide to the FDA inspector. CW1's account is corroborated by the FDA Report which indicates that Zimmer's corporate office was asked for documentation supporting the retrieval of the Hemovac Kits in 2006 and the FDA was told Zimmer "did not have any additional information."  Ex. A at 12.  Subsequent to the FDA inspection, CW1 learned from a direct report of VP of Quality Hawkins that the corporate office had

a copy of the previously complied report.  When CW1 asked why it was not provided; no response was given.

31.     Finally, CW1 stated that after the FDA auditor left in January 2008, ***production of disposable OSPs (Pulsavac and Hemovac products) was completely shut down at Dover***; there was nothing being shipped out of the facility.  As an analyst at Thomas Weisel Partners would point out on June 26, 2008, that Zimmer's OSPs portfolio totaled $230 million.

32.     CW2 worked at Zimmer for approximately a year and a half until his departure on January 30, 2008, the day after defendants announced Zimmer's guidance for 2008.  CW2 was the Manager of Microbiology, a department organized under production and operations in Warsaw, IN.  In that position, he provided support for sterilization of devices from other divisions, and his group conducted testing.  He reported to the Director of Sterilization, Russell "Rusty" Mills, who reported to interim VP of Quality Hawkins, who in turn reported to CEO Dvorak.

33.     Prior to his departure on January 30, 2008, CW2 was aware of the quality problems at the Dover facility.  He was aware of defects or failure trends with products at the facility and stated that the corporate quality department was also aware of these issues at Dover because the defect trends were discussed in management meetings.  These meetings were attended by the Quality Department, including VPs of Quality – Mills, Hawkins and Carter, as well as the directors of various departments and regulatory assurance.  At these meetings, internal metrics which illustrated defect trends were discussed.  According to CW2, CEO Dvorak was made aware of the contents of these meetings from Carter and Hawkins, who both reported to him.  Dvorak also would have received copies of whatever was discussed a the meetings.

34.     During his tenure, CW2 attended two management meetings, and at the second management meeting, held the first month VP of Quality Carter was hired (October 2007, as

confirmed by CW1) internal metrics for the Dover facility were discussed.  He saw charts and graphs at the meeting which showed defect trends increasing at the Dover facility over a two-year period. He did not see a plateau or downward slope indicating that the issues had either leveled off or decreased.  According to CW2, Director of Sterilization Rusty Mills was investigating the sterility of the Pulsavac product prior to the FDA inspection in January 2008 and that the issues with the Pulsavac product (which he discussed with Mills) had been known for a long time.

35.    CW2 stated that it was Zimmer's general approach not to spend money correcting quality defect issues.  He believed that OSP issues could have been addressed by Zimmer years ahead of time.  CW2 reiterated that prior to leaving the Company at the end of January 2008 that there were problems with silicone spotting in the Pulsavac line of products manufactured at Dover. He explained that silicone was categorized as a sterility issue in that the silicone would leak out and plug holes in the product.

36.    CW2 recalled that the FDA inspection at the Dover facility took place around the same time he was leaving the Company in January 2008.  He believed that the FDA possibly was alerted because the Company planned to issue recalls, and the FDA had to be alerted whenever there was a field action.  He defined a field action as recalling a product that was already distributed and needed to be collected from the field.

37.    CW2 confirms CW1's account of the live feed during the audit of Dover by explaining that the practice was common in the industry to have live feed during audits.  CW2 details that when VP of Quality Carter was brought on, a meeting, which CW2 attended, was held in his first month of employ (approximately October 2007) to discuss quality issues about Zimmer products, this included a discussion about the Durom Cup.  Finally, CW2 stated that he personally

would not have any type of device implanted in his body made by Zimmer, explaining that it was the worst company he had worked for.

38.     CW3 was the General Manager ("GM") of the Dover facility for 4 1/2 years until his departure in mid-January 2008.  He reported to defendant Dvorak.  He was responsible for OSPs for the Dover, Ohio and Statesville, North Carolina facilities.

39.     CW3 stated that Zimmer's OSP sales had declined approximately 5% each year and were becoming less competitive because other companies were producing OSPs offshore, in places such as China.

40.     According to CW3, Zimmer was notified by a customer of silicone spotting on its Pulsavac Plus product before January 2008.  After doing tests on this product, Zimmer's corporate headquarters in Warsaw, Indiana decided to recall it.  CW3 explained that a recall meant Zimmer had to retrieve a large volume of product from the field because approximately 800,000 units of this product were sold each year all over the world.  It was this recall that prompted the FDA inspection at the Dover facility.  CW3 also stated that individuals who handled this matter from Zimmer's corporate headquarters reported directly to Dvorak.

41.     CW4 was employed by Zimmer Wilson Phillips ("Wilson Phillips"), a distributor for Zimmer in San Antonio, Texas, as a Customer Service/Surgical Billing Representative from 2005 through mid-January 2008.  CW4 was responsible for billing hospitals for products used during surgeries, as well as re-ordering and replacing those products, which were usually stored at the hospitals.  He explained that Wilson Phillips covered a large portion of the "Southwest region," including parts of Texas and Louisiana.

42.     CW4 confirmed that each of Zimmer's distributors was independently owned, but had an exclusive contract with the Company to sell its products.  During his employment, Zimmer's

distributors were all referred to by using "Zimmer" followed by the last name(s) of the owner(s), as with Zimmer Wilson Phillips. He said that owners were often referred to as distributors, but that was not their official titles and that the owners/distributors were employees of Zimmer.

43.   CW4 indicated that *sales representatives were present at surgical procedures*. CW4 was responsible for ordering Zimmer's OSPs used during surgeries in Louisiana hospitals and also occasionally assisted in processing orders for hospitals in the San Antonio area. Beginning in October 2007, many OSPs were on backorder as reflected in the DCS Inventory Application Software. CW4 indicated that a backorder message appeared on the screen when he attempted to place an OSPs order. He explained that in October 2007, the backorder initially affected only a small number of OSPs, but that between October 2007 and December 2007, a larger number of OSPs were continually being placed on backorder. According to CW4, by December 2007, customers were going ballistic because many of their most frequently used items were on backorder. CW4 further explained that at this time, in December 2007, the computer listed the OSPs on backorder with an indefinite in-stock date. The ordering software would not even allow CW4 to enter an order which would have placed the hospital on the backorder list.

44.   Around December 2007, CW4 called Zimmer's Customer Service Department to obtain information about the status of the OSPs backorders. CW4 was advised that there were ordering issues, that the OSPs were out of stock indefinitely, and that he should tell the hospitals to place orders with Zimmer's competitors.

45.   CW5 worked from February 2008 through August 2008 as a receptionist for Zimmer Rocky Mountain, a Zimmer distributor in Utah. As a receptionist he was responsible for answering phones and processing OSPs orders for surgical centers. The orders were for soft goods used during the implant surgeries and included the OSPs discontinued by Zimmer's Dover facility. CW5

specifically recalled the Pulsavac product as one of the products from the Dover facility that was recalled.

46.     CW5 explained that in February 2008, when he first started at Zimmer Rocky Mountain, OSPs from the Dover facility were already on backorder.  This meant that customers could place an order for OSPs, but would not receive them until some unspecified later date.  CW5's supervisor, Office Manager Carol Fox ("Fox"), told CW5 that the products at the Dover facility had been contaminated and that Zimmer had to restart production of the products.  CW5 was further informed by Fox that until production commenced and the facility was able to produce non-contaminated products, OSPs from Dover were not available to customers.  CW5 was instructed to advise medical facilities only that the products were on backorder and that the Company was trying to improve the products and get them back out as soon as possible.  CW5 understood that Fox (and in May 2008, her replacement, Kristen Day) received her information and instructions from Bonnie Wilson in Zimmer's corporate office.

47.     CW5 advised medical facilities that Zimmer's OSPs were on backorder until CW5 was told in March/April 2008 by Fox that due to the contamination problem at the Dover facility, Zimmer had to halt production at the Dover facility altogether.

48.     CW6 was an Inventory Coordinator at Zimmer Rocky Mountain from November 2006 through July 2008.  As an Inventory Coordinator, he was responsible for billing hospitals and other medical facilities for Zimmer implant products (which included the implants and any accompanying products in the implant "kits" discussed below) used during medical procedures.  Zimmer Rocky Mountain sold various products used during partial and total joint replacement surgeries, which included OSPs and implants.  CW6 confirmed that OSPs (also referred to as "soft goods") were used during surgical procedures to assist with the wounds, and were considered to be

"everything but the implants."  OSPs were manufactured at Zimmer's Dover facility and included the Pulsavac products.

49.     CW6 first overheard conversations between the receptionist and Office Manager Fox, about "backorders" of OSPs from the Dover facility around January or February 2008.  These conversations involved how to handle the customers who were in need of Zimmer OSPs.  CW6 understood from later conversations between the receptionist and the then current Office Manager that the OSPs were "pulled" and ultimately recalled by Zimmer.

50.     CW6 confirmed that sales representatives were present in the operating rooms during medical procedures where OSPs and joint implants (hip and knee joint replacement products) were utilized.  He estimated sales representatives were present at 98% of the "non-trauma related surgeries" performed by doctors with whom they had accounts.  According to CW6, sales representatives were present to answer questions, and ensure that the products opened during the procedures were the correct products and were sterile.

51.     CW6 further confirmed that Zimmer kept a record of all defective products opened during a surgical procedure to ascertain any "trends."  These were recorded on a Product Experience Report ("PER").

52.     CW7 was a Junior Sales Representative at Zimmer Deptula, Inc., a distributor for Zimmer in Melbourne, Florida, beginning in May 2007 through May 2008.  As a Junior Sales Representative, CW7 worked with sales representatives assisting them with whatever they might need, from filing to interacting with doctors.  CW7 explained that Zimmer provided training to distributor sales representatives through the Zimmer Institute ("Institute").  The Institute was located on one of the floors in Zimmer's corporate building in Warsaw, Indiana.  He recalled that the

Institute offered classes in OSPs, Trauma, Knees, Hips, Selling Skills, Advanced Knees and Advanced Hips (which covered materials and products related to hip and knee revision surgeries).

53.     CW7 was originally scheduled to attend the OSPs class in March 2008 but in February 2008, he was advised by the owner of Zimmer Deptula, Thomas Deptula, that the class was on hold.  He believed that the postponement of the class was related to the problem at Zimmer's Dover facility, which manufactured OSPs.

54.     CW8 worked for two Zimmer distributors between September 2001 and August 2008. He began as a surgical Instruments Coordinator at Zimmer Southeast in September 2001 and was responsible for ensuring that surgical instruments necessary for joint replacement surgeries were available and delivered to hospitals for scheduled surgeries.  He also assisted in ensuring that implant products were delivered if the hospital did not have the necessary products in inventory.  In September 2007, he moved and began working as a Billing Coordinator at Zimmer's Rocky Mountain distributor – a position he left in August 2008.  While a Billing Coordinator, he was responsible for billing hospitals that used Zimmer's implants during surgeries.  CW8 indicated product failure information was tracked in a computer program by Zimmer.

55.     CW8 explained that sales representatives ordered the necessary joint implant products as well as the necessary instruments used during surgeries.  He further confirmed that sales representatives were present during surgeries.  The sales representatives received extensive training on the various Zimmer products and essentially had to be able to close their eyes and perform the surgery in their head.

56.     CW9 was a sales representative at Zimmer Davis, a distributor for Zimmer in Minneapolis, Minnesota from May 2005 until May 2008.  CW9 was often present in the operating room when doctors performed surgeries using Zimmer products as a courtesy to the doctors in case

Case 1:08-cv-01041-SEB-DML   Document 66-1   Filed 01/15/10   Page 24 of 121

**Page**

they had any questions or needed assistance with any of the products. CW9 was also responsible for ensuring that whatever products a surgeon needed for a scheduled surgery were provided to the medical facility days before the scheduled procedure.

57.     In approximately January/February 2008, CW9 was advised by Tom Davis ("Davis") – the President of the Zimmer Davis who had frequent conversations with defendant Dvorak – that there was an FDA inspection of Zimmer's Dover facility where OSPs were manufactured. Davis further advised him that the FDA inspection was in response to sterilization issues at Dover. CW9 did not believe the FDA inspection was routine. Davis also informed CW9 at this time that the OSPs manufactured at the Dover facility were now on backorder. In late February/March 2008, CW9 was advised that the Dover OSPs were being recalled and that the Dover facility was temporarily closing down. As a result of the OSPs recall, CW9 saw his total average monthly sales of $200,000 decrease by 30-50%. When CW9 left in May 2008, the Dover facility still was not manufacturing.

58.     CW9 was advised around January/February 2008 by either Davis, or the VP of Zimmer Davis, Eric Schroeder ("Schroeder"), that Dr. Dorr had made some negative comments about the Durom Cup, but was instructed that distributors should continue to sell the product as usual. CW9 was also aware of Dr. Dorr's April 2008 letter to the American Association of Hip and Knee Surgeons ("AAHKS") (of which there were more than 750 members) outlining his concern about the Durom Cup used in total hip replacement surgeries. CW9 received an e-mail from Schroeder about the letter shortly after the letter was made public. CW9 recalled that Dr. Dorr's complaints were that the implant was loose and was not made of good metal.

59.     Around February 2008, approximately five doctors began questioning whether to continue using the Durom Cup. The questions were directly related to Dr. Dorr's concerns. CW9

stated that he was not required to advise the doctors about Dr. Dorr's concerns and was told by Schroeder to tell the doctors that Dr. Dorr's findings were not true.  CW9 further stated that by March/April 2008 there was a noticeable decrease in the orders for Durom Cups.  CW9 attributed the decrease to concerns expressed by the doctors about the continued use of the product.  Prior to this March/April timeframe, CW9 sold about 20 Durom Cups a month.  After this time, sales dwindled to five Durom Cups a month.

60.     CW9 recalled that Zimmer had a technical guide for the Durom Cup that included the technique for implanting the device.  CW9 indicated that the pamphlet was comprised of double-sided letter size pages stapled together and was approximately 20 to 40 pages in length.  CW9 sat down with doctors who purchased the device individually and reviewed the Durom Cup pamphlet provided by Zimmer.

61.     CW10 was a Director of Quality Assurance at Zimmer's corporate headquarters from July 2002 through November 2007.  He reported to VP of Quality.  CW10 had quality and design control responsibilities over hip and knee product manufacturing and supply at Zimmer's corporate headquarters as well as in Puerto Rico.

62.     CW10 stated that Zimmer was attempting to bring the Durom Cup metal-on-metal product (hip resurfacing technology) to the U.S. market through pre-market approval with the FDA.  Zimmer was expecting this approval by April or May of 2008.  It was his understanding that Zimmer's 2008 fiscal forecast was based on the sales revenue in the United States from the Durom Cup's hip resurfacing technology and from the Durom Cup's existing hip replacement technology.  CW10 was also aware that Zimmer was preparing to increase production of the Durom Cup in Switzerland to meet the expected increased sales in the United States once the approval for metal-on-metal product was received.

63.    CW10 explained that surgical techniques should be included in an IFU (information for use), which accompanied the products as required by the FDA.  In addition, he explained that Zimmer also issued training to surgeons on technique at the Institute for its products.

64.    CW10 had heard that the OSPs division had a problem which had triggered the FDA inspection.  CW10 stated that Zimmer conducted regularly scheduled quality management review meetings to discuss the state of quality problems and trends.  According to CW10, the FDA regularly scheduled meetings to discuss the state of quality problems and any potential issues.  If a site manufactured products that were sold internationally, then it was also subject to ISO (International Organization for Standardization) mandated management meetings as well.  CW10 hosted these quality review meetings for the Warsaw facility.  After these meetings, CW10 compiled a report, which would have been provided to Carter.  Both ISO and FDA standards required that upper management must be notified of the outcome of these meetings.

65.    According to CW10, who was aware of 483 letters received by Zimmer in 2003 and 2006, a 483 letter is a list of observations made by the FDA after conducting an inspection.  He explained that the *observations contained in a 483 letter are very serious because it is essentially federal agents identifying lapses in quality systems*.  He explained that *there should not be lapses in quality systems because it means that the Company is selling faulty or adulterated products*.

66.    CW11 worked for Zimmer for more than 20 years, including as a SVP of Sales; he left Zimmer in January 2008.  In his last position, he reported to President of Americas and Chief Marketing Officer, Sheryl Conley.  He believed that Conley reported directly to CEO Dvorak.  As a SVP of Sales, and then later in his marketing position, CW11 had numerous communications with Dr. Dorr.  CW11 stated that Dr. Dorr assisted in designing the Durom Cup in conjunction with Centerpulse (previously known as Sulzer and later acquired by Zimmer) and described the Durom

Page

Cup as Dr. Dorr's baby.  CW11 stated that *Dr. Dorr informed Zimmer about design problems with the Durom Cup at least a year before the April 2008 letter sent by Dr. Dorr to the AAHKS*.

67.     Thereafter, Zimmer tasked the VP of Clinical Affairs, Russell Schenck, with collecting data about the Durom Cup from various surgeons using the implant.  However, according to CW11, Zimmer had stopped communicating with customers, *i.e*., surgeons, because of the DOJ investigation and the resulting deferred prosecution agreement ("DPA").  CW11 explained that he personally had asked CEO Dvorak about making efforts to communicate with surgeons about Zimmer products and Dvorak responded that Zimmer did not have anything to say to the surgeons and did not know how to explain the current situation given the DPA.

68.     According to CW11, Zimmer was trying to obtain approval for use of the Durom Cup for hip resurfacing in the United States.  He explained that there were only two hip resurfacing products already on the market, one of which was marketed by Smith & Nephew.  He said that Smith & Nephew's hip sales grew 50% each quarter after releasing its product.  As a result, it was important that Zimmer receive approval of the Durom Cup for hip resurfacing in order to obtain the market share in this area.  CW11 further elaborated that a recall of the Durom Cup would have put the hip resurfacing plan at risk.

69.     CW11 also stated that Zimmer fired the GM of Zimmer's Dover facility, Ken Coonce, months before the problems with the OSPs were announced publicly.

70.     CW12 was employed at Zimmer's headquarters for more than 20 years, leaving in June 2006.  He held a variety of positions within the product development and marketing departments for the Company.  He last held the position of Director of Computer Assisted Surgery from January 2004 to June 2006.  He was responsible in this position for marketing computer

Page

navigation systems during surgery throughout the United States. Computer assisted surgery ("CAS") was used for knee and hip implant surgeries while CW12 was at Zimmer.

71.     CW12 observed at least 1,000 surgeries while at Zimmer, including a number of hip implant surgeries. He explained there are four components to a hip implant: the acetabular cup, the liner, the femoral head and the femoral stem. The acetabular cup is implanted into the acetabulum using a surgical instrument similar to a hammer or mallet. The surgeon drives the femoral component into the acetabulum and taps the rims of the cup to ensure that it is aligned. Alignment is also confirmed using the CAS program. CW12 explained that he observed a handful of hip replacement surgeries conducted by Dr. Dorr using the CAS software during the last three years of his employment. CW12 witnessed these surgeries during the live broadcasts of these surgeries. Zimmer used live broadcasts of various doctors using its products during joint replacement surgeries to train its sales force and other surgeons at the Institute. CW12 elaborated that Dr. Dorr was one of the best orthopedic surgeons he had ever seen operate and that Dr. Dorr knows and understands more about the hip joint than most surgeons.

72.     CW12 explained that while each of Zimmer's distributors were independently owned, they signed an exclusive contract with the Company to only sell Zimmer's products. Zimmer maintained ownership of the inventory but provided products to distributors and hospitals on a consignment basis, meaning Zimmer owned the inventory until a product was sold to the customer. Zimmer's inventory was managed through a program called ZDI (Zimmer Distribution Inventory) and each distributor was responsible for turning a certain amount of product a month or it had to pay or return any unused inventory. In approximately 2004/2005, there was a large reorganization of Zimmer's distributors and as a result, 74 distributors merged into 25 distributors.

Page

73.    CW12 confirmed the presence of sales representatives during joint replacement surgeries.  He indicated that sales representatives were present at most joint replacement surgeries in order to assist the surgeons, answer any questions about the product and to make sure everything runs smoothly.  Sales representatives were trained to handle problems that might occur during a procedure in the operating room and if there were ever a problem or a failure of a Zimmer orthopedic product in the operating room, the sales representative filled out a PER and sent it to Zimmer.  The sales representatives also notified the FDA (either directly or through someone at Zimmer) using a Medical Device Report ("MDR") if the problem or failure caused any harm to the patient.

74.    CW13 was a Senior and then Associate Manager of Regulatory Affairs from October 2006 through September 2008 for Zimmer TMT (a wholly owned subsidiary of Zimmer) in Parsippany, New Jersey.  CW13 reported to the assistant director who, in turn, reported to Toni Kingsley, Zimmer's VP of Regulatory Affairs in Warsaw, Indiana.  CW13 was responsible for registering both foreign and domestic Zimmer TMT products with FDA, including completing and submitting 510(k) filings to the FDA.  A 510(k) filing is essentially a pre-market notification or application to the FDA of a company's intent to market a new medical device that is substantially the same or substantially equivalent to a product already on the market.  CW13 was responsible for reviewing product materials when initially submitting the 510(k) as well as reviewing materials such as updated product labels and advertising materials to determine if any of the changes impacted the safety of the products.

75.    CW13 explained that companies created the surgical techniques to be used during surgeries with their medical devices and that surgical techniques were required to be submitted to the

Page

FDA as part of a company's 510(k) filing.  At Zimmer, surgical techniques were specific to the medical device being used and the surgery performed.

76.     With respect to the surgical techniques, CW13 indicated that usually additional training was only required or needed when a unique device or surgery was involved.  He stated most implants, such as hip and knee implants, were common and while some surgical techniques may have included a better way to size or position the implants, he never got the sense that the doctors needed the surgical techniques based on his experience in the industry.  CW13 explained that most package inserts included information about the device, such as its size, warnings and precautions, contraindications and possible adverse events

77.     CW14 joined Zimmer in 1991 and retired in October 2008 as the Corporate VP of Regulatory Affairs.  CW14 expresses that to the best of his knowledge Zimmer's actions were correct and appropriate.  He was part of the Regulatory Affairs Department for approximately 13 years.  As the Corporate VP, CW14 was responsible for overseeing the entire Regulatory Affairs Department, including individuals located at different Zimmer facilities.  CW14 reported first to Executive VP of Research and Development, Cheryl Blanchard and then to VP of Quality, Carter.  Both Blanchard and Carter reported to defendant Dvorak.

78.     CW14 first became aware of the issue with the Pulsavac gun manufactured at the Dover facility in late 2007 or early 2008.  According to CW14, Carter and Zimmer's corporate headquarters were involved in conducting an investigation of this product.  CW14 stated that shortly after the first stain was discovered, a second product was found to have a similar stain.  CW14 believed that the second product was also related to a wound debridement system product.  CW14 stated that once Carter became aware of this issue with a second product out of the Dover facility, he decided to conduct a more in-depth investigation.  CW14 stated that through this investigation,

Carter discovered there were other problems at the Dover facility.  CW14 stated that these problems were brought to Dvorak's attention through the quality department around the time of the FDA's inspection of the Dover facility, and ***Dvorak was informed that there were significant issues with the quality systems and that it was recommended by the quality department that the Dover facility be shut down until the problem could be satisfactorily addressed; Dvorak agreed to shut down the facility***.

79.    CW14 stated that Dr. Dorr advised Zimmer of his concerns with the Durom Cup sometime prior to sending the April 2008 letter to the AAHKS.  According to CW14, Zimmer's practice was to pay attention to concerns raised by doctors.

80.    CW15 is a former Associate Director of Financial Planning & Analysis ("FP&A") at Zimmer's corporate headquarters who was responsible for forecasts, budgets and planning for Zimmer from May 2008 to approximately the fall of 2009.  He compiled financial forecasts every month.  These forecasts covered (1) the current month, (2) each month remaining in the year and (3) the next five years.  The monthly forecasts were detailed and included forecasts by regions, product segment (*e.g.* hips and knees) and product brands (*e.g.* Durom).  The forecasts he prepared were distributed to the Operating Committee at Zimmer, which consisted of defendant Dvorak and his direct reports (including defendant Crines) by e-mail and hard copy with the exception of defendant Dvorak, whose forecast reports were sent by CW15 to Dvorak's Executive Assistant Cathy Day by e-mail with a hard copy to Dvorak.  CW15 recalls that the forecasts that he sent Dvorak, Crines and others reflected ***decreases*** in Durom Cup sales from the time he started with the company in May of 2008.

81.    CW16 was a former Director of Communications for Zimmer from June 2006 until approximately June 2008 and participated in communications directly with defendants Crines,

Page

Dvorak and other top management.  CW16 indicated that it was Dvorak who had oversight of the Dover facility and that because of Zimmer's tight financial issues (*i.e.,* divisions overseen directly by Dvorak not hitting financial and or investment targets, including Dover), Dvorak chose not to invest money in the quality systems at Dover.  Because of the failure to invest money into Dover's quality systems, they were antiquated – approximately 10 to 15 years behind the times.  CW16 elaborated that Dvorak was embarrassed by the state of the systems at Dover and as a result suppressed information about the status of the facility from others in the Company.  CW16 averred that Dvorak in early 2008 was expecting warning letters from the FDA and hired as the Head of Quality a specialist who previously worked for Abbott Labs and who was known for helping companies avoid warning letters.

82.    CW16 indicated that Dr. Dorr (who defendants owed $6.7 million in consulting fees) initially expressed his concerns with the Durom Cup by sending a letter to Zimmer which was originally received by a Brand Manager in the marketing department who reported to Martin Ma, the VP of Marketing for Zimmer.  Defendants ignored Dr. Dorr's letter for months.  CW16 elaborated that only when the Durom Cup issue begin to heat up in approximately April/May 2008 (months after they had received Dr. Dorr's complaints) did defendants launch an investigation into the Durom Cup.  Defendants Crines and Dvorak were present at management meetings and worked closely with CW16 to handle the Durom Cup situation.  CW16 was a member of crisis team.  Instead of ascertaining the truth of the Durom Cup's reported defects, the crisis team was tasked with searching for evidence to support the Company's position that surgeons were to blame.  CW16 explained that it took many months before Zimmer took action and as a result hundreds of people likely received a Durom Cup implant in the interim period.

83.     CW17 was a former VP of Global Communications & Education for Zimmer from approximately January 2006 to May 2008 who reported to Group President, Americas and Global Marketing and Chief Marketing Officer Sheryl Conley.  Conley reported to defendant Dvorak. CW17 was responsible for advertising.

84.     CW17 indicated that he learned that Dr. Dorr had told Zimmer of his experiences with the Durom Cup, including a high level of revisions, prior to the issuance of Dr. Dorr's April 22, 2008 letter to colleagues.  CW17 understood Dr. Dorr was upset because Zimmer had not responded to his warnings and thus escalated the issue to the AAHKS.  CW17 explained that the best practice of a medical device company, such as Zimmer, would be to respond to doctor concerns immediately. CW17 indicated that several Zimmer employees, in fact, left Zimmer because of the manner in which Zimmer handled the Durom Cup issue (*i.e.*, did not timely address known concerns).  CW17 was personally aware of at least three or four high volume surgeons who stopped using the Durom Cup.

85.     CW17 elaborated on  the significance of true fact that it was Dr. Dorr who  warned of defects with the Cup.  Dr. Dorr has global and industry-wide influence in orthopedics.  He has 20 years of experience and has four fellows each year whom he trains and mentors, equating to influence over 80 doctors just from fellowships.  Dr. Dorr also has influence over the numerous residents he has worked with, as well as a multitude of industry associations where he often speaks.

86.     CW17 stated that Dr. Dorr was in a unique position as a high volume surgeon, performing more than 100 surgeries a year.  The majority of orthopedic surgeons conduct fewer than 12 surgeries a year.  Only a select few surgeons, such as Dr. Dorr, perform more than 100 hip surgeries a year.  Thus, Dr. Dorr, unlike the majority of orthopedic surgeons, can more readily

Page

observe trends.  As a result, it was particularly important for Zimmer to pay attention to and respond to Dr. Dorr.

87.     CW18 was a former Zimmer Manager of Regulatory Compliance (later named Product Surveillance) from approximately March 2003 to the Spring of 2009.  He reported to Associate Director, Regulatory Compliance, Dale Miller, who, in turn reported to the VP of Quality. CW18 was responsible for investigating product complaints and filing MDRs.  He explained that every product complaint was required to be investigated by the FDA to determine if the product caused harm to a patient.  If it did, an MDR was required.

88.     CW18 learned from Miller and others he worked with that they were investigating Dr. Dorr's complaints later in 2008, but prior to the Durom Cup suspension.  He further learned that the Company was blaming the problems on surgeon error but had evidence of a design defect.  CW18 also confirmed, based on discussions with Miller and others close to the investigation, that a crisis team was formed to determine how to blame surgeons rather than resolve the underlying nature of the complaints.  CW18 additionally indicated that even one complaint can trigger an investigation and that if there was a noticeable trend an investigation would likely be triggered.  CW18 further indicated that if Zimmer had a reason to believe that doctors were using improper surgical techniques, than the Company needed to take immediate corrective action or have a rationale why no action was being taken where patient harm is involved.  Thus, even if the problem was technique as Zimmer claimed, the Company still should have taken immediate action.

89.     CW18 explained that in late 2008 the Regulatory Compliance Department that handled Durom Cup complaints determined that there had been issues with filing Medical Device Reports with the FDA. CW18 explained that hard copies of the MDRs either had not been submitted

**Page**

to the FDA or had been sent to the wrong address.  CW18 personally began reviewing the complaints submitted, including closely reviewing Durom Cup complaints.

90.     CW18 indicated that in his experience Zimmer was far more concerned with sales than patient safety.  Zimmer had a pattern of ignoring product problems.  He personally had investigated complaints regarding a sterility issue with a product and recommended that a recall committee be formed.  He was told not to pursue the matter further and to not mention it to anyone. Another product was determined to have a design defect by a recall committee, the ZMR hip stem, and it was concluded it should be recalled.  Chief Scientific Officer Cheryl Blanchard overruled the recall decision and demanded that CW18 hand over all of the information related to the investigation of the ZMR hip stem and delete the information from his computer and Company records.

91.     CW18 elaborated on the pattern and practice of defendants to ignore FDA regulations and patient safety.  Between April 2008 and December 2008, in preparation for an FDA inspection in 2009, the Company determined that the FDA had not been notified of 33 products where a recall determination had already been made by Zimmer.

92.     CW19 is a high volume orthopedic surgeon in Louisiana who performs 100-150 implants a year.  As such, he is unique among hip surgeons as he, like Dr. Dorr, can observe trends as opposed to the majority of surgeons as explained by CW17.  CW19 first implanted the Durom Cup in May 2006 and in total has implanted 78 Durom Cups.  CW19 has revised 26 or 33% of the Durom Cups he has implanted.  CW19 considers a 10% failure rate for a hip implant highly unacceptable and indicative of product problems.  As of January 2008, CW19 decided he was never again going to use the Durom Cup.  In contrast to the Durom Cup, CW19's partner used Zimmer's Trilogy cup and in 15 years he has never performed a revision.

93.     In 2007, CW19 contacted Zimmer sales representative Mark Smith to inquire if any other surgeons were encountering problems with the Durom Cup.  Mark Smith had been CW19's Zimmer sales representative for more than ten years.  Mr. Smith informed CW19 that he had talked to the Company and no other surgeons were reporting problems with the Durom Cup to Zimmer. CW19 continued to have concerns about the Cup and thus kept inquiring of his Zimmer sales representative whether other surgeons were encountering problems with the Durom Cup – all told, he asked Zimmer three to four times in 2007 alone.  At one point, after repeatedly questioning Zimmer about the Durom Cup he was told by Smith that he might want to talk to Drs. Dorr and Long about their experiences.  However, he was specifically told by Zimmer in response to his questions that Drs. Dorr and Long were not experiencing problems with the Durom Cup so he did not immediately reach out to these surgeons.  CW19 trusted that if Dr. Dorr was not experiencing problems, those that CW19 were encountering must be isolated.

94.     Still in 2007, CW19 explained he continued to be concerned about the Durom Cup so he contacted Dr. Dorr.  Dr. Dorr responded saying that he was experiencing problems with the Durom Cup and was now even more certain that other surgeons were as well.  Dr. Dorr further informed CW19 that he had communicated his concerns to Zimmer and the Company was not responsive.  Dr. Dorr indicated in this 2007 discussion with CW19 that he would re-contact the Company.  CW19 was then told by Zimmer to stop communicating with Dr. Dorr because of the DOJ investigation.

95.     CW19 describes one of his patients who was  in severe pain requiring hip revision surgery within 3 months after the initial surgery.  During the revision surgery (which a Zimmer representative would have been present), the Durom shell popped right out and there was no bone attachment on the backside.

96.     After CW19's repeated complaints about the Durom Cup, in approximately May 2008 he had a conference call with Zimmer's Senior Product Manager, Brian Parker and VP of Research, Erin Johnson about the Durom Cup.  During the conference call, he learned that ***Zimmer never performed any clinical trials of the U.S. Durom Cup***, which differed from Durom Cups used in Europe, Canada and Australia (the U.S. implant has a different thickness porous surface).  CW19 found the fact there were no clinical trials on the Durom Cup product used in the U.S. ***highly alarming***, he compared it to putting a loaded gun in front of a baby.  CW19 no longer uses any Zimmer products because the Company was reckless and cannot be trusted.  CW19 believes the Durom Cup has multiple design defects which contribute to the inability of the bone to grow into the cup, and explained that Zimmer's own VP of Clinical Affairs, Russell Schenck, later reviewed his patients' X-rays and told CW19 that his positioning of the implant was the best he had seen.

97.     CW20 was employed at Zimmer from approximately 2003 until March 2009.  CW20 worked in the finance group as a Financial Analyst.  He reported to Finance Director Joseph Leja, who reported to Steven Deitch, VP of Finance, who in turn reported to CFO Crines.  As a Financial Analyst, CW20 was responsible for tracking daily U.S. sales of hips, knees, extremities, trauma and OSPs, as well as maintaining monthly forecasts for U.S. hips and extremities.  CW20 incorporated the sales numbers into an Excel spreadsheet called the Daily Sales Report.  The report listed the previous day's U.S. sales by hips, knees, extremities, trauma and OSPs, as well as the total sales, compared to the average daily sales figure.  The report was the first thing he did each morning and it was reviewed by Leja and Deitsch before distribution.  CW20 e-mailed the spreadsheet to the distribution list, which included defendants Dvorak and Crines, as well as Chief Accounting Officer Derek Davis and individuals in the corporate financial planning and analysis group.

98.     CW20 explained that sales in hips had been decreasing at the Company in general in 2007 and there was a noticeable decline in 1Q08 as well.  He estimated the sales were five percent lower than projected in hips for 1Q08, which was definitely noticeable in the Daily Sales Report. Because the Company was already predicting flat sales without much growth, the noticeable decline in sales would have been alarming to management.  However, the Company did not take steps to decrease the forecasts for the remainder of the year prior to his departure from the hips and knees division.

99.     CW20 also explained that Zimmer did not have a product approved for hip resurfacing and was not able to get the Durom Cup approved for this use before its competitor Smith & Nephew.  As a direct result, Zimmer lost market share to Smith & Nephew.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

100.     Prior to the Class Period, defendants Dvorak and Crines were appointed CEO and CFO in the midst of a Department of Justice ("DOJ") investigation of Zimmer regarding illegal kickbacks paid to doctors to use Zimmer products.  The DOJ investigation not only resulted in $169.5 million fine and a DPA but it changed the manner in which Zimmer operated as it could no longer pay doctors to use its products.  During the second and third quarter of 2007, under the scrutiny of the DOJ, the defendants disappointed the street by repeatedly reducing announced guidance.  Heading into 2008 and the start of the Class Period, January 29, 2008, the pressure on the defendants to produce results and put the DOJ investigation and resulting DPA behind Zimmer was mounting.

101.     When appointed, analysts at Cowen and Company reported on July 26, 2007, that Dvorak and Crines had a tough act to follow: "The team of Elliot/Leno [former CEO/CFO] set a very high bar.  They routinely beat their own guidance on the top- and bottom-line."  Later, after

Zimmer lowered its 4Q07 outlook, on November 8, 2007 analysts at Canaccord Adams questioned whether Zimmer's challenges were "management related" noting that "[a]fter a tough Q3/07 and disappointing guidance, Zimmer has realized a significant correction in the stock price . . . . [A]ny slowdown in hip and knee sales will have a direct impact to the top line going forward."  Thus, defendants were under pressure to issue strong guidance for 2008 as reflected in defendant Dvorak's statement on the first day of the Class Period that defendants first major priority was to "meet or exceed [defendants] stated goals for financial performance."

> A.   **In January 2008 Defendants Issued False Guidance, Touted Its Quality Systems, Minimized Severe Issues with Its Durom Cup by Concealing Defective Quality Systems and Clinical Failure of Its Durom Cup Hip and Misled Investors in Response to Direct Question Regarding FDA Investigation Issues**

102.   On January 29, 2008, the beginning of the Class Period, defendants disclosed Zimmer's net sales and adjusted EPS outlook for full-year 2008 in a press release, noting that Zimmer would no longer be providing guidance on a quarterly basis.  The press release also informed the market that Zimmer expected 2008 reported net sales growth of 10% to 11%, or sales of $4,287 million to $4,326 million:

> *Full year 2008 net sales are expected to be approximately 10 to 11% over 2007*, including an approximate favorable foreign currency impact of 2%.  *Adjusted diluted earnings per share for the full year 2008 are expected to be $4.20 to $4.25*, reflecting an increase of approximately 4 to 5% over prior year.  *The guidance reflects the expected costs for a number of ongoing infrastructure and operating initiatives*, including upgrades to the Company's U.S. sales and distribution capabilities, such as inventory tracking and instrumentation; *enhancements to* information technology and *quality systems*; increased investments in sales force and other marketing programs in the Spine, Dental and Trauma business units; and start-up costs for an expansion of worldwide manufacturing and distribution operations.

103.   Later, on January 29, 2008, defendants held a conference call with financial analysts who covered Zimmer.  During that call, defendants highlighted their knowledge of Zimmer's

operations and products by describing the methodical process they went through to reach their

guidance:

>**David Dvorak – Zimmer Holdings, Inc. – President, CEO**
>
>                    \*          \*          \*
>
>        Turning to our 2008 outlook.  ***We developed our 2008 guidance taking into account our assessment of the market and the opportunities and risks that could impact our performance***.  I'll now take you through our expectations for our sales and earnings.  First, looking at the market for our core reconstructive product categories and geographies, we enter 2008 with positive momentum and underlying market demand for orthopedic devices.  When all Company reports are in for 2007, we expect the results will indicate that the global reconstructive market grew in the range of 8 to 10%.  We continue to believe this reflects mid single digit growth and procedures with the balance due to mix and flat to modest price improvements.  We anticipate similar market dynamics in 2008 and slightly higher market growth rates for spine, trauma, dental, and extremities consistent with recent trends.  ***Our outlook calls for top line growth for the year of 10 to 11% net sales on a reported basis and adjusted earnings per share of $4.20 to $4.25***.  Sales will be driven by ***new product introductions*** and further market penetration by key products launched in 2007, as well as the positive effect of a weaker U.S. dollar abroad . . . .
>
>                    \*          \*          \*
>
>**Jim Crines – Zimmer Holdings, Inc. – EVP-Fin., CFO**
>
>                    \*          \*          \*
>
>        ***As David mentioned, after reviewing market dynamics and our relative opportunities and risk we expect to deliver 10 to 11% top line sales growth in 2008 and adjusted earnings per share in a range of $4.20 to $4.25***.

        104.    Following defendants' false guidance, they continued to mislead investors in response

to analyst questions as follows:

>**Bob Hopkins – Lehman Brothers – Analyst**
>
>        Okay, and then finally just to be clear on the philosophy around guidance, I think you were pretty clear on this but ***these are not aspirational goals, these are things that you expect to meet or exceed; is that correct***?
>
>**David Dvorak – Zimmer Holdings, Inc. – President, CEO**
>
>        ***That is correct***.

Page

\*       \*       \*

**Matt Miksik – Morgan Stanley – Analyst**

Okay, and then just one last question, just in the past couple of quarters, I think it's fair to say that it sounds and looks like you've learned some lessons in terms of forecasting and providing guidance and perhaps managing the business as well.  I just wanted to ask if there's anything that you see yourself doing differently over the next, as you talk about your quarter and your guidance today or going forward, based on what you've learned say in the last nine months?

**David Dvorak – Zimmer Holdings, Inc. – President, CEO**

Well, Matt, *we obviously went through an extremely methodical process to put our 2008 plan together.  We described that process broadly to people that we've met with and really all of that hard work puts us in a great position and provides us with nice momentum coming out of the fourth quarter*, so we're anxious to execute on these plans and optimistic that the we're going to have a good year in 2008.

\*       \*       \*

**Joanne Wuensch – BMO Capital Markets – Analyst**

Okay and this question has been sort of asked a couple of different ways but I want to really get my arms around it which is that in the second quarter, the Company met expectations and then guided lower and in the third quarter they met expectations and guided lower and now in the fourth quarter you beat expectations and guided in line with the Street.  *If you had to say what happened between the last conference call and this conference call, could you just put a couple of items that [] may give you some increased confidence in the way [] the financial guidance is being provided*?  Thank you.

**Jim Crines – Zimmer Holdings, Inc. – EVP-Fin., CFO**

*Sure, as David explains, we've had the opportunity to go through a very detailed review of our business unit and corporate operating plans*, we're very pleased frankly with the performance in the fourth quarter relative to our earlier expectations.  We see our supply chain and our sales and distribution networks responding to the increase that we're seeing in demand across the quarter.  *That together with the process that we went through gives us the confidence that we have going into 2008 that we will meet or exceed the financial targets that we've set for ourselves*.

\*       \*       \*

Page

**Bill Plovanic – Canaccord Adams – Analyst**

Great, thank you, just a few questions, clarification questions for me here. ***First of all just in terms of the double digit earnings growth '09 off of '08, is that off of the 4.20 to 4.25 guidance***?

**David Dvorak – Zimmer Holdings, Inc. – President, CEO**

***That's correct.***

105.    On the same January 29, 2008 conference call, defendant Crines deliberately misled

investors when in response to a question about "market expectations for units in U.S. hips," he

pointed to "hip resurfacing growth in the U.S. hip market" as follows:

**Bruce Nudell – UBS – Analyst**

Good morning, thank you.  Could you guys provide a little more granularity with regards to your market expectations for units in U.S. hips, U.S. knees, O-U.S. hips and O-U.S. knees?  Just what kind of range you might see for hips and knees in those geographies?

**Jim Crines – Zimmer Holdings, Inc – EVP-Fin., CFO**

Yes, well, Bruce, we talk about the market in global terms and unit growth being at around mid single digits.  We have not really broken it down by geography.  It's probably a bit higher in the U.S. than it is in Europe, but again, on a global basis, we see the market continuing to grown in mid single digits and then we would have mixed to modest price improvements accounting for the balance of growth to get to a market that we see growing in 8 to 10% and understanding as well that at least with respect to the U.S., ***we do see hip resurfacing accelerating growth in the U.S. hip market***.

106.    Defendants' also affirmatively misled investors in response to direct questions

regarding quality systems and FDA observations and inspection on the same conference call as

follows:

**Matt Miksik – Morgan Stanley – Analyst**

That's helpful.  ***One question just on the regulatory front.***  One of your competitors has been hit by a couple of warning letters from the FDA over the last year or so and ***I was just wondering if you can give us any sense of maybe where you are in the cycle of inspections and over the past 12 months, where you stand with the FDA***?

*        *        *

Page

**David Dvorak – Zimmer Holdings, Inc. – President, CEO**

*We obviously have a variety of different facilities, as you know, Matt, and so as inspections are taking place on a rolling basis, Jim mentioned that we have initiatives under way to enhance further our quality systems, that's a significant priority for us as one would imagine* and we're going to continue to improve those systems as we go forward. *So it's an ongoing commitment in our area but one that we treat as a major premise to running our business.*

\*        \*        \*

**Tao Levy – Deutsche Bank – Analyst**

*All right, and you mentioned you talked about investing in compliance and systems. Do you currently have any issues with the FDA, any warning letters, that usually takes a few months for those to be posted, that they may have been issued or 483'd?*

**David Dvorak – Zimmer Holdings, Inc. – President, CEO**

*We don't have any warning letters at this point.*

107.    Defendants' statements were assimilated into the market.  For example, Deutsche Bank Securities Inc. ("Deutsche Bank") reported on January 29, 2008 that defendant's guidance "exceed[ed] both the prior consensus estimate of $4,176 million and [its] prior $4,157 million forecast.  On the bottom line, guidance calls for earnings of $4.20 to $4.25 per share versus prior consensus and DB estimates of $4.22 and $4.17, respectively . . . . [M]anagement [also] did indicate it expects to return to at least low double-digit growth [in 2009]."

108.    The next day, on January 30, 2008, Zimmer presented at the Wachovia Healthcare Conference.  At the conference, defendant Crines falsely stated:

[S]ummarizing our guidance for 2008, *we guided to top line of 10% to 11% reported growth*.  That does include about 200 basis points from currency, so it would translate into 8% to 9% constant currency growth and adjusted earnings per share of $4.20 to $4.25.  *That reflects about a 4% to 5% growth in adjusted earnings per share over 2007 and includes significant obviously incremental expenses associated with the infrastructure and operating initiatives*, as well as monitor [any] related compliance expenses.

\*        \*        \*

*Within our core franchise, we would expect to be able to achieve at least low double-digit growth in earnings going into '09* and have the opportunity to leverage some of these investments beyond 2009.

109.    Defendant Crines also misled investors when describing their hip portfolio at the same conference:

*With what we have to offer, we do have a large diameter head metal-on-metal offering [the Durom Cup].  Some of the feedback that we're getting from the field would indicate that it is a bit challenging to implant, and there are some things we can do in the way of surgical technique training that ought to help us with that level of penetration.*

*         *         *

Again, for that reason, *we have a significant portion of our R&D spending focused on maintaining and hopefully enhancing our leadership position in hip and knees across the world.*

110.    Later at the same conference, defendants continued to falsely tout their quality systems:

Just touching on the infrastructure and operating initiatives we have underway, we announced yesterday that we're looking to expand our international manufacturing capacity by about 100,000 square feet.  We are also centralizing our distribution operations in Europe.  *We are taking the opportunity, as we build out additional manufacturing capacity, to invest in and upgrade our quality systems infrastructure across all of our facilities.*  We're making some pretty significant investments directed at providing better support to our U.S. sales and distribution efforts, putting more instruments, more inventory out into the field, and also providing them with some more significant incentives particularly focused on that trauma product line.

**B.      Reasons Why Defendants' January 2008 Statements Were Knowingly Materially False and Misleading When Issued**

**1.      2008-09 Guidance Based On Quality System Deficiencies, FDA Issues and 483 Observations**

111.    The statements made by defendants on January 29 and 30, 2008 in ¶¶102-106, 108-

110 above regarding Zimmer's "quality systems" and 2008-09 guidance were each knowingly

materially false and misleading when made as evidenced by the FDA Report, defendants' own

Page

admissions in SEC filings and conference calls, and facts detailed by percipient witnesses concerning the severe deficiencies at Zimmer's Dover facility.

112.    Zimmer's Dover facility is where Zimmer manufactured 70 to 80% of patient care items used to support orthopedic surgery called OSPs, including disposables used in blood management (Pulsavac Plus, Pulsavac 2, Pulsavac 3, Hemovac Kits and Hemovac Autotransfusion System) and certain cement accessories.

113.    Zimmer's OSPs were important to Zimmer.  In 2007, Zimmer declared itself a "global leader" in OSPs.  Defendants knew that quality-related issues with OSPs would impact Zimmer's reputation in the worldwide orthopedic market because the market was dominated by only five companies sharing 97% of the market.  OSPs were also a major revenue source for Zimmer.  In 2006 and 2007, the two years prior to the Class Period (and to the OSP recalls), OSP net sales were the third-highest revenue source for Zimmer.  In 2007, OSP net sales alone (revenue from OSPs less cost associated with selling them) accounted for 6% of Zimmer's global net sales.  Seventy to eighty percent of these OSPs were manufactured at Zimmer's Dover facility.  The Dover facility also manufactured Zimmer's highest volume OSP, the Pulsavac Plus, and was the second-largest revenue-producing facility for Zimmer.  In 2007, Zimmer's OSPs accounted for $234 million in revenue and approximately 6% of the Company's total sales, as well as 6.1% of its U.S. sales.

114.    In direct contrast to defendants' representations that Zimmer's 2008 guidance reflected costs for infrastructure initiatives, including enhancements to its "quality systems," CW16, who directly communicated to defendant Dvorak, explained that defendants, including Dvorak who had oversight of the facility, had not invested in quality systems at Dover because the financial and investment targets of the Company in the OSP and other divisions were not being met.  ¶81.  CW16, who worked directly with Dvorak and Crines, explained that infrastructure at Dover was 10 to 15

Page

years behind the times (*i.e.*, antiquated) and caused embarrassment to defendant Dvorak, who had responsibility for Dover's quality systems even prior to becoming CEO (a fact corroborated by CW1).  ¶22, 81.

115.   CW2 confirms that Zimmer's approach was not to spend money correcting quality defect issues and that management meetings attended by Dvorak's direct reports, Hawkins and Carter, would have informed Dvorak of the quality defects at Dover.  ¶¶33, 35.  CW1 and CW2 detail a quality meeting held in October 2007 that discussed the declining quality trends at Dover and was attended by Quality VPs Hawkins and Carter, who reported to Dvorak.  ¶¶22, 34.  Thus, defendants were well aware that Dover was suffering from quality issues that would undermine Zimmer's guidance.

116.   Importantly, at the time of defendants' statements, they knew that the failure to invest in and maintain quality systems had already prompted Class II recalls of five OSPs manufactured at its Dover facility, three of which were a direct result of the FDA inspection. Ex. A at 9.  Defendants had also informed the FDA that as of January 7, 2008 that Zimmer's Pulsavac 2 and 3 products had been discontinued.  *Id.* at 22.  As a result of the quality deficiencies, CW1, CW9 and CW14 indicated that Dover manufacturing was shut-down.  ¶¶31, 57, 78.  Accordingly, no revenue would be generated and "a major premise" to running Zimmer's business had been compromised.  ¶106.

117.   Five days prior to January 29, 2008, defendants were aware that three OSP recalls at the Dover facility came as a direct result of an FDA investigation. Ex. A at 9.  Defendants were also well aware of observations by the FDA of "significant deficiencies" in the very infrastructure and systems that defendants told investors would drive results; deficiencies that had already resulted in "systemic failures" identified by the FDA which allowed adulterated products to be produced and released into the market.  *Id.* at 5.

118.    The FDA's inspection of Zimmer's Dover facility is documented in an FDA Report, which provides a roadmap and timeline of defendants' knowledge of the serious system defects at Zimmer's Dover facility as a result of failing to comply with regulatory requirements, and the negative consequences of those known flaws to the Company.  The FDA Report establishes that an investigation of the Dover facility commenced on January 7, 2008 with the FDA inspector present on January 7-11, January 16, January 18, January 25 and January 29.  *Id*. at 2.  The FDA Report states that at the time of the inspection Zimmer had received a total of 24 customer complaints about silicon leakage in Pulsavac Plus starting in May 2007.  *Id.* at 21.

119.    On December 18, 2007, the FDA was notified of Zimmer's plan to recall its Pulsavac Plus product, ***the highest production volume product at Dover (according to the FDA and CW1) due to leakage of silicone***.  *Id.* at 19.  The FDA inspector discovered that silicon leakage in Pulsavac Plus was due to "too much silicone applied during assembly."  *Id.* at 21.  The inspector also discovered that this process was not automated, but was in fact a manual step.  *Id.* at 21, 31.  In other words, an antiquated process.

120.    The same day the investigation began, January 7, 2008, defendants halted production of its Pulsavac 2 and Pulsavac 3 products, products also "with [a] manual silicone application process."  *Id.* at 22.  Zimmer had received 19 complaints on Pulsavac 2 for silicon staining, similar to that of the Pulsavac Plus, since January 2004.  It was not until the FDA's inquiry, however, that Zimmer halted production and ceased distribution of Pulsavac 2 and 3.  Thereafter, on January 24, 2008, five days before defendants' first misleading statements, the Pulsavac Plus recall was expanded to include Pulsavac 2 and 3 and the FDA was informed that Zimmer had decided to "to discontinue production of the Pulsavac 2 and 3" altogether.  *Id.*

121.    These recalls were classified as an FDA Class II recall which includes products which may cause temporary or medically reversible *adverse health consequences* (21 C.F.R. §7.3(2)) and were in the wake of the FDA's observation that Zimmer's initial recall in 2007 of its Pulsavac Plus product was incomplete and inadequate.  *Id.* at 22.  The recalls removed from the market more than 800,000 Pulsavac products and since production was discontinued, defendants knew that no sales or revenue would be generated for Zimmer by these products.  ¶121.  Further still, Zimmer, as acknowledged by Dvorak on the January 29, 2008 conference call, would lose customers to competitors as a result of quality defects.  On January 23, 2008, Zimmer notified its customers by letter of the recall of Pulsavac Plus.  Thus, defendants were aware of the loss of customers as a result of the quality deficiencies.

122.    CW1, the top QA person at Dover, explained that it was Zimmer's corporate office that made the decision to initially remove the Pulsavac Plus in late 2007 and who assembled an unprecedented team to "handle" the resulting FDA Dover audit.  ¶24.  CW1, who was a percipient witness to the very FDA issues defendants denied on the January 29, 2008 conference call, indicated that it was very clear that Zimmer would receive 483 observations if not a warning letter after the week-long audit at Dover.  ¶25.  CW1 also stated that *Dvorak was updated at least every other day* on the status of the FDA inspection once it commenced on January 7, 2008.  ¶27.  Further, *Dvorak had a live feed to his office computer of transcribed communications between the FDA inspector and Zimmer's employees present at the Dover facility* (¶27), a practice confirmed by CW2.  ¶37. Others in the corporate office, including VP of Quality Carter, Hawkins, Miller and Parker (when not at the Dover audit) had the same live feed.  ¶27.

123.    The FDA inspector, Mary Storch, corroborated CW1's recollection (¶25) that 483 observations were made the first week of the Dover inspection.  Ms. Storch explained during the

**Page**

course of plaintiffs' investigation that FDA inspectors are instructed to communicate observations,

areas of concern and infractions as soon as they are observed and not to wait until the end of an

inspection.  The FDA inspector's practice is confirmed by the FDA Investigations Operations

Manual §5.2.3 which provides that:

> Regardless of whether an establishment's FDA 483 is annotated,
> *investigators and analysts should make every reasonable effort to discuss all*
> *observations with the management of the establishment as they are observed, or on*
> *a daily basis, to minimize surprises, errors, and misunderstanding when the FDA*
> *483 is issued*.  This discussion should include those observations, which may be
> written on the FDA 483 and those that will only be discussed with the management
> during the closeout meetings.

124.    The FDA Report also established that on January 11, 2008, Zimmer notified the FDA,

for the first time, that on December 6, 2006, it had recalled two lots of its Hemovac Kit.  Ex. A at 11.

The recall was also classified as a Class II recall because Zimmer's defective product could cause

adverse health consequences.  A FDA Form 483 observation was also issued as a result of Zimmer's

failure to timely notify the FDA of this recall until January 2008 – more than 13 months after its

initiation.  *Id*. at 11.

125.    As a result of the FDA inspection, less than two weeks later, on January 24, 2008, the

FDA learned that Zimmer was expanding the lot numbers involved in the Hemovac Kit recall

manufactured between January 2003 and January 2007, *i.e.*, recalling even more Hemovac Kits.  *Id.*

at 10.  Management initially told the FDA that Zimmer's corporate office and the Dover facility did

not report the initial removal of the product from the field because they did not feel the risk was

great despite complaints that included nurses spraying themselves with blood.  *Id.* at 11.  The FDA,

however, disagreed and concluded that Zimmer did not have sufficient evidence to support its

decision not to report the field removal in particular because the risk involved was bodily fluid

exposure and Zimmer had previously acknowledged the risk associated with this product failure after

Page

being forced to report two MDRs related to the Hemovac Kit when hospitals had initiated Medwatch Reports prior to the recall. *Id.*[4] The Medwatch website was created by the FDA for health care professionals to submit "serious, adverse event, product quality problem or product use error."

126.    The FDA observations likely would have been even worse had Zimmer's corporate office not deliberately withheld information during the FDA's inspection.  CW1 had personally investigated and compiled a report for Zimmer's then-corporate VP of Quality regarding serious complaints about the Hemovac Kits malfunctioning years prior to the FDA inspection. ¶30.  Shortly after the report was completed, Zimmer decided not to provide the additional complaints regarding the Hemovac Kit malfunctions to the FDA.  ¶30.  CW1 learned after the FDA inspection that Zimmer's corporate office had a copy of this report at the time of the FDA inspection in January 2008 but it was not provided to the FDA inspector.  ¶30.  The deliberate act of withholding this report highlights defendants' deception and knowledge that the FDA had serious concerns with its quality systems, which would have been exacerbated had the FDA inspector been provided complete information.

127.    The FDA Report also established a recall of the Hemovac Autotransfusion System as a result of the FDA inspection.  Between April 2005 and December 2006, Zimmer had received complaints regarding holes in the sterile packing for Hemovac Autotransfusion System. Ex. A at 17. Zimmer had investigated the problem and had established that "to prevent the problem the firm needed to adjust the design of the device to prevent damage from occurring to the packaging." *Id.* at 20.  However, the inspector observed that "even with the problem identified and a planned correction

---

[4]      An "MDR" is a Medical Device Report.  By law, a manufacturer must report an MDR within 30 days after they became aware that a device "may have caused or contributed" to a death or serious injury, or a malfunction that would likely cause or contribute to a death or serious injury.  21 C.F.R. §803.3.

Page

[Zimmer] continued to manufacture the device under the problematic design and still took no additional steps to control or monitor the process to alleviate the potential for sterility compromise as a result of damaged product" and that "[p]rior to the [FDA] inspection [Zimmer] had not conducted a risk assessment or health hazard evaluation . . . . " *Id.* at 20-21. During the FDA inspection, Zimmer acknowledged "***the trend*** pointing to compromised packaging." *Id.* at 21. After agreeing with the FDA inspector's assessment, Zimmer "initiated a recall of all lots manufactured between 10/1/2003 and 8/21/2006 ***prior to the close of the inspection***." *Id.*

128.    Significantly, contrary to defendants' representations about Zimmer's "Quality Systems" and investment in infrastructure to drive results, the FDA Report also documents the FDA's findings of "significant deficiencies" in Zimmer's Corrective and Preventive Action System ("CAPA") which resulted in systemic failures related to capturing trends of device failures and/or defects. *Id.* at 51. As a result, the FDA observed that Zimmer products, including the Pulsavac and Hemovac products, continued to be produced and released when they should not have been. *Id.* at 5.

129.    Zimmer's CAPA is governed by the Code of Federal Regulations and requires Zimmer to establish and maintain sufficient procedures to capture trends and document its activities (which it failed to do or in the case of the Hemovac Kit, deliberately hid). 20 C.F.R. §820.100. Further, the Code of Federal Regulations puts the burden on management with executive responsibility to ensure that such procedures are effectively implemented and maintained. 20 C.F.R. §820.20. Thus, defendants cannot disavow responsibility for these "significant deficiencies."

130.    Defendants also knew, as acknowledged in Zimmer's 2007 Form 10-K, that the failure to maintain quality systems as required by the FDA (21 C.F.R. §8.20) may result in recalls (which they had already undertaken and notified the FDA of as of January 24, 2008), and the suspension of production (which had already occurred for the Pulsavac products). Defendants also

Page

acknowledged in Zimmer's 2007 Form 10-K that recalls and product suspensions could have a "material adverse effect on our business, financial condition and results of operation." These events **had occurred** as of January 29, 2008 and yet they kept this material information from investors and misled investors by telling them that their guidance reflected infrastructure costs, including "enhancements to quality systems" and that further initiatives to "enhance quality systems" were underway and a major part of running Zimmer's business.

131.    Defendants having recalled and made the decision to shut down the manufacturing of Zimmer's Pulsavac products and expand the recall of the Hemovac Kits and Pulsavac at Dover facility no later than January 24, 2008, knew when they issued Zimmer's 2008 guidance on January 29, 2008 as well as in subsequent statements to investors regarding Zimmer's financial condition and operations that: (1) no revenue would be generated from the sales of its Pulsavac products or Hemovac Kits at Dover since they had been recalled, and production halted; (2) Zimmer's expenses would increase as a result of having to update the antiquated quality systems at Dover and recall Zimmer's defective products; and (3) they would lose customers to other suppliers of OSPs who could fulfill the orders and did not have defective products. Thus, defendants' affirmations that they were committed to "quality systems" and guidance of double-digit growth for 2008 and EPS of $4.20 to $4.25 was knowingly false when issued.

132.    Percipient witnesses corroborate the FDA Report and confirm defendants' knowledge of the deficiencies in Zimmer's quality systems and of FDA issues, including the FDA inspection and 483 observations. As discussed above, defendants' conduct indicates that they were very concerned about the FDA inspection at Dover. CW1, who was the top QA person at Dover and interfaced with the FDA inspector and audit team from corporate headquarters during the inspection, detailed that after receiving one week's notice of the FDA inspection, an unprecedented team was

assembled by Zimmer's corporate headquarters led by Andrew Parker (Manager of Global Audits and Certifications from Zimmer's headquarters, according to the FDA Report).  ¶24.  The corporate team coached employees at Dover on what to say to the FDA auditor.  ¶24.

133.    Dvorak was apprised at least every other day of the status of the FDA inspection, in addition to having transcripts of communications with the FDA inspector accessible by live feed at his computer.  ¶¶26, 27.  This included the FDA inspector's communications with CW1 and others ***notifying the Company that it would be receiving 483 observations as issues were noted by the inspector***.  ¶¶25, 123.  Further, it was clear after a week-long audit that 483s were to be issued and thus Zimmer knew that it would be receiving 483s from the FDA prior to the closeout meeting (held on January 29, 2008 according to the FDA Report).  ¶25.  The only week-long audit noted by the FDA Report is January 7-11, 2008.  Ex. A at 2.

134.    In addition to the unequivocal language used by the FDA to describe Zimmer's quality lapses (*e.g.*, "once the decision was made to submit complaints involving a blood exposure [the FDA inspector] did not see how [Zimmer] could not justify continuing with that same rational[e] with subsequent complaints") (*id.* at 14), CW10, a former Zimmer Director of Quality Assurance at Zimmer's headquarters, explained that 483s are very serious because they constituted federal agents identifying lapses in quality systems that resulted in the company putting faulty or adulterated products in the marketplace.  ¶65.  CW10's account is corroborated by the FDA Investigations Operations Manual §5.2.3 which clearly states that 483 observations are issued by the FDA for ***"significant objectionable conditions"*** – in this case because products had been adulterated and were injurious to the health of others.  The deficiencies in Dover's quality systems were so bad that Dvorak feared warning letters.  ¶¶16, 81.

Page

135. CW16 who worked directly with defendant Dvorak explained that Dvorak hired a specialist from Abbott Laboratories to deal with the FDA in early 2008 in order to avoid expected warning letters. ¶81.

136. CW14, a former Corporate VP of Regulatory Affairs, confirmed knowledge of issues with the Pulsavac Plus and the wound debridement system (*i.e.*, the Hemovac Kit) at the corporate level, including Dvorak's knowledge of significant issues with the quality systems at Dover at the time of the FDA investigation and the recommendation that its quality department at Dover be shut down, a recommendation with which Dvorak agreed. ¶78. CW1 and CW9 also indicated that the Dover facility was shut down. ¶31, 57.

137. CW3 corroborated CW1's and CW2's accounts that Zimmer's corporate office was directly involved in the recall of the Pulsavac Plus prior to his departure in mid-January 2008 and stated that the recall involved a large volume of product – more than 800,000 units. ¶40. CW3 further confirmed that defendant Dvorak was well aware of the recall because the Zimmer personnel handling the matter reported directly to Dvorak. ¶40.

138. Witnesses also confirm that defendants knew of defect or failure trends with products at Dover. CW2 explains that defendant Dvorak was aware of the defective products at Dover as a result of management meetings attended by at least two of defendant Dvorak's direct reports where defect trends at Dover were discussed. ¶40. Indeed, CW2 personally attended a management meeting where internal metrics depicted increasing defect trends at Dover over a two year period prior to January 29, 2008. Dvorak's direct reports Hawkins and Carter also attended these meetings, including a meeting shortly after Carter joined in 2007 attended by CW1 and CW2 where Dover's quality defects were discussed. ¶¶20, 33.

Page

139.    CW10, a Director of Quality Assurance at Zimmer Corporate, also corroborates CW2's description of management review meetings where quality issues and trends were discussed. ¶64.  CW6, moreover, explains that defective product trends were tracked at Zimmer by the recording of all defective products opened during a surgery. ¶51.  CW8 confirms that product failure information was tracked by a computer program. ¶54.  Thus, the tracking system at Zimmer also would have informed defendants of the defects in Zimmer's products.

140.    Defendants also knew of the negative consequences of the quality defects at Dover because the defective products were hurting Zimmer's ability to generate revenue across the country. CW20 confirmed that defendants received daily sales reports on OSPs each morning.  ¶97.  These daily sales reports which informed defendants that no sales were being generated by the halted products.  Further, CWs who were personally involved in the sale process of these products explain that the products were unavailable for sale.  Five different witnesses who worked with Dover's distributors to sell OSP products learned of the unavailability of Zimmer's OSPs to generate revenue and earnings.

141.    CW4 witnessed that beginning in approximately October 2007, OSPs were placed on backorder and that by December 2007, approximately two months before the conference call and at the time the FDA Report a large number of products were placed on backorder with an indefinite in-stock date.  ¶¶43, 44.  CW1 explained that while the paperwork was being compiled for the Pulsavac Plus recall, it would have appeared to distributors on the computer system as a backorder.  ¶43.

142.    CW5 corroborates CW4's accounts.  CW5, who was hired in February 2008 and who processed orders for OSPs, explained that at the time he joined, OSPs from the Dover facility were already on backorder.  ¶46.  He understood from his supervisor that products at Dover had been contaminated and that OSPs were not available to customers.  ¶47.  CW5 later was informed in the

Page

March/April 2008 timeframe that production had been halted altogether at Dover.  ¶47.  Consistent with other witness accounts, CW5 described that when he first started his position in February 2008, he was told by his supervisor that the products at the Dover facility had been contaminated so they were not available to customers.  ¶46.

143.    CW6 learned that OSPs from Dover were on backorder in roughly January/February 2008.  ¶48.  Likewise, CW7 was advised of problems with OSPs at Dover in February 2008 when a class he was scheduled to attend in March 2008 related to OSPs was canceled.  ¶53.  CW9, a sales representative, also learned in the January/February 2008 timeframe of the sterilization issues at Dover and the FDA inspection as well as the backorder of the Dover OSPs.  ¶57.  CW9 would later be informed in February/March 2008 that there had been a recall of the Dover OSPs and the temporary shutdown of the facility.  ¶57.  The OSPs recall resulted in the decrease of OSPs monthly sales by 30-50%.  ¶57.  These witnesses' descriptions of the events at Zimmer demonstrate the widespread internal knowledge of Zimmer's issues with defective OSPs at Dover and resulting halt in sales, facts that defendants deliberately concealed from investors.

144.    Defendants also knew that OSPs' reported growth would be adversely affected and, in fact, negative for 2008 as a result of declining trends and sales reports they received each morning. ¶97.  The chart below highlights the alarming decline in growth defendants would report as a result of the quality deficiencies known at the time of their January statements:

| OSPs' Growth 2007 v. 2008. | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Fiscal Year Ending December 2007 | | | | | Fiscal Year Ending December 2008 | | | | |
| | Q1 | Q2 | Q3 | Q4 | Year | Q1 | Q2 | Q3 | Q4 | Year |
| Other Surgical/OSP | 41.1% | 47.4% | 43.3% | 49.2% | 45.3% | 2.8% | (15.4%) | (14.6%) | (18.4%) | (11.6%) |

145.    Defendant Dvorak also acknowledged on the January 29, 2008 conference call the obvious, that in absence of illegal kickbacks, "healthcare professionals are making decisions with respect to products and the best interest of their patients" and that "the quality of products" is what is

Page

the "basis for competition on a go forward basis."  Thus, the absence of quality OSPs at Dover

would serve as a competitive disadvantage and result in lost market share.

146.    In addition to the FDA Report and witness accounts, Dvorak belatedly admitted on

April 24, 2008 conference call that defendants knew prior to their false statements on January 29 and

30, 2008 that there had been an FDA inspection and observations:

> Let me walk through a little bit more with a little bit more detail, Mike, the
> events that occurred.  *As you said we had a recall in December*.  There were *other
> recalls subsequent to that event* and as we were rescoping those issues we got deeper
> and deeper and became more and more concerned with some of the fundamental
> quality systems there, ultimately leading to the decision [that] we announced earlier
> this month.  Included in that time period was, *as you know any time you make a
> recall there's likely to be an FDA inspection.  There was an inspection.  There
> were some observations*.

147.    These admissions were echoed at a May 6, 2008 Deutsche Bank Health Care

conference by defendant Crines, who admitted that the FDA made "observations" that "caused

[Zimmer] some concern" when it audited the Dover facility and that the FDA inspection at Dover in

1Q08 was focused on quality systems – the very quality systems that defendants claimed were a

major premise to running Zimmer's business and that defendants had undertaken initiatives to

further enhance in statements to investors in January.

148.    Indeed, analysts at Credit Suisse openly questioned on April 2, 2008 the failure to

disclose the quality problems at Dover in January: "On its quarterly conf call in Jan, when asked

whether it had any FDA warning letters or 483 observations, ZMH commented there were no

warning letters, but did not comment on 483s.  The recall suggests the possibility of a 483 . . . ."

149.    Defendants' revelation on April 3, 2008 that the defective quality systems at Dover

would adversely impact 2008 OSPs revenues by $70 to $80 million and on April 24, 2008 that

Zimmer's 2008 EPS would take an $0.18 to $0.20 hit as a result of the issues at Dover and that the

OSPs situation had "a negative financial impact . . . as a result of lost sales, inventory losses and

remediation costs. . . ." supposedly to be offset by share repurchases, reductions in expenses and other actions are further evidence of defendants' fraudulent scheme. Dover's quality deficiencies, recalls and product halts had occurred ***prior to*** defendants' guidance, affirmations of quality systems that would "generate returns" and misleading responses to analysts' questions directly on point.

150.    In short, the FDA Report, accounts of confidential witnesses and defendants' own belated admissions demonstrate that, contrary to defendants' representations, Zimmer's guidance announced on January 29, 2008 was knowingly false and misleading – it did not take into account the costs related to defective quality systems at Zimmer's Dover facility which had been deliberately neglected by defendant Dvorak, the costly recalls of the Pulsavac and Hemovac products, the substantial halt in loss of revenue from the production of its highest volume OSP and the expenses associated with updating the systems and maintaining an idle plant. Defendants' investment infrastructure was not going to translate into results and growth. Instead, defendants' failure to spend the monies to maintain quality systems resulted in substantial lost revenue and customers, lower earnings and increased costs.

### 2.    Guidance Impaired By Durom Cup Defects

151.    In addition to the costly quality problem at Dover, defendants' 2008-2009 guidance at ¶¶102-105, 108 was materially false and misleading because defendants knew, months prior to the issuance of Zimmer's statements, of severe problems with the Durom Cup, which would decrease growth, sales and market share as well as increase expenses. Defendants' statements in January that Zimmer's U.S. metal-on-metal hip resurfacing product, the Durom Cup, was "a bit challenging to implant," "there are "some things we can do in the way of surgical technique training" to penetrate market share and that resurfacing would accelerate growth in U.S. hips were also materially false and misleading in light of these known problems.

**Page**

152.    In short, defendants knew: (1) that several surgeons, including one of the most prominent in the industry who collaborated in the creation of the Zimmer Durom Cup product, and who defendants cited to as Durom Cup's Clinical Technology Reference in materials provided to U.S. surgeons, had expressed serious warnings regarding the Durom Cup, including concerns regarding patient suffering and injury requiring an unusually high rate of revision surgeries (*see* ¶¶157, 160, 166, 167); (2) that no clinical trials of the U.S. Durom Cup had been performed and thus, negative trends observed by high-volume surgeons were alarming; (3) of prior negative surgeon experience in France with the Durom Cup in 2007 when it was repositioned (a technique typical of U.S. surgeons and permitted under Zimmer's then surgical guidelines) and ***their internal conclusion that the cup could not be repositioned***; and (4) of multiple other surgeons' negative experiences with loosening of the Durom Cup as a result of adverse events filed with the FDA as detailed in ¶182.

153.    Zimmer's Durom Cup was approved in the U.S. in 2006 for hip replacement procedures and was touted by Zimmer as the only metal-on-metal offering that is forged, not cast, with a high carbon content producing a smoother, harder surface that could lead to less wear and greater implant longevity; its pure titanium coating is intended for secure cementless fixation to a hip socket's skeleton.  Zimmer purchased the Durom Cup from Centerpulse (formerly Sulzer) who CW11 explains designed the product in collaboration with prominent surgeon, Dr. Dorr.  ¶66.

154.    The Durom Cup was one of Zimmer's reconstructive products, which Dvorak in his January 30, 2008 statement, characterized as a core business.  These products " produc[ed] highest operating profit margins among [Zimmer's] products accounting for approximately 84% of 2007 sales."  Zimmer sold more than $629 million worth of hip products in 2007.  These sales included tens of millions of dollars in sales of the Durom Cup.

155.    The Durom Cup was a key product for Zimmer because it was the foundation for a hip resurfacing system for which Zimmer was planning to seek FDA approval for use in the U.S. in order to tap into a $400 million U.S. market.  ¶175(e).  In 2007, Zimmer was No. 1 in the U.S. hip market with a 27% market share.  However, Zimmer was in danger of loosing its market share because it was at a competitive disadvantage.  The lack of a hip resurfacing product in the United States was noted by analysts at Bear Stearns on July 26, 2007 as the reason why Zimmer's growth in the hip market was below average and reflected the importance of FDA approval of a hip resurfacing product for Zimmer in the U.S.  Indeed, Zimmer conceded it "losing procedures to resurfacing" on its 3Q07 conference call.

156.    Zimmer told investors in its 2006 Annual Report that the Company had the "entire package of what surgeons, patients, and hospitals need, both today and in the future," explaining that "[s]urgeons know Zimmer as the company putting 'Confidence in your hands' by [its] educational initiatives focusing on skills and knowledge. . . ."  Zimmer went on to brand itself in its 2007 Annual Report filed on February 29, 2008 as "Zimmer – Enhancing lives."  Indeed, Zimmer told investors that the focus on "enhancing patients' lives is the foundation for [its] business."  Defendants, however, were informed months, if not a year, prior to their January 2008 statements that the Durom Cup had significant flaws and that the Durom Cup was not "enhancing lives" but crippling patients.

157.    Dr. Dorr, who has considerable prestige and influence over other surgeons, expressed concerns to Zimmer that an abnormal number of patients upon whom he had performed surgeries required additional hip replacement surgeries due to serious pain following a Durom Cup hip implant.  Ex. E.  Dr. Dorr has conducted more than 5,000 hip replacement surgeries which cost $30,000 to $40,000 a procedure; he is considered by some to be the surgeon most knowledgeable about hips, the father of aristopholy and is described as understanding more about hips than most

Page

surgeons and one of the best orthopedic surgeons. Ex. E. CW12 explained that Dr. Dorr's surgeries were used by Zimmer to train other surgeons. ¶71. Dr. Dorr, along with a colleague, is reported to have more articles published on the clinical use of modern metal-on-metal hip implants than any other surgeon/researcher. Zimmer itself cites Dr. Dorr's articles in its Clinical Technology References for the use of the Durom Cup. *See* Ex. B.

158. Defendants knew from prior experience that the Durom Cup warnings by Dr. Dorr were serious and, at a minimum, warranted an immediate investigation, a step defendants did not take until the warnings were public ***more than a year later***. Zimmer had purchased the product (and the division that created it) from Centerpulse. Both Centerpulse (formerly Sulzer) and Dr. Dorr had a well-known experience with a defective hip product that resulted in billion dollars paid in product liability claims against Sulzer who nearly went bankrupt as a result of the defective cup. Defendant Crines was well-aware of this problem as he referenced it on a May 6, 2008 conference call as described in ¶205.

159. In the case of the Sulzer cup, Dr. Dorr had complained to the president of Sulzer that he was experiencing loose cups. Sulzer tried to keep Dr. Dorr's complaints from others and blamed inexperienced doctors. Internal documents produced in litigation showed that Sulzer's concern for market share was a driving force for keeping the product on the market. Indeed, Sulzer did not file adverse event reports with the FDA until 10 days before they recalled the product. Defendants knew it would sound remarkably similar to other orthopedic surgeons who saw their reputations harmed when they had implanted the Sulzer cup while Sulzer was "investigating" complaints. When Dr. Dorr wrote the AAHKS about the catastrophic failure rate he experienced with the Durom Cup, he explained that he "went through a similar scenario with the Sulzer cup failures where I was the only

Page

one experiencing revisions at the beginning and basically it was assumed that it was our technique.  I can assure you that [the Durom Cup] goes beyond technique."  Ex. F.

160.    Here, defendants did not even begin an investigation until after Dr. Dorr's April 22, 2008 letter to the AAHKS warnings of defects with the Durom Cup was leaked by analysts.  Dr. Dorr, fed up with Zimmer's non-action in response to his warnings, wrote to AAHKS members describing his and other surgeons' negative experiences with the Durom Cup, stating that ten revisions in 165 hips had been conducted and identified four additional hips that needed to be revised as a result of Zimmer's Durom Cup.  Ex. F.  The letter details that:

(a)    The fixation surface on the cups was not good and that there was a circular cutting surface on the periphery of the cup that prevents the cup from fully "seating;"

(b)    Based on his experience with Sulzer cup failures, he had learned his lesson in not informing everyone of the magnitude of failures with a device and that it was his obligation to inform everyone of the failures with the Durom Cup; and

(c)    Dr. Dorr further informed his fellow surgeons that Zimmer had been notified as well as the FDA of his experiences.

161.    Dr. Dorr's experience underscores the importance of his observations.  Most surgeons had not performed the number of surgeries that Dr. Dorr had performed with the Durom Cup (165) in the short period it had been on the U.S. market and thus were not in a position to observe the defective trends that Dr. Dorr had.  As CW17 details, Dr. Dorr performed more than 100 hip surgeries a year, when the majority of surgeons conduct less than 12; and thus Dr. Dorr was in a unique position to observe and warn of trends.  ¶86.  Defendants, however, ignored his warnings of unusually high revision rates to gain market share it was losing to competitors and generate growth as well as earnings.

Page

162.     Upon revelation of Dr. Dorr's warnings, analysts at Deutsche Bank on May 4, 2008 noted the importance of Dr. Dorr's complaints (which defendants had ignored) and influence on other surgeons' use of the cup: "In our opinion, Dr. Dorr's comments will sway some surgeons away from Durom. *While it's possible the problems are technique related, this may be irrelevant in terms of usage of Durom, again due to Dr. Dorr's influence.*"

163.     Deutsche Bank's observation was corroborated by a July 21, 2008 Credit Suisse report which provided summary results of U.S. surgeons that had experience with the Durom Cup: of 61 surgeons who responded, only six had not heard of Dr. Dorr's letter and more than half (33) had stopped using the Durom Cup. *Seventeen of the surgeons indicated they stopped because they had heard of Dr. Dorr's letter; 18 had stopped because of their own experience with the Durom Cup and four had stopped after hearing of other surgeons' experiences.*

164.     On July 29, 2008, *The New York Times* published an article entitled "The Evidence Gap: A Call for a Warning System on Artificial Joints," which explains Dr. Dorr's prior warnings to Zimmer:

> Dr. Lawrence Dorr, a nationally known orthopedic surgeon in Los Angeles, realized last year that something was very wrong with some of his patients.
>
> Months after routine hip replacements, patients who had expected to live without pain were in agony. "The pain was grabbing me around the back," said Stephen Csengeri, who is 54, and a lawyer from Torrance, Calif.
>
> Dr. Dorr found he had implanted the same metal hip socket in each patient. Several needed surgery again – a replacement for their replacement.
>
> *The doctor first told the device's manufacturer, Zimmer Holdings, last year about his concerns but nothing happened. Then in April, Dr. Dorr, who was a highly paid consultant for Zimmer, sounded an alarm to colleagues in a professional association and soon heard back from doctors with similar experiences.*
>
> "I saw one of Zimmer's engineers at a meeting, and I told her that you should pull this cup because you are crippling patients," Dr. Dorr said.

165.   Dr. Dorr's failure rate encountered with the Durom Cup was not due to chance.  His sample size (165 patients) is more than triple the sample size used in reported clinical results of the Durom Hip Resurfacing product (52 patients).  Moreover, it was nearly the sample size of the entire Swedish registry (200 patients) which defendants would try to point to as demonstrating good clinical results (even though a different version of the product was used in Europe) in May 2008, when news leaked of Dr. Dorrs's warnings.  ¶204.  Further, Dr. Dorr was not the only surgeon to report unusual failure rates.

166.   Dr. Long (Dr. Dorr's colleague) reported to the Arthritis Institute at the end of 2007 that he had encountered a 5% revision rate of the Durom Cup within one year, compared to Biomet's Birmingham cup which had less than a 1% revision rate.  He further reported that he told Zimmer in 2007 to redesign the Durom metal-on-metal cup as a result of his experiences with the hemisphere shape and to add hydroxyapatite to its surface because of the pain caused to patients and the high revision rate.

167.   Another high-volume orthopedic surgeon, CW19, explains that in 2007 he repeatedly inquired from Zimmer if any other surgeons were encountering problems with the Durom Cup and despite their knowledge of both Drs. Dorr and Long's warnings regarding defects with the Cup, defendants tried to conceal the flaws with the Cup by denying that any surgeon was encountering any problems with the cup.  ¶93.  CW19 implanted more than 78 Durom Cups prior to the Class Period and would revise at least 26 of the Cups, an alarming failure rate.  ¶92.

168.   CW19 continued to observe tell-tale signs of a problem and would learn in 2007 through his communications with Dr. Dorr, that in fact other surgeons were encountering problems with the Durom Cup and Zimmer was taking no action.  ¶94.  CW19 explained that the Cup did not fixate to the bone and that this observation indicated something was wrong with the Cup.  ¶95.  The

same observation which Drs. Dorr and Long had made and brought to Zimmer, and an observation

which Zimmer sales representatives present during the revision surgery according to multiple

witnesses (CW4, CW6, CW8, CW9, and CW12) would also note and report in Zimmer's device

tracking system.  ¶¶43, 50, 55, 56, 71.

169.     CW19 decided to discontinue use of the Durom Cup in January 2008 after he

discovered he had been lied to by Zimmer.  ¶92.  Subsequently, he was told by Erin Johnson, VP of

Research, and Brian Parker, Senior Product Manager, that no clinical study had been performed of

the U.S. Durom Cup.  At that point, CW19 decided he would not implant any Zimmer products as he

did not trust the Company, and his reputation was at stake.   ¶96.  According to CW19, not

performing a clinical trial of the U.S. Durom Cup was like giving a loaded gun to a baby.

170.     More surgeons warned the Company about the Durom Cup.  Analysts at Cowen and

Company would report on June 25, 2008:

> Our HVC [high-volume consultant-surgeon who has implanted a "couple
> hundred" Durom Cups over the past two years], who is also a Zimmer consultant,
> *relayed certain concerns he had about the Durom cup to the company early in*
> *Durom's launch*, as he foresaw certain characteristics as being potentially
> problematic.   These challenges included an "unfamiliar and uneven" 165°
> circumference (most cups are 180°) and that the rim is labeled as being 58mm, when
> it is really 61mm around the rim (need to ream to 58-59°).  Without prompting,
> *Zimmer management acknowledged that some of these unique product*
> *"attributes" could play a role in challenges with Durom*.

171.     In an interview set forth in a May 18, 2008 Deutsche Bank report, Dr. John Maltry,

another high-volume surgeon who was a Zimmer consultant, would explain his experience with

Durom Cup defects, and the importance of Dr. Dorr's complaints and the unusual revision rate with

the product.  He explained he had observed the same defects as Dr. Dorr:

> My name is Dr. John Maltry and I'm in Tucson with the Tucson Orthopedic Institute.
> I am starting my 16th year and all I do is hip and knee replacements.  Our group is a
> *30-member pure orthopedic specialty group* which lends itself to people like me.
> For approximately the last 8 to 10 years I have been a consultant for Zimmer.

*       *       *

As of about three weeks ago I discontinued use of the Durom cup, since ***we have seen the same type of problems that Larry Dorr has***.  Even when the product seems to be fully implanted at time of surgery, a certain percentage of the people, lets say between 5% and 10%, have persistent pain associated with it and won't put up with it for more than about six to eight months.

Dr. Maltry elaborated in response to questions:

**Tao Levy**: With Dr. Dorr's Letter out there for a couple weeks, would you expect Durom utilization to significantly decline from your colleagues?

**John Maltry**: Certainly ***Larry Dorr is a thought leader and has a certain degree of notoriety within the orthopedic community***.  With the currently concepts meeting coming up next week, this is an issue that will be fully disseminated, if it's not already fully disseminated between hip and knee surgeons and the general orthopedic community, it will be by the end of next week.  ***I would anticipate usage of this product to drop nearly completely until the product is redesigned***.

*       *       *

**Tommy Thomas**: Sorry just to follow up.  So the cases where you've had revisions on this Durom cup, do you attribute that to the product itself or to technique and then if it is technique, could there be a spill-over effect?  Could this be going on or happening in other resurfacing problems?  It's striking that this is – I don't know if it's as challenging to implant as other hip resurfacing products or metal on metal systems.

**John Maltry**: Good, a very valid question.  ***No I believe that I've put in 6,000 or 7,000 hip replacements and had none ever fail at the rate this is.***  So from my standpoint I believe that simply speaking for me ***this is a design issue*** with this cup which then makes it getting to perform very difficult from a technical standpoint, very unpredictable.  ***Therefore, if you had to ask me to question technique versus design, my simple opinion would be design***, and therefore not spilling over into any of the other products from any other company that might have this same type of thought process.

*       *       *

**Tommy Tomas**: Yeah, I just wanted to go through the numbers with you again.  So you said 5% to 10% of your hip procedures use this.  What's the cumulative number that you've put inside and how many of those are you replacing?

**John Maltry**: I have installed approximately 67 of the Durom acetabular components that you speak of.  To date I have revised three of those which proved to be loose.  And I think I have one more to do, so perhaps four out of 67.

Page

172.    Drs. Dorr, Long, Maltry and CW19 had installed more than 300 Durom Cups, more than 45 of which required revision surgery.  These highly experienced doctors (together performed more than 10,000 hip surgeries) were so alarmed by the unusually high revision rate that they stopped using the product.  Thus, when defendants told the market on January 2008, that its metal-on-metal offering, the Durom Cup, was "a bit challenging to implant, and there are some things we can do in the way of surgical technique training that ought to help us" to penetrate the hip market, the statement was extremely misleading and defendants knew it as Drs. Dorr and CW19 as well as other surgeons had already alerted Zimmer to the cups defects.  Instead, defendants ignored the warnings, even though no clinical trials of the cup had ever been performed, and deliberately lied to doctors and the market about the negative clinical experiences surgeons were encountering.

173.    In addition to the surgeons' accounts, four different witnesses report that defendants were well aware of serious issues with the Durom Cup months before Dr. Dorr told his AAHKS associates.  ¶¶58, 82, 84, 94.  CW11, who had more than 20 years of experience at Zimmer, including holding the position of SVP of Sales, confirms defendants' knowledge of Dr. Dorr's warnings about design problems with the Durom Cup in 2007.  ¶66.  CW16, Zimmer's former Director of Communications, explained that defendants did nothing for months after they received Dr. Dorr's warnings and only in April/May 2008 when the Durom Cup issue began to be publicized did defendants form a crisis team.  ¶82.  CW9, a sales representative, explained that as early as January 2008 he was aware that Dr. Dorr had made negative comments about the cup but was instructed that he should continue to sell the product as usual.  ¶58.  CW17, a former VP of Global Communications, also indicates that Zimmer was aware of Dr. Dorr's warnings prior to his letter in April 2008 to the AAHKS.  ¶84.

174.    CW18, who was responsible for investigating product complaints, explained that one complaint can prompt an internal investigation and the FDA requires an investigation to determine if a product is causing harm to patients (in this case crippling them), whether the complaint relates to a product defect or surgical technique.  ¶88.  CW16 and CW18 both independently explain that once Dr. Dorr's warnings leaked, a crisis team was created and charged with finding evidence to blame surgeon techniques (¶¶82, 90), not determine whether the cup was defective.  *Id.*  CW18 explains that the Company had evidence the product was in fact defective, just as Dr. Dorr had warned.  ¶80.

175.    The warnings about defects with the Durom Cup were a particular problem for defendants because they were losing market share to other competitors as a result of lack of FDA approval for a hip resurfacing system in the U.S. – the Durom Cup being the foundational component of the Company's FDA application for such a hip resurfacing system.  The severity of the warnings is highlighted by the following facts:

(a)    Wachovia Capital Market, LLC's analyst noted on October 25, 2007 that "Management comments on the [3Q07 conference] call indicate that the company was in losing procedures to resurfacing."

(b)    Zimmer's competitor, Smith & Nephew, had already received FDA approval for a hip resurfacing product and analysts at Canaccord Adams reported on July 26, 2007 that two additional Zimmer competitors, Stryker Corp. ("Stryker") and Wright Medical Group, Inc. ("Wright Medical"), were expected to be the next to enter the U.S. market with hip resurfacing products, noting that "Zimmer was far behind the pack."

(c)    CW11 explained that Smith & Nephew had seen sales grow 50% each quarter since releasing its hip resurfacing product that and the recall of the Durom Cup would have put Zimmer's hip resurfacing plan at risk.  ¶68.  CW11 personally spoke to Dvorak about talking to

Page

surgeons regarding Zimmer's products but instead, defendants continued to market and sell the Durom Cup.  ¶67.

(d)     Analysts at Credit Suisse underscored the problem on June 3, 2008, explaining that "[a] problem with the Durom cup also means a problem with bringing a hip resurfacing system to the US, which means a ***long term competitive disadvantage***."

(e)     One Canaccord Adams analyst stated on January 29, 2008: "Zimmer has mentioned that it is working to bring the Durom hip resurfacing technology to the US, as it is currently only approved in Europe.  We estimate hip resurfacing represents a significant revenue opportunity of $400M in the US hip market. For Zimmer, FDA clearance could be as early as 2009 for a complete system or as late as 2012 depending on FDA's requirement for clinical data. Management currently expects to file its PMA with OUS data (expected in 2008) with the FDA as Smith & Nephew did with its Birmingham system."

176.     As described by CW10, Zimmer was expecting pre-market approval with the FDA in April/May 2008 and Zimmer's 2008 fiscal forecast incorporated sales revenue in the U.S. from as-yet-approved hip resurfacing technology.  ¶62.  Further, Zimmer was preparing to increase production of the U.S. Durom Cup in order to meet the expected increase in sales.  *Id.*  However, when defendants issued their guidance and statements about hip growth from resurfacing, they knew approval of the hip resurfacing technology was subject to substantial risk and that Durom Cup sales would be materially lower if the truth about defects in the product and Dr. Dorr's criticism were made public.  Defendants thus concealed these problems and issued the false guidance.

177.     Less than 3 weeks after Dr. Dorr advised his fellow surgeons of negative experiences, defendants filed Zimmer's 1Q08 Form 10-Q, which indicated that they had received "reports of unusually high rate" of revision related to the Durom Cup.  ¶206.  Defendants also acknowledged

Page

publicly at a May 6, 2008 Deutsche Bank health care conference that they take the issues reported by Dr. Dorr seriously: "what we're focused on are the issues that he raises concerning his clinical experience.  And, as I said, we took that *very seriously*."  On May 29, 2008, defendants reiterated their admission in a letter to surgeons in an effort to minimize the damage done by Dr. Dorr's letter to the AAHKS that reports of the nature of Dr. Dorr's were "take[n] seriously" and that Zimmer's "foremost concern is that [it] provide safe and effective products."

178.    However, for more than a year, and not until Dr. Dorr took action to make known to other surgeons the unusually high revision rate using the Durom Cup (14 out of 165 hips), defendants ignored Dr. Dorr's warnings that the Cup should be recalled, defendants took no heed of Dr. Dorr's warnings despite his expertise for which Zimmer paid millions of dollars, and the fact that no clinical trials had been performed using the U.S. Durom Cup.  Rather than taking his clinical experiences seriously, as defendants would later admit was the appropriate course of conduct, defendants ignored the problem until Dr. Dorr made the issue public within the profession. Defendants kept the Durom Cup on the U.S. market and omitted any mention of Dr. Dorr's warnings, adverse events and faulty instructions for several reasons, including:

(a)    Zimmer's 2008 guidance depended on sales of the Durom Cup and on the sales of the as-yet-approved hip resurfacing product;  ¶¶62, 68, 99.

(b)    Knowledge that Dr. Dorr's influence on other surgeons' use of the Durom Cup would decrease sales of the product;

(c)    Knowledge that defendants would have to reduce Zimmer's 2008 EPS and double-digit net sales growth guidance as a result of the OSP issues at Dover and that they could not afford to miss their guidance for the third time since new management had taken over the Company;

(d)     Knowledge that disclosure of Dr. Dorr's adverse experiences with the Durom Cup would delay (if not prevent) FDA approval of a hip resurfacing product, rendering Zimmer's market share further behind its competitors and at a comparative disadvantage; and

(e)     Knowledge that the disclosure of the known problems with the Durom Cup would inevitably lead to the payment of expenses associated with a recall, revisions and/or product liability claims.

179.    In addition to surgeon warnings of unusually high revision rates in a product that had not been tested in a clinical trial, defendant Crines belatedly admitted at a May 6, 2008 Deutsche Bank health care conference, that *in the early part of 2007*, Zimmer was aware of problems in France with the Durom Cup and that "*[t]his is a cup that once it's seated up into the acetabulum cannot be repositioned*."  Zimmer's Durom Cup instructions in the U.S., however, did not tell surgeons this critical information and Zimmer continued to sell the product until the end of the Class Period with this knowledge.

180.    CW9 explained that the technical guide for the Durom Cup included the technique for implanting the Cup and that as a sales representative he reviewed the pamphlet with surgeons.  ¶60. CW10 confirms that Durom Cup surgical techniques were included in the information which accompanied the product as required by the FDA and that surgeon training on technique was provided by Zimmer.

181.    CW13, a former Zimmer Senior Regulatory Affairs Manager, explained that Zimmer was required to submit surgical techniques as part of its 510(k) pre-market application to the FDA, thus they were integral to the sale and marketing of the device.  ¶75.  Further, defendants acknowledged in Zimmer's 2007 Form 10-K that failure to comply with regulatory requirements, including a labeling requirement, could have material adverse effect on Zimmer.  Ex. C.  Defendants

Page

recalled the Durom Cup on July 22, 2008 citing inadequate labeling instructions – instructions they knew by Crines' admission in 2007 were inadequate.

182.    Complaints made to the FDA regarding Zimmer products called adverse event reports confirm defendants' knowledge of defects with Zimmer's hip product and confirm that defendants knew that the Durom Cup would not be generating sales and growth as they led the market to believe.[5]  By January 29, 2008, there were 18 adverse events related to the Durom Cup where the product was deemed to be loose.    Another six were reported in February.    Zimmer sales representatives, as confirmed by CW12, would have been present during Durom Cup surgeries and were aware of adverse events.  ¶73.  By the end of 2008, more that 200 adverse events as a result of the cup would be reported.

183.    Dr. Dorr along with Drs. Long, Manish Dastane, Michael J. Harris and Zhinian Wan conducted a prospective clinical study of the Durom Cup which would be reported in an article dated September 2, 2009.  The article indicates that these surgeons began implanting the cup in May 2006, following 181 patients (one died during the study for non-related reasons) who had Durom Cup hip implants from May 2006 through November 2007.  The doctors performed 29 revision surgeries wherein the patients had radiographic criteria of loosening.  They also reported that 28 of the 151 unrevised patients had radiographic impending failure.  The clinical failure rate was 23%.  The surgeons described the cup as a design failure and recommended it not be used.  They also put to rest the notion that the unusual failure rate was a product of surgical technique.

---

[5]    The adverse event data for the Durom Cup can be found at http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/search.CFM using the Brand Name "Durom."

184.    Dr. Dorr and his colleagues also noted in their clinical study that "[t]he recommended techniques [for the Durom Cup] was not described as different from any other cup (Zimmer Cup brochure)," and in discussing technique as a potential limitation to the results of the study noted that when they examined 13 of the removed Durom Cups, there was no bone attachment to the fixation surface, which in their experience meant that surface of the cup did not promote bone fixation or the Cup was not in contact with the bone.

C.    **In March and April 2008, Defendants Misled Investors by Issuing False Guidance; Announcing Zimmer's Quality System Upgrades, Subsequent Recalls and Suspension of OSPs, as Well as Challenges with the Durom Cup, Without Revealing the FDA Observations at Dover, the Known Defects with the Durom Cup or the Full Financial Impact of These Adverse Events on Zimmer**

185.    On March 18, 2008, defendants participated in a Cowen and Company Health Care Conference.  Defendants mislead the market as follows:

**Jim Crines – Zimmer Holdings – EVP Finance, CFO:**

*            *            *

We manage over 130,000 SKUs.  It's a very large and complex portfolio.  We have manufacturing and quality systems infrastructure supporting the manufacturing, and delivery, and distribution of those devices around the world, and our products are sold in over 100 countries.  And given the size and complexity to this portfolio, ***the company has recently undertaken a major investment initiative to upgrade manufacturing quality systems***, IT systems, infrastructure, investments that we believe will put this company in a position ***to take full advantage of the growth opportunities that we see in this market in the years to come***.

*            *            *

We also, ***as we look at our hip portfolio, recognize and would acknowledge that we have some challenges and opportunities.***

*            *            *

We have a large diameter head device that we have offered in the U.S. and we understand that there are some challenges, some technique challenges with that device. ***So there are some things that we need to do in terms of providing training to orthopedic surgeons and some things that we can do, as well, from a***

*development perspective, to address some design differences with respect to our device and how it matches up with competitive devices*. That's something that will take a bit longer. But certainly, the training is something that we can begin to address already in 2008.

*     *     *

We have, as we talked about on our fourth quarter call three, major priorities for 2008, the first of which is to meet or exceed our financial commitments for this year.

186.    On April 3, 2008, Zimmer issued a press release which stated:

Zimmer Holdings, Inc. . . . announced today that it has ***taken a number of actions to improve quality systems*** at its Dover, Ohio facility, which manufactures Zimmer Orthopaedic Surgical Products (OSP).

The Company ***recently conducted a review of quality systems at the Dover***, Ohio OSP facility and ***initiated voluntary product recalls*** of certain OSP products manufactured at the Dover facility that the Company has determined do not meet internal quality standards. In addition, the ***Company has voluntarily and temporarily suspended production and*** sales of certain OSP products manufactured at the Dover facility. The suspension will permit the Company to focus the OSP organization on the needed improvements to manufacturing and conduct enhanced quality training for employees.

The Company has notified the U.S. Food and Drug Administration (FDA), distributors and end-users of the recalls. These recalls do not affect the Company's core hip and knee implants business.

The OSP division produces a variety of patient care items used to support orthopaedic surgery, including disposables used in blood management, surgical wound site debridement and cement accessories. In 2007, Zimmer reported revenues from its OSP and Other product category of $234 million, less than half of which were generated by products affected by the recalls and suspension. ***These actions are expected to adversely impact 2008 OSP revenues by $70 to $80 million.*** Additional detail on the expected impact will be provided during the Company's first quarter investor conference call on April 24, 2008.

187.    Subsequently, on April 24, 2008, Zimmer issued a press release announcing its first

quarter financial results as follows:

Guidance

***The Company updated its full year 2008 sales guidance and reaffirmed its earnings guidance. Reported sales for 2008 are expected to increase by 10 to 11%***

*over the prior year*.  This sales guidance reflects a reduction in constant currency growth to 6 to 7%, countered by favorable foreign currency, now estimated at 4%. ***Full year 2008 adjusted diluted earnings per share are expected to be in the same range as previously issued guidance of $4.20 to $4.25***.  These estimates include the impact of previously announced actions at the Company's Ohio-based Orthopaedic Surgical Products operation.  These actions are expected to adversely impact 2008 adjusted diluted earnings per share by $0.18 to $0.20, including $0.07 related to inventory charges, idle plant costs and other nonrecurring expenses.  The Company expects this impact to be offset by reductions in planned operating expenses, share repurchases and other actions.

188.    Later that day, defendants held a conference call with financial analysts who covered

Zimmer.  During that call, defendants stated:

**David Dvorak – Zimmer Holdings, Inc. – President, CEO**

\*          \*          \*

We previously explained that we developed our guidance taking into account our assessment of the market and the ongoing opportunities and risks that could cause and impact our performance.  Our outlook called for top line growth for the year of 10 to 11% net sales on a reported basis.  As we indicated in our fourth quarter call, sales will be driven by new product introductions and further market penetration by key products launched in 2007 and this year, as well as the positive effect of a weaker U.S. dollar a broad.  ***Our guidance for top line growth remains in the 10 to 11% range on a reported basis***.  The previously announced impact on OSP revenues is expected to be offset by the positive effect of a weaker dollar.  ***In addition, as the year began, we projected earnings per share between $4.20- and $4.25 based on those expectations.  We've maintained that guidance today, after taking into account the negative financial impact we'll experience as a result of lost sales, inventory losses, and remediation costs in our OSP business***.  We have also now factored in the anticipated positive financial impact of a number of other planned actions that [ ] Jim will describe in [ ] detail which are expected to offer the negative impact of the OSP situation.

On our fourth quarter earnings call, Jim and I previewed a number of significant infrastructure initiatives that will position us to respond to the growing medical needs of an aging population.  Chief among these are the investments we're making to ensure that ***we maintain state-of-the-art quality systems and processes in all of our business operations globally.  Our ongoing commitment to quality*** will be unyielding as we continuously improve our quality systems.  To that end, ***our infrastructure investment plans for 2008 are in part directed at opportunities to enhance quality systems across our entire manufacturing network and to ensure the quality systems and practices in all divisions meet or exceed our standards as well as those of agencies that regulate us.  As a result of this endeavor, in the first quarter we initiated a comprehensive remediation effort at our OSP division in***

***Dover, Ohio***, including voluntary product recalls of certain OSP products, voluntary and temporary suspension of manufacturing and sales of certain products, facilities equipment and procedural upgrades, enhanced quality training for OSP employees, and appointment of a new Divisional President.  While we're clearly disappointed by the OSP situation, we believe the actions we've taken demonstrate the seriousness with which we take quality systems matters and we're keeping the FDA informed of all of our actions.

*      *      *

**Jim Crines – Zimmer Holdings, Inc. – CFO**

*      *      *

Now, I'd like to provide an update on guidance for 2008.  As reported in our press release on April 3, ***OSP related actions are expected to adversely impact 2008 OSP revenues by 70 million to $80 million.  These actions are expected to negatively impact 2008 adjusted earnings per share by $0.18 to $0.20 including $0.07 related to inventory charges, idle plant costs, and other nonrecurring expenses***.  Approximately $0.03 of the full year effect is reflected in our first quarter results.  ***We expect this impact to be offset by reductions in planned operating expenses, share repurchases, and other actions***.

189.    On the same April 24, 2008 conference call, analysts openly questioned not only the timing of defendants' disclosures but the previously undisclosed financial impact on Zimmer's earnings:

**Bob Hopkins – Lehman Brothers – Analyst**

Okay and then one other question I have and I'm just curious about the timing of things.  Obviously on the fourth quarter call, you guys gave very bullish report, a very bullish tone and yet ***when we look back at the timing of the FDA recall announcement as it relates to OSP, that was sort of in full swing as you were giving that guidance but it wasn't disclosed, and now we're hearing that it's an $0.18 to $0.20 headwind for the full year.  I'm just wondering why didn't you disclose it on the first, on that call on the fourth quarter call especially now knowing that it's going to be such a major headwind for the full year?***

**David Dvorak – Zimmer Holdings, Inc. – President, CEO**

***Yes.  We had identified a particular recall problem and acted upon that promptly and obviously, the problem was much deeper than what we knew at the time of the call***, so work was under way but the scope of that issue had not been defined as of the first quarter call, and so we've reported out on the magnitude of that issue as soon as it was defined, Bob.

**D.**   **Reasons Why Defendants' March and April 2008 Statements Were Knowingly Materially False and Misleading**

**1.**   **Guidance Based on Quality Deficiencies**

190.   The statements made by defendants in ¶¶185-189 above were each materially false and misleading when made.  As set forth in §V.B., the true facts, which were then known by defendants were that Zimmer's Dover facility had suffered massive quality systems problems identified by the FDA which materially impacted the Company's operations and financial performance, including net sales growth and EPS at the time of their January statements, and that the Company would not meet 2008 guidance reaffirmed by defendants on April 24, 2008 in the face of increased expenses and lost sales as a result of known defects with the Durom Cup reported by multiple surgeons as well as the OSPs quality defects that would not be off-set as defendants' claimed.  Further, defendants continued to mislead investors about the timing of their knowledge of the OSPs quality defects.

191.   Indeed, contrary to defendants' statements on March 18, 2008 that the Company had "undertaken a major investment initiative to upgrade manufacturing quality systems . . . to take full advantage of the growth opportunities. . .," defendants had been forced to invest in its quality systems as a result of the FDA's January 2008 inspection of Dover that resulted in 483 observations for significant deficiencies.  §B.B.1.  According to three witnesses, CW1, CW9 and CW14, production at the Dover facility was shut down as a result.  ¶¶31, 57, 78.  Defendants had failed to update the systems at Dover in order to achieve earnings and inflate guidance as well as Zimmer's stock.

192.   Crines' statement that defendants' first priority is to "meet or exceed its financial commitments" highlights the mindset of defendants at the time.  Defendants, driven by the necessity to meet or beat guidance, on March 18, 2008 falsely told the market that Zimmer's "major

Page

investment" in quality systems was to "take advantage of growth opportunities."  In fact, this investment was because Zimmer's Dover facility was antiquated as a result of deliberate neglect by defendant Dvorak and that Zimmer's top-line would be impacted by at least $70-$80 million and earnings by $0.18-$0.20.  ¶¶22, 81, 187, 188.  An impact that could not be offset by other factors as defendants claimed.

193.     Two weeks later on April 3, 2008, defendants would tell the market it had recalled and halted production of products at the Dover facility because "the Company has determined [the OSPs] do not meet internal quality standards" and that their actions were voluntary.  ¶186.  This statement was misleading:

(a)     The recalls at Dover were prompted by the FDA inspection and resulting 483 observations.  §V.B.1.  Defendants had been specifically asked by analysts about issues with the FDA on January 29, 2008.  Defendants, in response, deliberately concealed the FDA issues at Dover and resulting 483 observations and instead touted Zimmer's "quality systems."

(b)     When defendants issued the April 3, 2008 press release, defendants knew that the market was concerned about issues with FDA and yet claimed the recalls related to "internal quality standards" and not regulatory violations.

(c)     Defendants misled investors when they claimed that they had "taken a number of actions to improve quality systems" at Dover by omitting that this purported "improvement" came about as a result of the FDA inspection of Dover's significantly deficient quality systems that prompted multiple recalls and production halts to avoid warning letters.

194.     Defendants also misled investors on April 3, 2008 when they told the market that they expected the recall and suspension of products at Dover to negatively impact 2008 revenues by $70 to $80 million but did not lower 2008 EPS guidance of $4.20 to $4.25 and growth of 10%-11%.

Page

Instead, they indicated further detail would be provided on April 24, 2008.  Defendants knew but purposely misled the market about the impact of the quality problems on Zimmer's finances and operations by failing to advise the market that they would have to reduce 2008 guidance.

195.    The misleading nature of defendants' statements was reflected by the market's expectation that the EPS hit would be minimal.  Indeed, analysts, such as Credit Suisse, reported on April 4, 2008 that "we estimate the EPS impact to be around $0.03-$0.05."

196.    On the April 24, 2008 conference call, defendants belatedly told investors that Zimmer shareholders should expect a $0.18-$0.20 decrease in EPS for 2008 based on OSPs quality problems, but importantly (and falsely), in furtherance of defendants' scheme to defraud investors and in-line with their number one priority meeting or beating guidance, defendants also falsely claimed that Zimmer's 2008 guidance of 10%-11% net sales growth and $4.20-$4.25 adjusted EPS would be confirmed for the year as a result of off-setting factors, including the repurchase of shares. Zimmer's share repurchases had already been planned and factored into its 2008 guidance as evidenced by defendants' statement to the market on January 29, 2008 that repurchases would be "a bit more modest" than 2007.

197.    Defendants, trying to minimize the impact of their partial disclosure, also falsely told the market on the April 24, 2008 conference call that "the recall problem . . . was much deeper than what we knew at the time of the [January 29, 2008 call]."  This simply was not true – *the recalls and production halts had already occurred no later than January 24, 2008, five days before the January 29, 2008* call.  *See* §V.B.1.; Ex. A.

198.    At this point, an analyst at Credit Suisse openly questioned defendants for not disclosing the OSPs recall during the Company's January conference call: "[L]ack of disclosure is a

**Page**

concern for us as we worry there are other issues that have yet to be disclosed." Analysts at Wachovia also noted that Zimmer now had "little room for EPS upside and less margin for error."

199.    The analysts would later learn that their concern was well founded and that defendants' reaffirmation of Zimmer's 2008 guidance was unsupported by the facts known at the time, including the financial impact and reputational harm of the OSPs quality problems as well as the defects with the Durom Cup that Dr. Dorr had warned Zimmer in 2007 and notified his fellow hip surgeons two days before the April 24, 2008 conference call confirming guidance of $4.20 to $4.25 EPS and 10%-11% growth. Defendants knew that the defects with the Durom Cup, including Dr. Dorr's warnings to fellow surgeons, would impact sales of the Cup and market shares but kept this information from investors. Defendants also knew that the major headwind in the form of its quality defects, could not be offset by other factors.

## 2.    Guidance Based on a Defective Durom Cup

200.    At the time of defendants' March and April statements, defendants, in addition to the facts described in §V.B.2 regarding known defects with the Durom Cup, also knew of a decrease in sales of the Cups as surgeons had learned of negative clinical experiences with the Cup and high revision rates. CW19, a high volume orthopedic surgeon had stopped using the Cup after his experiences were confirmed by Dr. Dorr. CW9, a former sales representative, explained that as early as February 2008, surgeons were also questioning him about Dr. Dorr's concerns. ¶59. CW9 was advised to tell surgeons Dr. Dorr's findings were not true, a story very similar to what CW19 was told on multiple occasions in 2007 – that no other surgeons were encountering any problems with the Durom Cup. *Id.* By March/April 2008, however, CW9 witnessed a noticeable decrease in sales – a 75% decrease in Durom Cup sales (from 20 to 5 per month) further demonstrating the influence of

Page

Dr. Dorr on other surgeons (¶59) a decrease that would be echoed later by analysts when they survey doctors about the use of the Durom Cup, ¶163.

201. Once news of the Durom Cup's defects began to leak to surgeons, they were not willing to risk implanting the product and were moving to Zimmer's competitors. A nearly 10% failure rate (which is what Dr. Dorr described) two post-operative years later is considered to be a catastrophic failure rate for any total surface hip replacement. Indeed, CW19 states the rate was way too high based on his experience. ¶92.

202. Defendants, however, continued to try to prop up Zimmer's share price by minimizing the problems with the Durom Cup in public statements and concealing Dr. Dorr's and other surgeons' concerns. On April 28, 2008, defendants misled investors by telling them that Zimmer's U.S. sales of hip products were up 4% year-to-year to $148 million, and made no disclosure of Dr. Dorr's warnings or the extent of difficulties with the Durom Cup. Indeed, analysts at Canaccord Adams on April 24, 2008 noted defendants' forecast of a 10% improvement in hip sales for 1Q08 as well as "[s]trong sales of the TM primary and modular cups, Durom, M/L Taper and EPOCH stems."

203. On March 18, 2008, defendants, in furtherance of their fraudulent scheme, defendants downplayed the safety risks and resulting financial consequences of the Durom Cup defects by misleadingly telling investors that the Durom Cup had "some challenges and opportunities" and that defendants were going to "address some design differences."

(a) Having made affirmative representations to the market regarding hip product sales and the Durom Cup, defendants had a duty to tell investors the truth – that clinical experiences with the Cup were indicating that it had an unusually high revision rate (a serious issue defendants would later concede) and that its co-collaborator who was a highly influential and well-paid

consultant had told Zimmer in 2007 to recall the product because it was defective.  ¶¶157-161, 164-165; other surgeons concurred.  ¶¶166-169.

        (b)    Instead, defendants knew of but concealed from investors the extent of the problems with the Durom Cup, including the inaccurate surgical guidelines and unusually high revision rates which they were not investigating in an attempt to continue to sell the product and capture market share with a hip resurfacing product in the U.S.  As such, defendants deliberately downplayed the clinical disasters of the Durom Cup reported by Dr. Dorr and others which were causing sales to already decrease on the mere hint to other surgeons that Dr. Dorr had expressed concerns with his "baby."

### E.    Defendants Deliberately Misled Investors in May and June 2008 About Zimmer's Financial Condition and the Timing and Scope of Warnings About the Durom Cup, Including the Known Patient Safety Risks

204.    On May 6, 2008, defendants made a presentation at the Deutsche Bank Health Care Conference.  At that conference, defendant Crines stated:

> We have talked in the past about a segment – subsegment of the hip portfolio growing at a faster rate than the overall hip portfolio, that subsegment being the alternate bearing offerings that address the needs of a younger patient, where there's an expectation with, for example, the metal-on-metal offerings, that surgeons will be able to achieve better longevity with those devices.  In our particular case, we have this Durom cup, which goes with out Metasul large diameter heads.  That is our metal-on-metal offering here in the U.S.

> And, as I'm sure many of you know, there have been *questions raised by one surgeon in particular in the U.S. concerning high failure rates* that he's experienced with about 165 patients, I believe, he has reported.  He's had at least 10 early failures that he's referenced in a letter that he sent out to the Hip and Knee Society and another four patients that he believes he's going to have to revise.  *At this point I can tell you that we take these issues very seriously*.  We'll have a team of very senior research people meeting with this surgeon and getting – beginning to get access to data on these patients so they can begin the analysis of what may have led to the early failures that he's experienced with this device.

> I will tell you that this device, this construct, has been in the market here in the U.S. since the second half of 2006.  There are many surgeons that have had very

good clinical results with this device. *It's been in the European market for over three and a half years. There's independent registry data – as an example, the Swedish registry that's tracking over 200 patients and out three and a half years is reporting 99.5% survivorship with this device. So what was reported in this letter from this particular surgeon at this point I can tell you is somewhat isolated – it would appear to be somewhat isolated to this particular surgeon's experience*.

I will also tell you that we did receive somewhat similar indications in the European market in the early part of 2007 with a couple of surgeons in France. We were able to trace their experiences to issues with the technique that they were using. *This is a cup that once it's seated up into the acetabulum cannot be repositioned.* And we have had situations where – this particular situation in France where a couple of surgeons had experienced early failures as a result of the technique that they were using where they were repositioning the cup after it had been seated up into the acetabulum. So we were able to address that particular issue with surgical technique training.

That's an issue I can tell you that we paid a lot of attention to here in the U.S. as this product has been launched into the U.S. There's a lot of information that's provided to our sales reps, training that's provided to our sales reps, so they're able to convey to any surgeons that are using this device the importance of following the technique.

205. Analysts asked defendants the following questions during the May 6, 2008 conference call, to which Crines responded:

**Tao Levy – *Deutsche Bank Securities – Analyst, Moderator***

I mean, what struck me as we were digging over the weekend regarding this issue, and I had never heard of Dr. [Dorr] personally before, but we talked to a few surgeons over the weekend. Some of them refer to him as the father of hip arthroplasty. He's very well regarded. And it seems like from his letter, at least, that he did have an early dialog with Zimmer, and I don't know really what happened there, but felt that he needed to go out to the public. Do you care to get into the relationship that you have with this surgeon? I understand he is a consultant for Zimmer, a fairly well-paid consultant, or was.

**Jim Crines – *Zimmer Holdings, Inc. – CFO***

*Well, the issue – what we're focused on are the issues that he raises concerning his clinical experience. And, as I said, we take that very seriously*. We're going to have a team of very senior people working with Dr. Dorr to get an understanding of what may have contributed to the failures that he has experienced. Concerning his motivation to address this issue the way that he has, that's not something I want to speculate on. You'd have to talk to Dr. Dorr. I understand in his letter, which I've seen, he references his prior experience with the InterOp cup.

And those of you who don't know the story concerning the InterOp cup, that was a Centerpulse product that failed in large numbers of patients.  And that may have – that experience that he had had back then – and that was as a result of a manufacturing issue with that cup – certainly may have weighed, I understand, from what he put in his letter, into his thinking behind putting a letter out to his peers.

**Tao Levy** *– Deutsche Bank Securities – Analyst, Moderator*

But as far as Zimmer is concerned, I mean, in terms of the product properly manufactured, working well with the proper technique, data out of Europe and out of Australian registries, no reason to pull this thing off the market.  It's still a very good product.

**Jim Crines** *– Zimmer Holdings, Inc. – CFO*

*We have no plans at this stage to recall this product*.

\*       \*       \*

**Tao Levy** *– Deutsche Bank Securities – Analyst, Moderator*

So to follow up on the prior question, so how does this play out now here in the U.S.?  The letter goes – the surgeon, prominent surgeon, puts out a letter to – gets sent out to his peers.  I know it's early, but have you gotten any other feedback from surgeons, either positive or negative, that have actually seen that as well but just haven't talked about it yet?

**Jim Crines** *– Zimmer Holdings, Inc. – CFO*

Well, at this stage *I can tell you that we have received lots of calls*, but it's – we need to give our technical people the opportunity to get in and get busy with Dr. Dorr and his partner in understanding, as I said, what may have led to and what may have contributed to the failures that he has experienced.  And until such time as we can complete that analysis and respond to his letter with our findings, there's really – again, we have to – *he's raising an issue, a clinical issue.  We have to treat that very seriously*, and we're not going to speculate on what might be leading to those failures until that analysis is completed.  So there's not much that we can tell those surgeons.

206.    On May 12, 2008, Zimmer filed its Form 10-Q for 1Q08 which misled investors by

stating that:

*Durom*® Acetabular Cups contributed to new product sales for the three month period ended March 31, 2008 and *Durom*-related procedures generally account for 5 to 10 percent of our hip sales in the U.S.; however, *sales of this product during the remainder of 2008 may be adversely affected as a result of certain reports of unusually high rate of revision*.

\*      \*      \*

Gross profit as a percentage of net sales was 76.0 percent in the three month period ended March 31, 2008, compared to 78.3 percent in the same 2007 period. **The primary contributors to the decrease in gross profit margin were the increase in period over period hedge losses, increased inventory charges due to the OSP related actions and an increase in excess inventory and obsolescence charges.**

\*      \*      \*

We are conducting an on-going investigation into certain reports of an unusually high rate of revision of the *Durom* Acetabular Cup. We have not completed our review and analysis of the relevant data and we will continue to investigate to try to determine what factors may be contributing to these reports of a higher revision rate. Depending upon the outcome of our investigation, **this matter could result in product liability lawsuits and claims, safety alerts or product recalls which, regardless of their ultimate outcome, could have a material adverse effect on our business and reputation**.

207.   On this news, Zimmer's stock price dropped approximately 4% from $69.56 to $66.85.

208.   On June 18, 2008, Zimmer made a presentation to investors at the William Blair & Company Growth Stock Conference. At that conference, defendant Crines stated:

We have, at the moment some challenges within our hip portfolio. I think most are aware of the letter that went out from an individual surgeon concerning our [Durom] cup product. That's our large diameter head, metal on metal offering that's going into again, this younger patient segment of the hip market. That is, I would acknowledge, probably **the fastest growing segment of the hip market**.

In this letter, the surgeon raised concerns, questions about this particular device and the experience that he has had with it. We have an ongoing investigation. Our technicians within our research organization are getting out and meeting with other users of this device and studying the results that those other users have had with this device. And as we work our way through this investigation, if we come across any issues or concerns with respect to patient safety, we'll take appropriate action.

**At this time we have had no indication that there are any issues with patient safety**. The investigation is still ongoing and we expect to be able to provide a more detailed update with respect to conclusions that the team reaches on our second-quarter investor call.

Page

**F.      Reasons Why Defendants' May and June 2008 Statements Were Knowingly  Materially False and Misleading**

209.     The statements made by defendants in ¶¶204-206, 208 above were each materially false and misleading when made.  As set forth in §§IV., V.B., V.D., V.F., the true facts, which were then known to and disregarded by defendants were that Zimmer's Dover facility had suffered massive quality systems problems which materially impacted the Company's operations, financial performance and reputation and that defendants knew that the Company would not meet the guidance announced on April 24, 2008, in the face of increased costs and lost sales as a result of the known defects with the Durom Cup, which defendants were trying to conceal with their "crisis team."

210.     Defendants' conference call on May 6, 2008 was in direct response to Dr. Dorr's warning to his fellow surgeons on April 22, 2008 which could not be contained by defendants for long.  Deutsche Bank reported two days earlier, that Dr. Dorr had written to the AAHKS on May 4, 2008:

> On Friday, [May 2, 2008] we were notified that a prominent surgeon (Dr. Larry Dorr) had issued a negative letter on Zimmer's Durom (metal) hip cup.  (We talked to ZMH management and they are aware of this.)  ZMH shares were down $1.50 (2%) on the news, which we believe reflects the potential ensuing financial impact.

211.     Rather than acknowledging the material problems with the Durom Cup and the resulting significant decreased sales as a result of unusually high revision rates reported by Dr. Dorr and others, defendants attempted to deflect the negative news regarding the Durom Cup by misleadingly pointing to success rates of the Durom Cup in other countries.

(a)      Analysts at Cowen and Company noted on May 5, 2008 that "Zimmer management acknowledged that a prominent orthopedic surgeon has circulated a letter to many of his peers suggesting that the company's Durom metal acetabular cup should be removed from the

market based on the high rate of revisions he has seen in his patients at 3 years." The analysts further noted that "[o]ur sense is that ZMH was caught off guard by the distribution of the letter based on our discussion. The company pointed us towards Swedish and Australian registry data which demonstrate a generally low revision rate for Durom at 3 years."

(b)     As the analysts at Cowen and Company pointed out in the same report, the Swedish and Australian product was different from the U.S. product, and thus, "the comparison was of apples to oranges." The fact is that these were different products used in different ways from the U.S. product – a fact noted by Dr. Dorr and his colleagues in their clinical study where in they describe the Durom Cup as a design failure and noted by CW19 who was alarmed to hear that Zimmer never performed a clinical study of the U.S. Durom Cup, which differed from other foreign Durom Cups, prior to releasing it on the market. Thus, the lower revision rates in Sweden and Australia had no bearing on the failures of the U.S. product.

212.    Defendants' statements on the May 6, 2008 conference call that they took Dr. Dorr's clinical experiences "very seriously" and complete failure to address questions as the timing of Dr. Dorr's warnings and his role as a well-paid Zimmer consultant, and statement that there was "no reason" to pull the Cup off the market, were also extremely misleading. Defendants' stance that they took Dr. Dorr's clinical failure rate very seriously and were thoroughly investigating the warnings stood in direct contrast to their inaction in response to the same warnings in 2007 and their response to Dr. Dorr (without any investigation) that they would not take the product off the market.

(a)     Further, by this time defendants had created a crisis team and CW16, a member of that team, explains that the team was charged with finding evidence to back-up Zimmer's story that any problems were isolated and technique related and not to investigate the safety and soundness of the Cup. ¶82. The crisis team's goal was confirmed by CW18, who indicated that

Zimmer had evidenced that the product was defective.  Nor did defendants disclose the decrease in sales that CW9 explains were evident by March/April 2008 and CW15 explains were documented in monthly forecast reports provided to Crines and Dvorak.  ¶¶59, 80.

(b)     Defendants also omitted the financial impact on Zimmer, including its April 24, 2008 guidance which they knew already could not be achieved because of the quality issues at Dover and the decrease in sales of the Durom Cup as well as costly expenses related to the inevitable product liability claims.

213.   Similarly, defendants' statements on May 12, 2008 in Zimmer's Form 10-Q that "sales of [the Durom Cup] during the remainder of 2008 may be adversely affected as a result of certain reports of an unusually high rate of revision" and that "*this matter* [*i.e.* Dr. Dorr's negative experiences which defendants had been aware of since 2007 but failed to act on or disclose] *could result in* product liability lawsuits and *claims*, safety alerts or product recalls which, regardless of their ultimate outcome, *could have a material adverse effect on [Zimmer's] business and reputation*" were false.  Sales and defendants' reputation had already been affected.  ¶¶59, 92, 164, 166, 171.  Further, at least one claim had already been made as a result of the defective product rendering defendants' statement false.  A claim by one of Dr. Dorr's patients who suffered as a result of the product.

214.   Three days before Zimmer's 2Q08 results were filed, on Friday, May 9, 2008, Zimmer announced in a Form 8-K the termination of Sheryl Conley as Group President, Americas and Global Marketing and Chief Marketing Officer.  Analysts at Cowen and Company noted the unanswered questions raised by her departure, including: "(1) why now, (2) was this move at all tied to specific regulatory challenge(s), and if so, is it a new development (*i.e.*, Durom). . . ."

215.     The day after Zimmer filed its Form 10-Q on May 12, 2008, analysts at Credit Suisse issued a report entitled: "***Durom Cup Issues: Surprise, Now Its Material Enough to Disclose***." Credit Suisse went on to express that it is "***concerned with the way in which this company is communicating and what else may be 'immaterial' today that turns into something 'material' tomorrow as was the case with the OSP recall and now the Durom hip cup***."

(a)     Credit Suisse was right to be concerned. Zimmer's Form 10-Q for 1Q08 was false and misleading because it failed to sufficiently disclose the seriousness of the problems with the Durom Cup and its significant financial impact, including lost sales, loyalty and market share.

(b)     Indeed, on May 13, 2008, analysts at Cowen and Company reported that "based on what is now known . . . we do not believe there is any reason to conclude that Durom sales are going to completely disappear in the U.S. . . ." In contrast, what was known to defendants is that they would disappear because the product had adverse health consequences to patients.

216.     Only in late May 2008 did Zimmer write to surgeons telling them they were investigating Dr. Dorr's complaints (which they had known of in 2007), but defendants did not suspend sales. While Zimmer was "investigating," roughly 1,300 patients still received the Durom Cup. Indeed, patients such as Marianne Hunter and Larry Ramsey experienced pain as a result of the Durom Cup. Based on lawsuits filed by these patients, Mrs. Hunter's X-rays on December 31, 2007 showed that the Durom Cup had slipped and Mr. Ramsey's X-rays showed he had a radiolucent gap. Both had to have revision surgery – a surgery which a Zimmer representative would be present according to CW4, CW6, CW8, CW9 and CW12.

217.     In addition, analysts were taking issue with Zimmer's comparison of apples (U.S. Durom Cup) to oranges (foreign Durom Cup), to claim that the Durom Cup was safe. On June 3, 2008, analysts at Credit Suisse noted discrepancies in defendants' explanations with respect to the

concerns about the Durom Cup and the negative affect of Durom Cup problems on its competitive

advantage as follows:

> ***Durom is a real issue and should not be dismissed or minimized.*** Zimmer and others have pointed to an internal registry, and two international registries as support for the products performance. We see flaws and are not comforted as we will discuss in this report. The internal registry is too selective (just 13 physicians) and is voluntary. The international registries ***are like mixing apples and oranges***. First, internationally, Durom is used in hip resurfacing plus, ***the US product has a different coating (it's thicker)***. It may be subtle but it's a difference, thus international data is not 100% applicable. ***A problem with Durom cup also means a problem with bringing a hip resurfacing system to the US, which means a long term competitive disadvantage.***

> \*       \*       \*

> ***Zimmer's internal registry.  Our take: It's too selective and [it's] voluntary.*** On an industry conference on May 14, Zimmer referred to its internal registry tracking 13 surgeons in the U.S. and cited 3 failures out of 480 patients (0.6% failure rate). However, in our view this is way too selective (*i.e.*, only 13 surgeons) and it's voluntary, thus not all events may be captured. Obviously, Dr. Dorr was not one of the select 13 in the registry. Dr. Dorr reported 10 revisions in 165 hips, with 4 more scheduled to be revised.

> ***The Australian registry data: It's being used in hip resurfacing patients, so it's not comparable unless in the U.S. the Durom cup is being used off-label in hip resurfacing since components are available which raises even more concerns***. The 2007 annual report states, "Using the Registry algorithm, the ASR and the Durom were identified as having a higher than anticipated rate of revision." It also says "The Durom has twice the risk of revision compared to other resurfacing procedures with 2.7 revisions per 100 observed component years." The revision rate overall was 4.4%. Moreover, ***the patient characteristics in the Australian registry may be different (since [it's] hip resurfacing) from the typical patient receiving the Durom cup is being used***.

218.    Defendants had also previously told investors in Zimmer's 2007 Form 10-K that most

European implants are designed specifically for Europe:

> The European reconstructive implant and trauma product markets are more fragmented than the Americas or the Asia Pacific segments. The variety of philosophies held by European surgeons regarding hip reconstruction, for example, has fostered the existence of many regional European companies, including Mathys AG and Waldemar LINK GmbH & Co. KG, which compete with us in addition to the global competitors. Today ***most hip implants sold in Europe are products developed specifically for Europe***, although global products are gaining acceptance.

**Page**

Therefore, we will continue to develop and produce specially tailored products to meet specific European needs.

219.    Thus, European data was not equivalent to the experiences in the U.S.  This would be noted by Dr. Dorr and his colleagues in their clinical studies of the Durom Cup.  It is corroborated by CW19, a high-volume surgeon.

220.    Later, on June 25, 2008, Cowen and Company analysts, independently reduced their EPS expectations for Zimmer by $0.04 based on their own research which evidenced a 75% decline in Durom Cup sales for 2008 (the same that CW9 witnessed) and specifically noting that:

> *While our changes are on the lower end of the sensitivity analysis we included in notes issued last month subsequent to Dr. Dorr's disclosure, absent a recall, we believe these changes adequately capture the likely impact of reduced Durom sales.  We believe the changes we made to our 2009 forecast could prove conservative.*

*    *    *

> *Durom Challenges Not Completely Surprising*
>
> *Our HVC [high-volume consultant-surgeon who has implanted a "couple hundred" Durom Cups over the past two years], who is also a Zimmer consultant, relayed certain concerns he had about the Durom cup to the company early in Durom's launch*, as he foresaw certain characteristics as being potentially problematic.  These challenges included an "unfamiliar and uneven" 165° circumference (most cups are 180°) and that the rim is labeled as being 58mm, when it is really 61mm around the rim (need to ream to 58-59°).  *Without prompting, Zimmer management acknowledged that some of these unique product "attributes" could play a role in challenges with Durom*.

*    *    *

> The Durom procedure is more complicated than the norm as it requires: . . . *Repositioning, if necessary, as cup does not always fit perfectly into "trial" mold*[.]
>
> Zimmer strongly recommends that surgeons reposition cups only if absolutely necessary – this is in part because it is believed that the rotation of Durom's large fins can cause fixation problems.  While the larger size should render Durom relatively more forgiving than smaller cups, *repositioning is fairly typical in hip replacement procedures – the recommendation against repositioning is atypical and potentially more technically unfamiliar to less Durom-experienced surgeons*.

Page

221.   Also disturbing was that Zimmer management told Cowen and Company analysts that they expected to provide more detail on the financial impact on the Q2 call, and that *if there were any material developments that occurred prior to the call they would strongly consider holding a conference call* with both the medical and investment community.  As detailed by CW15 in ¶80, however, defendants Dvorak and Crines were already aware of decreased sales of the Durom Cup as a result of internal forecast.  Further, defendants knew that contrary to the products' labeling, surgeons could not reposition the Durom Cup once it was inserted.  ¶¶180, 184, 204, 220, 227.  Further still, surgeons already had lost faith with the Zimmer Cup and would not return to Zimmer. ¶¶59, 92, 145, 164, 166, 171.

222.   A Thomas Weisel Partners' report issued on June 26, 2008 identified Zimmer's ability to leverage its planned investments as a central driver behind better EPS, identifying the OSP issues at Dover and concerns with respect to Durom as a challenge.  Further, the report noted that the "OSP Recall [was] Still Unresolved" and indicated that "*there could be downside to future top-line growth if planned reinvestment in other areas has been pushed off and costs that were expected to be reduced or removed from the model in 2009 continue to impact reported numbers*."

### G.   The End of the Class Period

223.   On July 11, 2008, the headline of a news story by Jon Kamp of the *Dow Jones Newswires* read: "Earnings Preview: No Holiday Lull in US Med-Device Sector 2Q."  The article stated:

> Orthopedic companies Stryker Corp. (SKY) and Zimmer Holdings Inc. (ZMH) will be closely watched for details on some product-related problems, however.  The issues include a recall of replacement hip parts at Stryker that dampened first-quarter hip sales, and potential problems with a Zimmer hip part that a doctor raised publicly in April.

224.   Two days earlier than anticipated, on July 22, 2008, Zimmer reported an "in line" quarter but announced it was suspending the sales of its Durom Cup.  Further, Zimmer cut guidance

Page

– lowering its 2008 EPS guidance by $0.15 to $4.05-$4.10 and sales growth from 10%-11% to 8.5%-9.0%. Defendants told the market on July 23, 2008, among other things, that "[t]he adjustment to our sales guidance includes a projected loss of $20 million to $30 million in hip products sales, pertaining principally to Durom Cup in the US;" and "[r]evised adjusted earnings guidance gives effect to the reduction in sales from prior guidance."

225.    On July 22, 2008, Zimmer issued a press release announcing the Company's financial results for the second quarter of 2008 stating:

Durom Acetabular Component

***Zimmer is temporarily suspending marketing and distribution of the Durom*** ® Acetabular Component (Durom Cup) in the U.S. on a voluntary basis, while the Company updates labeling to provide more detailed surgical technique instructions to surgeons and implements its surgical training program in the U.S. The Durom Cup will continue to be marketed without interruption outside the U.S.

While many surgeons have had success implanting the Durom Cup since it was launched in the U.S. in 2006, ***a subset have reported cup loosenings and revisions*** of the acetabular component used in total hip replacement procedures. These results contrast with product experience in Europe, where post-marketing data continue to show excellent clinical outcomes since the product launched in 2003. Following a comprehensive review of clinical experience and product conformance to specifications in the U.S. and Europe, Zimmer has found no evidence of a defect in the materials, manufacture, or design of the implant. The Company has identified that surgeons who regularly achieve the desired outcome with the Durom Cup consistently execute crucial technique steps and place the cup in a specific manner. Following its review, Zimmer has determined that revised surgical technique instructions and a surgical training program are required to more consistently achieve desired clinical results in the U.S. The Company has shared its review and conclusions with the U.S. Food and Drug Administration and will continue to update the Agency.

While the Company believes the likelihood of currently implanted patients requiring revision is low, Zimmer has sent a letter to U.S. surgeons advising them to stop implanting the Durom Cup, until the updated labeling is issued providing more detailed surgical technique instructions and they receive training. Additional information is being made available at www.zimmer.com.

Guidance

The Company is revising its guidance and expects full-year 2008 sales growth to be in a range of 8.5% to 9.0% over the prior year, which reflects constant currency growth of 4.5% to 5.0%. This compares with prior guidance of 10% to 11% reported and 6% to 7% constant currency growth over prior year. The adjustment to sales guidance includes a projected loss of $20 to $30 million in hip product sales pertaining to the Durom Cup in the U.S., weakness in U.S. Dental revenues and slower than anticipated uptake on certain new products. Adjusted diluted earnings per share for the full year are expected to be in a range of $4.05 to $4.10, as compared to prior guidance of $4.20 to $4.25. ***Revised earnings guidance gives effect to the reduction in sales from prior guidance*** as well as an increase in operating expenses associated with the global implementation of the Company's enhanced compliance program. Further details regarding the revised guidance will be discussed during tomorrow's investor conference call.

226. As a result of these disclosures, Zimmer's stock price declined from $70.88 to $66.01, a 7% drop in one day, as artificial inflation came out of the stock price.

227. On July 22, 2008, Zimmer also sent a letter to surgeons marked "Urgent Device Correction" which advised surgeons that "The results of our in-depth investigation have led us to conclude that additional surgical technique instructions and training are necessary in the United States, and ***we strongly recommend that U.S. surgeons stop implanting the Durom Cup until receiving such training***. . . . Revised product labeling to include more detailed surgical technique instructions will be the subject of a further communication to surgeons over the next several weeks." Further, Zimmer conceded to doctors that these revised technique instructions would include the following steps: "line-to-line reaming, use of trials in every case, proper cup position for this device, appropriate impaction techniques, and ***no repositioning***."

228. UBS analyst Bruce Nudell was quoted in *The New York Times* on July 24, 2008 as follows: "They had given hints that there would not be a recall but this [the suspension] came as a surprise."

229. On July 23, 2008, defendants held a conference call with financial analysts who followed Zimmer. On that call, defendants stated:

Page

**David Dvorak – Zimmer Holdings, Inc. – President CEO**

*       *       *

While many US surgeons have had success with the Durom Cup since its launch, *a subset have experienced elevated revision rates*. This observation clearly contrasts ongoing positive clinical experience in Europe, where the product has been available since 2003.

We launched a rigorous investigation, which included a thorough review of manufacturing processes, design specifications, production documentation and clinical experience in the US and Europe. Based on the results of that investigation *we will temporarily suspend marketing and distribution of the Durom Cup in the US*.

We will update labeling to provide more detailed surgical technique instructions to surgeons and prepare to implement a comprehensive surgical technique training program for the US.

*       *       *

But we want to make sure that we are *clear with our US surgeons that they should stop implanting the Durom Cup* until we issue the updated labeling that provides more detailed guidance on surgical technique, and until they receive training.

*       *       *

We made good progress during the quarter on our quality systems upgrades. With respect to our orthopedic surgical products operation in Dover, Ohio, our remediation plans continue as scheduled. And we expect to have most, if not all, of OSP products back in production by the end of this year, many in the next two or three months.

*       *       *

I will now turn to our *updated guidance for the full year 2008*. Jim will provide more details momentarily. *Due to the developments in the second quarter, including Durom*, we are revising our expectations for 2008 fully full year sales growth to 4.5% to 5% constant currency.

*We're also lowering our adjusted earnings guidance for the full year to be between $4.05 and $4.10 per fully diluted share.*

*       *       *

**Jim Crines – Zimmer Holdings, Inc. – EVP Finance, CFO**

$$*\qquad*\qquad*$$

*Sales of $1,080 million* for the quarter represent an increase of 11.2% reported and 5.5% constant currency.  These results, among other things, reflect the benefit of one additional selling day in the quarter compared to same period in the prior year, strong underlying unit growth in knees in all three of our operating segments, and *lower OSP, Durom and dental product sales*.

$$*\qquad*\qquad*$$

*In the US Durom Cup sales volume was off 26% from our first quarter in response to reports of loosenings and revisions.*  Durom Cup sales units outside the US grew by over 10% in the second quarter compared to same period prior year. These results, absent Durom-related losses, reflect steady growth across our primary hip portfolio, including porous primary stems and our Trilogy and TM Acetabular Cups.

$$*\qquad*\qquad*$$

*The OSP and other category was down 15.6% in the Americas*, declined 26.8% in Europe, and was down 17.3% in Asia-Pacific compared with the prior year period.

$$*\qquad*\qquad*$$

Now I would like to provide an update on guidance for 2008.  *We expect to deliver topline sales growth in 2008 of 8.5% to 9% compared to the original 10% to 11% range.*  And adjusted earnings per share in the range of $4.05 to $4.10.

Our sales guidance anticipates approximately 4 points of growth to come from foreign currency, and therefore assumes a constant currency growth rate of 4.5% to 5%.  *The adjustment to our sales guidance includes a projected loss of $20 million to $30 million in hip products sales, pertaining principally to Durom Cup in the US, weakness in US Dental revenues, and slower than anticipated uptake on certain new products, partly due to delays in offering training programs in support of the new products introductions.*

230.    Following defendants' revised lowered guidance, defendants responded to analysts'

questions on the July 2008 conference call, including:

**Tao Levy – *Deutsche Bank – Analyst***

I was wondering maybe if you could spend a few minutes going through – you did mention as we move into 2009 some of the headwinds you are facing in '08 start to disappear.  *I was wondering if you could quantify the three main areas and the impact that you're seeing this year, and what percentage of that could disappear in '09?*

*I would love it if you could hit Durom, OSP and the compliance monitors.*

**Jim Crines – *Zimmer Holdings, Inc. – EVP Finance, CFO***

This is Jim.  First of all, with respect to – I guess will start with OSP.  As David indicated and I indicated in my comments, we're on schedule with our remediation efforts.  Expect to be back in production of those patient care products between now and the end of the year.  And have the opportunity to go back into the market as those products come back online.

*Going into 2009 we would look to get back as much of that $70 million to $80 million [that]  we lost as we possibly can.  We wouldn't expect to get [it] all back*.  But we will certainly be back in the market with those products and pursuing opportunities to regain share in that segment.

*            *            *

**Bruce Nudell – *UBS – Analyst***

What is the aggregate – what is the anticipated aggregate revision rate, early revision rate with the product, given the disparities in training?  *And how much reputational damage could do that cause, given the 13,000 implants that have taken place to date?*

**David Dvorak – *Zimmer Holdings, Inc. – President, CEO***

I'm going to let Cheryl respond to that question.

**Cheryl Blanchard – *Zimmer Holdings, Inc. – Chief Scientific Officer***

*            *            *

It is very difficult for us to project out where we think those numbers are going to go eventually.  *What I can tell you is that we were able to discern [that] there were some specific elements of surgical technique and cup placement that are the items that really make the difference in terms of those clinical outcomes.*

I think it is difficult to comment on the last part of your question, which is reputational damage.  I think that will frankly be determined by the actions that we have taken today and our level of being proactive as we move forward, trying to work with surgeons to help them get through this difficult situation with their patients.

We absolutely recognize that for those patients that are involved that there will be some items that we will need to help them with, and we're going to be proactive about that.

*            *            *

**Page**

**Michael Jungling –** *Merrill Lynch – Analyst*

*       *       *

> ***Secondly on Durom, the $20 million to $30 million worth of sales, can you indicate how much that is in terms of annual sales?  I think it is pretty much the entire amount.***

*       *       *

**Jim Crines –** *Zimmer Holdings, Inc. – EVP Finance, CFO*

> This is Jim.  With regard to Durom, as we indicated in earlier comments, it represents about 5% to 10% of our hip revenues in the US.  It happens to be the case as well outside the US.

> If you look at how, and we look at how that product was growing coming into the year, coming out of the first quarter before reports of loosenings and revisions, we were trending clearly to the high end of that range.  ***And the $20 million to $30 million, again principally associated with Durom, does get you to two-thirds to the full amount.***

> But as I indicated, with regard to the hip franchise there's also the impact that some disruption that training is having on the new products that we reintroduced in the hip portfolio, namely the M/L taper with Kinectiv and the Fitmore and the EPOCH devices, that we're focused on in the second half of year as well.

231.    Not surprisingly, on the day Zimmer suspended sales of the Durom Cup it settled what is reported to be a product liability claim regarding the Durom Cup – the settlement reached with a patient of Dr. Dorr.

232.    Additionally, analysts at Cowen and Company reported on July 23, 2008 that "we are admittedly surprised by the voluntary suspension of marketing and distribution [of the Durom Cup]" – suspension that really was a Class II recall as evidenced by an October 29, 2008 FDA Enforcement Report.  The Enforcement Report cites the July 22, 2008 press release for the recall of more than 19,000 cups because "surgical technique instructions are inadequate."  A removal of a product from the market can only be considered a recall if the product is in violation of FDA laws and it would be

Page

"subject to legal action, e.g. seizure."  21 C.F.R. §7.3(g); 21 C.F.R. §7.46.  In other words, the

suspension was a recall required under FDA regulations.

233.    The impact of defendants' defective Durom Cup would be felt by the Company for

years.  Indeed, as Dvorak conceded on July 23, 2008, the suspension of the Durom Cup would have

"*financial consequences*."  Defendant Crines also conceded *that there would be a delay beyond*

*2011 in any hip resurfacing product as a result of their suspension of the sales of the Durom Cup*.

An analyst for Thomas Weisel projected that hip resurfacing sales could represent more than 10% of

total hip sales in the United States by 2012.

234.    On July 23, 2008, analyst Ben Andrew of William Blair & Company issued a report

on Zimmer which stated:

> Zimmer announced it is suspending the marketing and distribution of Durom
> in the United States, which has been the *major concern* for investors in the past
> couple months.

235.    On July 29, 2008, *The New York Times* published an article entitled, "A Call for a

Warning System on Artificial Joints," detailed in ¶164 which explained that prominent surgeon Dr.

Dorr had told Zimmer in 2007 about his concerns with the Durom Cup including the high revision

rate and suffering of patients.

236.    On August 4, 2008, defendants stated in Zimmer's Form 10-Q for 2Q08 that:

> *The temporary suspension of marketing and distribution of the Durom Cup* in the
> U.S. *will negatively impact hip sales growth for the remainder of 2008*.
> Additionally, with the lack of a hip resurfacing product within our U.S. hip portfolio,
> *we expect to face a challenge in hip sales growth* . . . .
>
> *                *                *
>
> *Gross profit as a percentage of net sales was 75.7 percent in the three
> month period ended June 30, 2008, compared to 77.7 percent in the same 2007
> period and 76.0 percent in the three month period ended March 31, 2008.  The
> primary contributors to the decrease in gross profit margin were the increase in
> period over period hedge losses, idle plant costs due to the OSP related actions and
> an increase in excess inventory and obsolescence charges*.

\*      \*      \*

In July 2008, we temporarily suspended the marketing and distribution of our *Durom* Acetabular Component (*Durom* Cup) in the U.S. on a voluntary basis. As a result of our investigation into certain reports of an unusually high revision rate, we determined that revised surgical technique instructions and a surgical training program are required to more consistently achieve desired clinical results in the U.S. We expect our U.S. hip product sales will be adversely affected while we update product labeling and implement a surgical training program for U.S. surgeons. These events may result in product liability lawsuits and other claims which, regardless of their ultimate outcome, could have a material adverse effect on our business and reputation. ***These actions could also delay our planned entry into the growing hip resurfacing market in the U.S. as the Durom Cup has been integral to our plans.***

237.    Later, on an October 23, 2008 conference call, defendants reported Zimmer's 3Q08 financial results revealing that it had set aside $47.5 million related to "known and anticipated claims" and other expenses and credits related solely to revisions associated with the Durom Cup. On the same October 23, 2008 conference call, defendants explained that Zimmer's OSP business was down 19% for 3Q08 and that ***Zimmer had lost customers as a result of*** "not only the enhanced compliance program implementation but obviously ***the disruption that was created by the Durom Cup matter and some of the other things that [the Company] faced including OSP*** . . . ."

238.    On this news, Zimmer's stock price dropped 13.49% from $51.66 to $44.69. Zimmer would subsequently concede in its 2008 annual report that it had lost sales in 2008 as a consequence of "the events involving the Durom Cup" and importantly, that its U.S. hip resurfacing product had been "hindered or delayed as the Durom Cup had previously been integral to our plans for entry into that market."

239.    The financial impact of the issues with the Durom Cup and OSPs continue to plague the Company. On January 30, 2009, Credit Suisse analyst reported, "On the 3Q08 call, management acknowledged that the combination of transition to the new compliance model, the OSP recall and Durom sales suspension has caused frustration amongst certain physicians and as a result, Zimmer had lost some customers across its geographic sales channels."

Page

240.   Zimmer's 1Q09 hip sales were down 9% "as the impact of the Durom implant recall clearly continues to negatively impact performance," reported analyst Deutsche Bank on April 23, 2009.  As of 3Q09, Zimmer reported reserves of more than $100 million for liability to patients undergoing revision related surgeries related to the Durom Cup.  Numerous patients have filed suit against Zimmer for their injuries but rather than vigorously defending the claims, Zimmer continues to delay responding to the complaints in a vast majority of the cases.

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

241.   Defendants Dvorak's and Crines' compensation was directly tied to Zimmer's financial performance.  For 2007, defendant Dvorak was paid $3.7 million and defendant Crines $2.8 million.  Defendants' compensation was based, in large part, on the Company achieving its targets.  As reported in Zimmer's Proxy Statement, filed with the SEC on March 20, 2008:

> [T]he [compensation] committee has historically set total target cash compensation (base salary plus target bonus opportunity) for the CEO at a multiple of the total compensation of the next most highly compensated executive officer who has been the CFO.

242.   The Company's compensation plan for officers included three elements: (1) base salaries; (2) Executive Performance Incentive Plan ("EPIP"); and (3) Equity Based Incentive.  The EPIP was based on three performance measures: adjusted EPS (weighted at 50%), consolidated revenue (weighted at 25%) and consolidated cash flow (weighted at 25%).  The allocation among these three factors was based on the Compensation Committee's stated philosophy that *EPS is the performance measure that correlates most directly with stockholder value*.  Under the EPIP, officers could receive payout at 200% of a specified percentage of base salary.  The Equity Based Incentive included stock options, restricted stock, restricted stock units and performance shares.  Performance shares were conditioned upon achieving performance goals.  The Compensation

**Page**

Committee awarded mid-year equity-based awards to both defendants in connection with their respective promotions in 2007.

243.    In April 2007, Dvorak reached an agreement with Zimmer regarding his compensation.  Dvorak's salary was raised from $415,000 to $700,000; his ***EPIP award target*** was increased from 60% to ***100% of his base salary***; he was awarded 100,000 stock options; and he was also awarded an additional 57,000 restricted stock units subject to the Company's performance ending December 31, 2008.

244.    In April 2007, Crines also reached an agreement with Zimmer regarding his compensation.  Crines' salary increased from $315,000 to $415,000; his ***EPIP award*** was increased from 50% to ***60% of his base salary***; he was awarded 25,000 stock options; and he was awarded 13,335 restricted stock units subject to the Company's performance ending December 31, 2008.

245.    Thus, defendants Dvorak and Crines had a financial incentive to artificially inflate the Company's EPS as 50% of their bonuses (or $350K for Dvorak and $124.5k for Crines) depended on achieving EPS goals.  Defendants attempted to meet their bonus targets by concealing the Dover quality deficiencies and Durom Cup failures – issues they knew would negatively impact their top and bottom lines, causing lower-than-announced EPS.

246.    Defendants Dvorak and Crines also signed the certifications described below pursuant to Sarbanes-Oxley demonstrating their scienter with respect to the misconduct alleged herein.

247.    Zimmer's Form 10-K for FY07, filed on February 29, 2008, included the following certification signed by Dvorak and Crines pursuant to §302 of Sarbanes-Oxley:

I, David C. Dvorak [James T. Crines], certify that:

1.    I have reviewed this Annual Report on Form 10-K of Zimmer Holdings, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,

in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

248.    The certifications went on to assure investors that:

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

*     *     *

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors: All significant deficiencies and material weaknesses . . . and [a]ny fraud.

Page

249.    Zimmer's Form 10-K for FY07 also included the following statements signed by Dvorak and Crines:

> In connection with the Annual Report of Zimmer Holdings, Inc. (the "Company") on Form 10-K for the period ending December 31, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:
>
> (1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

250.    Similarly, the Forms 10-Q for 1Q08 and 2Q08 contained identical certifications signed by both Dvorak and Crines.  These certifications establish that Dvorak and Crines knew about or recklessly disregarded the impact of the material flaw in the quality systems at Zimmer's Dover facility and the material problems with Zimmer's Durom Cup on Zimmer's business (including market share and reputation) and financial condition.

251.    Defendants' pattern and practice of illegal activity also heightens the inference of scienter.  In addition to the DPA for allegations of illegal kickbacks, the SEC was investigating Zimmer regarding potential violation of the Foreign Corrupt Practices Act in the sale of medical devices in a number of foreign countries as detailed in Zimmer's 2007 Form 10-K:  "We are cooperating fully with the Securities and Exchange Commission with regard to an ongoing informal investigation of potential violations of the Foreign Corrupt Practices Act in the sale of medical devices in a number of foreign countries by companies in the medical device industry."

252.    Defendants' inability, based on the DOJ and SEC investigations, to pay doctors to use their medical devices domestically and internationally increased the pressure on defendants to make their financial targets without bribing doctors as they had relied on in prior years.

**Page**

## VII.   LOSS CAUSATION/ECONOMIC LOSS

253.    During the Class Period, as detailed above, defendants misled investors about Zimmer's financial health and performance, and its prospects for future financial success, by issuing false guidance, falsely assuring investors that there were no FDA issues, touting its quality systems, misleadingly telling the market it had "some issues" with the Durom Cup and omitting material information regarding the deterioration of the Company's earnings, sales and growth as a direct result of known issues affecting its products – OSPs and the Durom Cup.

254.    Defendants' false representations and omissions artificially inflated Zimmer's stock price and operated as a fraud or deceit on Class Period purchasers of Zimmer securities.

255.    When the material flaws at Zimmer's Dover facility, the problems with the Durom Cup and the resulting financial impact began to be disclosed, Zimmer's stock price declined and the artificial inflation began to come out of the Company's stock price.

256.    As a result, class members who purchased Zimmer stock during the Class Period suffered economic loss as reflected in the following chart:

**Page**



257.    Defendants' false and misleading statements and omissions caused and maintained the artificial inflation in Zimmer's stock price throughout the Class Period.  From the close of the market on January 28, 2008 to April 3, 2008, Zimmer's stock price increased 16% from $68.08 per share to more than $79 per share.  Zimmer's stock continued to trade at artificially inflated prices as defendants continued to conceal the true cause, scope, magnitude and financial impact of Zimmer's quality systems and product defects.

258.    When defendants revised the Company's guidance downward – citing problems with the Durom Cup and the effect of reduction in sales from prior guidance – Zimmer's stock price fell on July 23, 2008 to $66.01, down 17% from the Class Period high of $79.63, and a single-day decline of 7%.

259.    On January 29, 2008, defendants announced the Company's financial results for 2007 and issued guidance for 2008.  During the conference call, defendants assured analysts the guidance was based on an "extremely methodical process" and "a very detailed review of [Zimmer's] business unit and corporate operating plans."   Yet, defendants concealed material quality problems at Zimmer's Dover facility (even in the face of direct questions from analysts) as well as known problems with the Durom Cup.  On this news, Zimmer's stock price increased from $68.08 to $77.03, a 13% increase compared to a 0.62% increase in the S&P 500 and 0.56% increase in the peer group identified by Zimmer in its SEC filings.[6]

260.    On April 3, 2008, Zimmer announced in a press release that the Company had initiated recalls of certain OSPs for failure to meet quality standards.  The Company also announced it had temporarily suspended production and sales of certain OSPs manufactured at its Dover facility.  The Company stated it expected these actions to adversely impact OSPs revenues by $70 to $80 million, but failed to disclose the earnings impact of this development or take down defendants' 2008 double-digit net sales growth and EPS guidance.  Instead, defendants promised additional details regarding the expected impact on the 1Q08 investor conference call scheduled for April 24, 2008.  Zimmer's stock declined slightly on this news by 1.4%, but remained artificially inflated as the market could not fully assess the impact of the plant shutdown and product recall due to the incomplete information disclosed by defendants.

261.    On April 24, 2008, defendants told investors that the OSPs recall and sales and production stoppage would adversely impact adjusted earnings by $0.18 to $0.20 per share but

---

[6]    The "peer group" referred to herein is comprised of companies identified by Zimmer as their North American competitors and, where not publicly traded, their parent companies: Johnson & Johnson (parent of DePuy Orthopaedics, Inc.), Stryker, Smith & Nephew (parent of Smith & Nephew, Inc.), Wright Medical and Synthes, Inc.

Page

continued to mislead investors and artificially inflate Zimmer's stock price by reaffirming 2008 guidance of 10%-11% net sales growth and $4.20-$4.25 adjusted EPS.  On this news, Zimmer's stock closed at $72.87, a 4.06% decrease compared to a 0.64% increase in the S&P 500 and a 0.13% increase in the peer group.  Zimmer's stock remained artificially inflated.  Defendants continued to mislead investors regarding the Company's finances and operations and falsely assured the market that other actions would offset the $0.18-$0.20 EPS hit related to its OSPs.

262.    On May 2, 2008, analysts were made aware of Dr. Dorr's letter to the AAHKS regarding problems with the Durom Cup.  On this news, Zimmer's stock fell 1.95%.

263.    On May 4, 2008, analyst Tao Levy of Deutsche Bank issued a report on Zimmer which stated:

> On Friday, we were notified that a prominent surgeon (Dr. Larry Dorr) had issued a negative letter on Zimmer's Durom (metal) hip cup.  (We talked to ZMH management and they are aware of this.)  ZMH shares were down $1.50 (2%) on the news, which we believe reflects the potential ensuing financial impact.  The letter was distributed to a significant number of his colleagues.  While his concern related to a high number of revisions due to loosening of the Durom cup, it's unclear if other surgeons have experienced this problem.  Based on data from both the Swedish and Australian orthopedic registries, the Durom cup doesn't appear to have a materially different revision rate to other metal-on-metal hip implants.  Further, the product has been in use in int'l markets over the past 5 yrs and is one of the more popular metal-on-metal products.  In the US, the product has only been on the market for []2 yrs, and the surgeon indicated that problems surfaced at the 2 yr mark.

> Takeaways and estimate changes: In our opinion, Dr. Dorr's comments will sway some surgeons away from Durom.  While it's possible the problems are technique related, this may be irrelevant in terms of usage of Durom, again due to Dr. Dorr's influence.

264.    On May 5, 2008, analyst Ben Andrew of William Blair & Company issued a report on Zimmer which stated:

> •    On April 22, Dr. Larry Dorr, an Ingleside, California-based clinician sent a letter to a large e-mail list of hip and knee surgeons indicating that his center has experienced a high rate of early loosenings of Durom acetabular cup (14 out of 165).  Durom is the large diameter, metal-on-metal cup used for total

Page

hip replacements (both in the U.S. and overseas) and for the company's hip resurfacing product (overseas only).

- We have reviewed the available clinical data on Durom (two national registries) as well as the FDA's MAUDE database. Specifically, in MAUDE, there are only 17 total reports on Durom in the last 18 months, and just five that mention loosening of the cup. This number could increase, however, as awareness of this issue increases due to Dr. Dorr's letter. More important, the two national registries support that Durom's performance is in line with comparable products.

- Based on those independent sources, we do not see a systematic problem with the implant. While risk aversion could lead some clinicians to take a more cautious approach to Durom, potentially impacting hip growth, we do not believe this is likely unless a significant number of new reports come to light. Dr. Dorr had previously notified the FDA and Zimmer regarding these issues, but we do not expect Zimmer to take any market action with regards to Durom, so the concerns raised by his letter are quite likely to prove overblown.

\*     \*     \*

Dr. Dorr is a well-regarded surgeon, who has been an active clinical collaborator with Zimmer, receiving roughly $1.9 million from the company in 2007 (according to the company's Web site).

265.     Zimmer's stock remained artificially inflated, however, as defendants continued to conceal material information from investors. During the May 6, 2008 Deutsche Bank Health Care Conference, moreover, defendants falsely characterized the problem as "somewhat isolated" to a "particular surgeon," misleadingly cited success in the European and other markets as evidence that the device had a long track record of success, attributed problems to surgical technique and assured the market that the Durom Cup would not be recalled.

266.     After Zimmer filed its Form 10-Q for 1Q08 on May 12, 2008, disclosing that sales of the Durom Cup "during the remainder of 2008 may be adversely affected as a result of certain reports of unusually high rate of revision," Zimmer's stock price dropped 3.9% from $69.56 to $66.85.

Page

267.   The disclosures on April 24, May 2 and May 12, 2008 revealed *some* of the previously concealed problems but were still misleading as defendants continued to conceal adverse facts from the market, artificially inflating Zimmer's stock price.

268.   On July 22, 2008, defendants announced Zimmer was suspending marketing and distribution of the Durom Cup in the United States and giving "effect" to the reduction in sales from prior guidance.  The Company also, for the first time since the beginning of the Class Period, revised earnings guidance downward, stating that "the adjustment to sales guidance includes a projected loss of $20 to $30 million in hip product sales pertaining to the Durom Cup in the U.S." and "[r]evised earnings guidance gives effect to the reduction in sales from prior guidance."

269.   The Company also reported on July 23, 2008 that OSPs and "other sales declined 17.6% in the quarter, as a result of the suspension in sales" and that Durom Cup sales volume was off 26% from 1Q08.  On this news, Zimmer stock traded as low as $64.02 before closing at $66.01 on July 23, 2008, a 6.87% decline compared to a 0.41% increase in the S&P 500 and a 0.32% increase in the peer group and down 17.10% from its Class Period high.

270.   Each disclosure of adverse facts which removed inflation from Zimmer's stock price was connected to defendants' false statements and omissions and fraudulent conduct alleged herein.

VIII.   **APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

271.   At all relevant times, the market for Zimmer's securities was an efficient market for the following reasons, among others:

(a)      Zimmer's common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)      As a public company, Zimmer filed periodic public reports with the SEC;

Page

(c)     Zimmer regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Zimmer was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

272.     As a result of the foregoing, the market for Zimmer's securities digested current information regarding Zimmer from publicly available sources and reflected such information in Zimmer's stock price.  Under these circumstances, all purchasers of Zimmer securities during the Class Period suffered similar injury through their purchase of Zimmer securities at artificially inflated prices, and a presumption of reliance applies.

## IX.     NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS

273.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was

**Page**

false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Zimmer who knew that those statements were false when made.

274.     Additionally, defendants failed to provide any meaningful discussion of the risks which throughout the Class Period were materially and adversely impacting the Company's operations.

## X.     CLASS ACTION ALLEGATIONS

275.     This is a class action on behalf of purchasers of Zimmer common stock between January 29, 2008 and July 22, 2008 (the "Class").  Excluded from the Class are defendants, officers and directors of the Company, as well as their families and the families of defendants.  Class members are so numerous that joinder of them is impracticable.

276.     Common questions of law and fact predominate and include whether defendants: (1) violated the Exchange Act; (2) omitted and/or misrepresented material facts; (3) knew or recklessly disregarded that their statements were false; and (4) artificially inflated the price of Zimmer common stock and the extent of and appropriate measure of damages.

277.     Plaintiffs' claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.     CLAIMS

### COUNT I

#### For Violations of §10(b) of the Exchange Act and Rule 10b-5
#### Against All Defendants

278.     Plaintiffs incorporate by reference ¶¶1-277 herein.

279.     Defendants violated §10(b) and Rule 10b-5 by:

**Page**

      (a)     employing devices, schemes and artifices to defraud;

      (b)     making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      (c)     engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of Zimmer common stock.

280.    Class members were damaged as they paid artificially inflated prices for Zimmer common stock in reliance on the integrity of the market.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

281.    Plaintiffs incorporate by reference ¶¶1-280 herein.

282.    Defendants Dvorak and Crines acted as control persons of the Company within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their stock ownership, high-level positions and participation in and/or awareness of the Company's operations, each of these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading.  Each of these individual defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

283.    Defendants Dvorak and Crines had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, was presumed to have had the power to control or

Page

influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  Zimmer also controlled defendants Dvorak and Crines as well as all of Zimmer's employees.

284.    By reason of such wrongful conduct, Zimmer, Dvorak and Crines are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding plaintiffs and other members of the Class damages together with interest thereon;

C.    Awarding plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding plaintiffs and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

Page

## XIII.  JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  January 15, 2010                    COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            WILLOW E. RADCLIFFE
                                            LUKE O. BROOKS
                                            S. ASHAR AHMED

                                            _____
                                                     s/ Willow E. Radciffe
                                                 WILLOW E. RADCLIFFE

                                            100 Pine Street, Suite 2600
                                            San Francisco, CA  94111
                                            Telephone:  415/288-4545
                                            415/288-4534 (fax)

                                            Lead Counsel for Lead Plaintiff Plumbers and
                                            Pipefitters Local Union 719 Pension Fund, S.D.
                                            Ind., No. 1:08-cv-01041-DFH-JMS

                                            SUGARMAN & SUSSKIND
                                            HOWARD S. SUSSKIND
                                            100 Miracle Mile, Suite 300
                                            Coral Gables, FL  33134
                                            Telephone:  305/529-2801
                                            305/447-8115 (fax)

                                            Additional Counsel for Lead Plaintiff

                                            COHEN & MALAD, LLP
                                            IRWIN B. LEVIN
                                            RICHARD E. SHEVITZ
                                            SCOTT D. GILCHRIST
                                            One Indiana Square, Suite 1400
                                            Indianapolis, IN  46204
                                            Telephone:  317/636-6481
                                            317/636-2593 (fax)
                                            ilevin@cohenandmalad.com
                                            rshevitz@cohenandmalad.com
                                            sgilchrist@cohenandmalad.com

                                            Liaison Counsel for Lead Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

PLUMBERS AND PIPEFITTERS LOCAL UNION 719 PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _4_ day of _August_ , 2008.

PLUMBERS AND PIPEFITTERS LOCAL UNION 719 PENSION FUND

By: _Robert M. Colle_

Its: _Chairman, Trustee's_

- 2 -

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 05/02/2008 | 2,200 | $75.45 |

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CARPENTERS PENSION FUND OF WEST VIRGINIA ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

_See_ attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _15_ day of _January_, 2010.

CARPENTERS PENSION FUND OF
WEST VIRGINIA

By: _____

Its: _____CHAIRMAN_____

- 2 -

ZIMMER

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 07/08/2008 | 2,600 | $67.43 |