UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: ZIMMER HOLDINGS, INC., SECURITIES, DERIVATIVE AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | ) ) ) ) ) | Master File No. 1:09-ml-06000-SEB-DML MDL No. 2055 |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| PLUMBERS AND PIPEFITTERS LOCAL UNION 719 PENSION FUND AND CARPENTERS PENSION FUND OF WEST VIRGINIA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) ) | 1:08-cv-1041 SEB-DML |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO AMEND COMPLAINT |
| ZIMMER HOLDINGS, INC., DAVID C. DVORAK AND JAMES T. CRINES, | ) ) ) | |
| Defendants. | ) ) ) ) | CLASS ACTION
DEMAND FOR JURY TRIAL |

478683_1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II. ARGUMENT .............................................................................................................4

    A.  Legal Standard: Leave to Amend Should Be Liberally Granted ............................4

    B.  No *Foman* Factor Weighs Against Amending the Complaint................................5

    C.  Amendment Is Not Futile: Plaintiffs' Amended Complaint States a Claim
        for Securities Fraud................................................................................................6

        1.  Defendants Gave False Guidance and Deliberately Misled
            Investors About Quality Issues at Dover in Their January 2008
            Statements ..............................................................................................7

            a.  The FDA Inspection of the Dover Facility Resulted in
                Significant Consequences Requiring a Halt in Production
                and Recall of Several OSPs ...........................................................9

            b.  Defendants Had Personal Knowledge of the FDA 483
                Observations Before Their False Statements on January 29,
                2008................................................................................................12

            c.  Zimmer's Massive OSP Problems Were Caused by
                Dvorak's Failure to Invest Capital in Quality Systems at
                Dover..............................................................................................13

            d.  The FDA Inspection, OSP Recalls, FDA 483 Observations
                and Antiquated Systems Concealed by Defendants Were
                Material ..........................................................................................14

             2.  Defendants' March and April 2008 Statements Were Materially
             False and Misleading ..............................................................................16

             3.  Defendants Gave False Guidance and Deliberately Misled
             Investors About Material Problems with the Durom Cup .......................17

             a.  The Durom Cup Was Material to Zimmer's Current and
                Future Revenue and to Its Survival in the Hip Implant
                Market ............................................................................................18

             b.  Defendants Knew that Warnings About the Durom Cup's
                Failure Would Result in a Material Loss to Zimmer's
                Current and Future Revenue ..........................................................20

478683_1

**Page**

4.   Based on Prior Experience Defendants Knew Dr. Dorr's Warnings Were Material to Investors.........................................................................22

5.   Defendants' Quantification of the Fraud and the Market's Reaction Further Bolsters Materiality........................................................................27

III.   CONCLUSION.........................................................................................................28

478683_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ackerman v. Schwartz,*
    947 F.2d 841 (7th Cir. 1991) ........................................................................16

*Anderson v. Abbott Labs.,*
    140 F. Supp. 2d 894 (N.D. Ill. 2001) ..............................................................8

*Barry Aviation, Inc. v. Land O' Lakes Mun. Airport Comm'n,*
    377 F.3d 682 (7th Cir. 2004) ..........................................................................5

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)........................................................................................26

*Cent. Laborers' Pension Fund v. Sirva, Inc.,*
    No. 04 C 7644,
    2006 U.S. Dist. LEXIS 73375 (N.D. Ill. Sept. 22, 2006) .................................6

*Diersen v. Chi. Car Exch.,*
    110 F.3d 481 (7th Cir. 1997) ..........................................................................4

*Dubicz v. Commonwealth Edison Co.,*
    377 F.3d 787 (7th Cir. 2004) ..........................................................................6

*Foman v. Davis,*
    371 U.S. 178 (1962).....................................................................................4, 5

*Foster v. DeLuca,*
    545 F.3d 582 (7th Cir. 2008) ..........................................................................4

*Hirata Corp. v. J.B. Oxford & Co.,*
    193 F.R.D. 589 (S.D. Ind. 2000).....................................................................4

*Hollinger Int'l, Inc. v. Hollinger Inc.,*
    No. 04 C 0698,
    2004 U.S. Dist. LEXIS 20825 (N.D. Ill. Oct. 8, 2004).....................................8

*In re Anicom Inc. Sec. Litig.,*
    No. 00 C 4391,
    2001 U.S. Dist. LEXIS 6607 (N.D. Ill. May 18, 2001) .....................................8

*In re Bayer AG Sec. Litig.,*
    No. 03 1546 WHP,
    2004 U.S. Dist. LEXIS 19593 (S.D.N.Y. Sept. 30, 2004)..........................18, 22

478683_1

**Page**

*In re Carter-Wallace, Inc. Sec. Litig.*,
  150 F.3d 153 (2d Cir. 1998)........................................................................18, 20

*In re Carter-Wallace, Inc. Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000)..........................................................................17, 20

*In re Medtronic Inc., Sec. Litig.*,
  618 F. Supp. 2d 1016,
  2009 U.S. Dist. LEXIS 19701 (D. Minn. 2009) .............................................18

*In re Next Level Sys., Inc. Sec. Litig.*,
  No. 97 C 7362,
  1999 U.S. Dist. LEXIS 5653 (N.D. Ill. Mar. 31, 1999)....................................6

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)...............................................................................27

*In re World Access, Inc. Sec. Litig.*,
  119 F. Supp. 2d 1348 (N.D. Ga. 2000) ........................................................6, 16

*Miss. Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008)............................................................................7, 27

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000)..............................................................................17

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) ...........................................................................27

*Roots P'ship v. Lands' End, Inc.*,
  965 F. 2d 1411 (7th Cir. 1992) ...........................................................................4

*Schlifke v. Seafirst Corp.*,
  866 F.2d 935 (7th Cir. 1989) ..............................................................................8

*SEC v. Jakubowski*,
  150 F.3d 675 (7th Cir. 1998) ............................................................................27

*Selbst v. McDonald's Corp.*,
  No. 04 C 2422,
  2005 U.S. Dist. LEXIS 23093 (N.D. Ill. Sept. 21, 2005) ...................................3

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996).............................................................................7

**Page**

*Stephenson v. Hartford Life & Annuity Ins. Co.*,
  No. 02 C 3917,
  2006 U.S. Dist. LEXIS 60696 (N.D. Ill. Aug. 9, 2006) ........................................5

*Stransky v. Cummins Engine Co.*,
  51 F.3d 1329 (7th Cir. 1995) ..................................................................8, 16

*Takara Trust v. Molex Inc.*,
  429 F. Supp. 2d 960 (N.D. Ill. 2006) ..................................................................3

**STATUTES, RULES AND REGULATIONS**

Federal Rule of Civil Procedure
  Rule 9(b) ..................................................................5
  Rule 15 ..................................................................1
  Rule 15(a) ..................................................................4

21 C.F.R.
  §7.3(m)(2) ..................................................................9
  §803.3 ..................................................................10

478683_1

## I.      INTRODUCTION

Pursuant to the Court's December 1, 2009 and December 22, 2009 Orders, Federal Rule of Civil Procedure 15 ("Rule 15") and Civil Local Rule 15.1, lead plaintiff Plumbers and Pipefitters Local Union 719 Pension Fund and named plaintiff Carpenters Pension Fund of West Virginia (together "plaintiffs") move for leave to file their First Amended Consolidated Complaint for Violation of the Federal Securities Laws ("Amended Complaint"), submitted herewith.   This securities fraud action arises from defendants' scheme to mislead investors of Zimmer Holdings, Inc. ("Zimmer" or the "Company") about Zimmer's financial health and performance, and its prospects for future financial success, between January 29, 2008 and July 22, 2008 (the "Class Period").   On December 1, 2009, the Court issued an Order dismissing plaintiffs' Consolidated Complaint for failure to plead fraud with particularity.   The Amended Complaint states a claim for fraud and cures the deficiencies identified in the Court's December 1, 2009 Order.

The Amended Complaint includes detailed facts from the newly-added January 29, 2008 FDA Establishment Inspection Report (the "FDA Report"),[1] which unequivocally establishes that defendants knew about material quality issues at Zimmer's Dover, OH manufacturing facility before making their first false statements on January 29, 2008.   The FDA Report details numerous 483 Observations[2] issued by the FDA and states that five separate products – the Pulsavac Plus, Pulsavac 2, Pulsavac 3, Hemovac Infection Control Kits and Hemovac Autotransfusion Systems –

---

[1]      The FDA Report is attached to the Amended Complaint as Exhibit A.

[2]      A 483 observation is the FDA's mechanism for notifying "top management" of "significant objectionable conditions, relating to products and/or processes, or other violations of the FD&C Act and related Acts (see IOM 5.2.3.2) which were observed during the inspection."   FDA Inspections Operations Manual at 216-17, attached to the Amended Complaint as Ex. D.   Observations are a result of FDA findings of a product or conditions which would cause a product to be "adulterated or rendered injurious to health."   *Id.* at 217.

were recalled because of quality deficiencies, all before January 29, 2008.  The FDA Report also clarifies that the 483 Observations and recalls were due to serious quality defects that could cause adverse health consequences to consumers, not simple record-keeping or clerical inadequacies.

In addition to the FDA Report, the Amended Complaint includes new information from six new confidential witnesses, previous confidential witnesses, Zimmer SEC filings, the FDA inspector Mary Storch, the Code of Federal Regulations and other sources that cure the deficiencies identified in the Court's December 1, 2009 Order.  For example, CW1, provided new information establishing that defendants were advised about FDA issues and 483 Observations as they occurred.  The problems discovered during the FDA's inspection of Dover was so important that ***Dvorak had a live feed of all communications with the FDA sent directly to his computer*** and received almost daily updates from his team on the ground in Dover.

The Amended Complaint also includes new witness allegations and documents conclusively establishing defendants knew Zimmer's problems with the Durom Cup were material.  Newly-added witness, CW19, a high-volume board certified orthopedic surgeon, questioned Zimmer about defects with the Durom Cup repeatedly in 2007.  CW19 performed 78 Durom Cup implants and, like Dr. Dorr, suffered a catastrophic failure rate – 33% of the Durom Cups CW19 implanted had to be revised.  The new allegations also include Zimmer's alarming admission to CW19 that the Company never conducted clinical trials on the U.S. Durom Cup.  As CW 19 stated, marketing the U.S. Durom Cup without clinical testing was tantamount to placing a loaded gun in front of a baby because the U.S. Durom Cup product differed from the foreign product on which Zimmer relied to get FDA approval, and the U.S. Durom Cup suffered from defects which resulted in the cup not fixating to bone, causing patient pain and an unacceptable failure rate.  Having failed to conduct clinical testing, defendants should have been on red alert at the first hint of problems with the U.S. Durom Cup. Instead, defendants deliberately chose to ignore the serious deficiencies raised by CW19, Dr. Dorr,

- 2 -

his partner Dr. Long, and others because they knew such disclosure would result in a substantial loss of revenue, jeopardize Zimmer's plan to push forward the increasingly necessary FDA approval of its proposed Durom Cup resurfacing product and drive down Zimmer's stock price.

The Amended Complaint further details the importance of Dr. Dorr's and other high-volume surgeons' negative clinical experiences with the Durom Cup, alleging that because unlike most orthopedic surgeons, they perform 100-150 surgeries a year, and thus, are able to see defect trends in advance of other surgeons.  It also details the evidence presented to Zimmer from these prominent surgeons that strongly supported a design defect and not a benign explanation.  Further, the Amended Complaint sets forth the background in which Zimmer received these warnings involving Sulzer's Interop Cup and how its defects, which Dr. Dorr warned about and how concealed, caused that company to nearly go bankrupt paying a billion dollars in product liability claims.  Similarly, new facts demonstrate that Zimmer also misled surgeons about the known problems with the Durom Cup.  Further, the crisis team tasked with investigating Durom Cup problems, after Dr. Dorr went public to his colleagues, was given marching orders to find evidence that the problems were due to technique rather than look for the real issue.

With these allegations and others discussed herein, the Amended Complaint pleads with particularity that (i) the adverse facts known to defendants at the time Zimmer's guidance was issued regarding Zimmer's quality systems and Durom Cup product seriously undermined defendants' statements rendering them false and misleading in violation of the securities laws (*Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093 (N.D. Ill. Sept. 21, 2005)), and (ii) when defendants made affirmative statements regarding the Company's quality systems and the Durom Cup, they were misleading because they omitted key adverse facts which rendered the statements false. *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 972-73 (N.D. Ill. 2006).

- 3 -

Finally, the Amended Complaint adds new plaintiff Carpenters Pension Fund of West Virginia ("West Virginia").  West Virginia purchased Zimmer stock on July 8, 2008, after the final Class Period false statement, thus removing any doubt that the named plaintiffs have standing to represent all class members.  *See* Order at 17-19 (citing *Roots P'ship v. Lands' End, Inc.*, 965 F. 2d 1411 (7th Cir. 1992)).

## II.   ARGUMENT

### A.   Legal Standard: Leave to Amend Should Be Liberally Granted

Rule 15(a) provides that leave to file an amended pleading "shall be freely given when justice so requires."  *Foman v. Davis*, 371 U.S. 178, 181-82 (1962); Fed. R. Civ. P. 15(a).  As the Supreme Court held, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Foman,* 371 U.S. at 182.  The Seventh Circuit has adopted a liberal approach to amending pleadings so that cases may be decided on merits, not technicalities.  *Diersen v. Chi. Car Exch.*, 110 F.3d 481, 489 (7th Cir. 1997).   In light of the technical and demanding pleading standards in securities fraud cases, moreover, adherence to these principles is especially important.  *See, e.g.*, *Hirata Corp. v. J.B. Oxford & Co.*, 193 F.R.D. 589 (S.D. Ind. 2000).

The Seventh Circuit has held that a court should consider several factors, known as the *Foman* factors, to determine whether to grant leave to amend: undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants or futility of the amendment.  *Foster v. DeLuca*, 545 F.3d 582, 584-85 (7th Cir. 2008) (citing *Foman*, 371 U.S. at 182).  The party opposing a motion for leave to amend bears the burden to convincingly demonstrate that a substantial reason exists to deny leave to amend: "[u]nless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should

grant leave to amend after granting a motion to dismiss." *Barry Aviation, Inc. v. Land O' Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004).

### B.     No *Foman* Factor Weighs Against Amending the Complaint

The proposed Amended Complaint does not fall under the ambit of *Foman* factors. There is no undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to defendants or futility of amendment.

This motion is timely filed pursuant to the Court's December 1, 2009 and December 22, 2009 Orders. Plaintiffs do not proffer the Amended Complaint in bad faith but instead to remedy deficiencies identified by the Court. Lead plaintiffs have not been dilatory in seeking an amendment; plaintiffs' new allegations are based on information obtained after the Consolidated Complaint was filed and in response to specific concerns raised by the Court. Plaintiffs obtained the FDA Report after filing their opposition to defendants' motion to dismiss. New confidential witnesses added in the Amended Complaint were recently located and previous witnesses were recontacted to obtain further clarification based on the deficiencies identified by the Court.

Further, defendants would not be unduly prejudiced by amendment. "'Undue prejudice has been found in cases where the amendment "brings entirely new and separate claims, adds new parties, or at least entails more than an alternative claim or a change in allegations of the complaint . . . ."'" *Stephenson v. Hartford Life & Annuity Ins. Co.*, No. 02 C 3917, 2006 U.S. Dist. LEXIS 60696, at *32 (N.D. Ill. Aug. 9, 2006) (citations omitted). No new claims or defendants have been added to this Amended Complaint and the theory of liability remains the same. Moreover, defendants have sufficient time to review the new facts alleged in the Amended Complaint and frame their defense to the alleged fraud.

Finally, the amendment is not futile because, as discussed in detail below, the Amended Complaint more than adequately alleges fraud with the particularity required by Rule 9(b) and the

- 5 -

478683_1

Private Securities Litigation Reform Act and corrects the deficiencies found by this Court in the original complaint. *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 794 (7th Cir. 2004) (amendment not futile when it cures the defects identified by the district court). At the very least, plaintiffs should be afforded the opportunity to defend the Amended Complaint's allegations with full briefing on the totality of the facts alleged and the current law.

### C.   Amendment Is Not Futile: Plaintiffs' Amended Complaint States a Claim for Securities Fraud

The Amended Complaint alleges materiality and scienter with the required particularity – the thrust of the Court's basis for dismissal of the initial Consolidated Complaint. As to materiality, both the quality issues at the Dover facility and the defects with the Durom Cup constitute information which would alter the total mix of information available about Zimmer's financial condition and operations, including the soundness of Zimmer's guidance on January 29, and April 24. *Cent. Laborers' Pension Fund v. Sirva, Inc.*, No. 04 C 7644, 2006 U.S. Dist. LEXIS 73375, at *12 (N.D. Ill. Sept. 22, 2006). The combined impact of reputational harm, revenue loss and loss of competitive market share, plus expenses related to these two issues, were material and rendered defendants' statements false and misleading. *In re Next Level Sys., Inc. Sec. Litig.*, No. 97 C 7362, 1999 U.S. Dist. LEXIS 5653, at *22 (N.D. Ill. Mar. 31, 1999) (company's failure to address "several facts that undermine[d] the accuracy of [its] forecasts of continued growth, high demand and increased earnings . . ., each of which would have affected earning projections, amount[ed] to a material omission"); *In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1354-55 (N.D. Ga. 2000) (statements made about the success of product, when company was experiencing problems with the production, are actionable).

Plaintiffs do not rely solely on defendants' admissions and Zimmer's stock price drop to show earlier omissions by defendants' were material. Order at 31 n.21. In addition to such

- 6 -

allegations, as discussed below, the Amended Complaint details defendants' actual knowledge and bolsters the inference of materiality drawn from defendants' admissions and the market's reaction with additional allegations of defendants' knowledge prior to the first day of the Class Period. These allegations put to rest any contention that plaintiffs have "no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later." *Miss. Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008). Viewed together, as required, the Amended Complaint presents "'a series of factual allegations relating to a combination of developments known to the company'" that establish advance knowledge of fraud by defendants not fraud-by-hindsight. *Id.* at 90 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996)). The Amended Complaint alleges materiality and scienter with particularity based on defendants' contemporary knowledge.

> ### 1.   Defendants Gave False Guidance and Deliberately Misled Investors About Quality Issues at Dover in Their January 2008 Statements

On January 29, 2008 defendants gave their guidance for the year 2008. Defendants also falsely touted to the market Zimmer's investment in and commitment to "quality systems" specifically telling the market that "investing today in the infrastructure needed to serve the health care market of the future will generate attractive returns in the years to come." ¶3.[3] However. instead of the "quality systems" that defendants led investors to believe would generate solid returns, defendants knew at least five days before their statements that their failure to invest in Zimmer's antiquated systems had already resulted in multiple recalls and in production halts of OSP products as a result of an FDA inspection of Zimmer's Dover facility. ¶4. Defendants also knew Zimmer

---

[3]      All "¶__" references are to the Amended Complaint.

would not meet the guidance due to revenue loss and expenses from halted production at Dover and a recall of major OSPs.  ¶102; *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 904 (N.D. Ill. 2001) (projections are misleading and false, if one making them has no reasonable basis for making them); *In re Anicom Inc. Sec. Litig.*, No. 00 C 4391, 2001 U.S. Dist. LEXIS 6607, at *11-*12 (N.D. Ill. May 18, 2001) (falsity adequately pled when plaintiff alleged defendants' access to information rending their statements false).

In addition, Dvorak flatly lied in response to an analyst question about quality matters. Dvorak was asked, "Do you currently have any issues with FDA, any warning letters, that usually takes a few months for those to be posted, that they may been issued or 483'd?" Dvorak replied, "we don't have any warning letters at this point."  ¶106.  But Dvorak was aware of the FDA's 483 Observations, he was aware Zimmer had recalled and ceased production *of five products*, and he was aware of the material financial impact these issues had on Zimmer's bottom line. ¶116.  *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989); *Anderson*, 140 F. Supp. 2d at 903 ("If omitting the fact would make the statement so incomplete as to be misleading, the company must disclose it."). Dvorak's response was misleading – he had a duty to disclose any additional information necessary to rectify his false and incomplete responses.  *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("If one speaks, he must speak the whole truth."); *accord Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2004 U.S. Dist. LEXIS 20825, at *28 (N.D. Ill. Oct. 8, 2004). Instead of acknowledging that Zimmer had issues with the FDA, that 483s already had been issued and that five different OSPs, including Zimmer's highest selling OSP, Pulsavac Plus, had been taken off the market, Dvorak deliberately and knowingly misled analysts and investors by giving the impression Zimmer had no FDA issues at all.  Defendant Crines sat by silently and watched him mislead investors, and when asked a similar question the same day – he made similar false

- 8 -

statements.  As discussed below, defendants were acutely aware that Zimmer had major FDA issues and quality problems.

> ### a.      The FDA Inspection of the Dover Facility Resulted in Significant Consequences Requiring a Halt in Production and Recall of Several OSPs

The Amended Complaint exceeds the standard set forth in the Court's Order, which requires plaintiffs to "allege with sufficient particularity that the [FDA] inspection resulted in significant negative consequences which were known to Defendants."  Order at 23-24.  By itself, the newly-added FDA Report conclusively establishes that before the Class Period defendants knew there were major quality issues at Zimmer's Dover plant.  ¶¶118-129.  The FDA Report confirms that as a result of complaints from customers about leakage of silicon in Zimmer's product Pulsavac Plus, Zimmer had to recall that product from the market.  By *December 18, 2007*, Zimmer had notified all of its distributors of the recall and thereafter notified the FDA.  ¶119.  However, Zimmer did not inform investors about the recall, even though it was classified as a FDA Class II recall, which means the products were taken off the market because using them risked temporary or medically reversible *adverse health consequences*.  21 C.F.R. §7.3(m)(2); ¶121.

The FDA Report also confirms the following sequence of events known to defendants, further establishing "with particularity which OSPs had been stalled in production" (Order at 27) and detailing "when, where, what, and how the Dover facility was 'antiquated' and afflicted with 'quality problems'" (Order at 28): The recall resulted in a week-long FDA inspection of the Dover facility from *January 7 to January 11, 2008*, and follow-up visits by the FDA inspector on January 16, 18, 25 and 29, 2008.  ¶118.  The FDA inspector discovered that silicon leakage in Pulsavac Plus occurred because of "too much silicon applied during assembly."  ¶119.  The inspector also discovered that this process was not automated, but was in fact an antiquated manual step.  ¶119.  Upon further inquiry about other products "with manual silicon application process," the FDA

- 9 -

inspector was informed about two other defective products, Pulsavac 2 and 3.  ¶120.  Further, review of the Pulsavac 2 complaint revealed to the FDA inspector that since January 2004, Zimmer had received 19 complaints on Pulsavac 2 for similar silicon staining.  ¶120.  However, Zimmer had not recalled Pulsavac 2.  ¶120.  Pulsavac 3 had the same problem.¶120.  But, it was not until the FDA's inspection that Zimmer **halted production** and **ceased distribution** of Pulsavac 2 and 3 on **January 7, 2008**.  ¶120.  Thereafter, on **January 24, 2008**, five days before defendants' first misleading statements, the Plusavac Plus **recall was expanded** to include the Pulsavac 2 and 3 products.  ¶120.  As with the Pulsavac Plus recall, these recalls were classified as Class II because use of the products could cause adverse health consequences.  ¶121.  By **January 24, 2008**, Zimmer also decided "to discontinue production of Pulsavac 2 and 3" altogether.  ¶120.

The Dover facility's quality problems were not confined to the Pulsavac product line.  The FDA Report reveals that two other products, Hemovac Infection Control Kits ("HIC") and Hemovac Autotransfusion Systems ("HAS"), were also recalled.  ¶¶124-127.  The FDA inspector discovered that Zimmer had failed to report until January 11, 2008, the recall of two lots of HICs, which were initially recalled on December 6, 2006 due to complaints about bodily fluid exposures.  ¶124.  These recalls were also classified as Class II due to risk of adverse health consequences in this case of **death or serious injury**.  ¶124.  The FDA inspector found that Zimmer had a device that failed to function as described in the instructions for use, and as a result of this failure the risk was bodily fluid exposure.  ¶124.  Further, according to the FDA Report, Zimmer knew and had acknowledged the risk associated with this device's failure by filing two MDRs[4] prior to conducting field removal.

---

[4]     An "MDR" is a Medical Device Report.  By law, a manufacturer must report an MDR within 30 days after it became aware that a device "may have caused or contributed" to a **death or serious injury**, or a malfunction that would likely cause or contribute to a **death or serious injury**.  21 C.F.R. §803.3.

¶125.   On January 24, 2008, as a result of the FDA inspection, Zimmer's recall of HICs was expanded beyond the original two lots to cover *all HICs* manufactured between January 2003 and January 2007.  ¶126.   Unbeknownst to the FDA inspector, Zimmer concealed information about the complaints received in 2006 related to the HIC, information that was specifically requested.  ¶126.

As for HAS, the FDA inspector discovered that between April 2005 and December 2006, Zimmer had received five complaints regarding holes in this product's sterile packing.  ¶127.  At this time, Zimmer investigated and established that "to prevent the problems the firm needed to adjust the design of the device to prevent damage from occurring to the packing."  ¶127.  However, the inspector found out that "even with the problems identified and a planned correction, [Zimmer] continued to manufacture the device under the problematic design and still took no additional steps to control or monitor the process to alleviate the potential for sterility compromise as a result of damaged product."  ¶127.  After agreeing with the FDA inspector's assessment, Zimmer "initiated recall of *all lots* manufactured between 10/1/2003 and 8/21/2006 *prior to the [January 29, 2008 close of inspection*."[5]  ¶127.

In sum, the Amended Complaint cures the deficiencies the Court found with plaintiffs' allegations regarding the halt in production by alleging with particularity, among other things, "which OSPs had been stalled in production," and "when, precisely, production of the OSPs was actually halted" and establishing the enormous "magnitude of the cessation of production."  Order at 26-27.

---

[5]      The FDA inspection also revealed that Zimmer's Corrective and Preventive Action System ("CAPA"), which captured trends of device failures and/or defects, had "significant deficiencies resulting in insolated and systematic failures."  ¶128.  As a result, the FDA observed that products, including the Puslavac and Hemovac products, continued to be produced and released when they should not have been.  ¶128.

- 11 -

**b.      Defendants Had Personal Knowledge of the FDA 483 Observations Before Their False Statements on January 29, 2008**

The FDA Report indicates that at the end of the inspection, on January 29, 2008, Zimmer was issued formal 483s Observations relating to the above-described quality problems. Ex. A. However, the FDA inspector, the FDA Inspection Operation Manual and additional statements by previously pleaded CWs confirm that Zimmer's management knew about these observations *before the final day of the inspection* and, thus, before their false January 29, 2008 statements. ¶¶122-123. The FDA inspector who conducted the Dover inspection, without discussing the actual inspection, confirmed that inspectors do not wait until the end of an inspection to inform the management of the 483 Observations but rather communicate these observations to management as soon as they are observed. ¶123. The FDA Inspection Operation Manual confirms this protocol:

> Regardless of whether an establishment's FDA 483 is annotated, *investigators and analysts should make every reasonable effort to discuss all observations with the management of the establishment as they are observed, or on a daily basis, to minimize surprises, errors, and misunderstandings when the FDA 483 is issued*. This discussion should include those observations, which may be written on the FDA 483 and those that will only be discussed with the management during the closeout meetings. ¶123.

The Amended Complaint includes new information from CW1, one of the main contacts for the FDA inspector at the Dover facility and the one to whom the FDA 483 Observations were issued, confirming the timing and defendants' knowledge of the observations. ¶¶25-28. CW1 confirmed that the FDA inspector communicated with her and other individuals at the Dover facility and Warsaw headquarters throughout the inspection. ¶¶25-27. The FDA informed the Company it would receive 483 Observations on an ongoing basis as the violations were found. ¶25.

Significantly, CW1 also averred that defendant Dvorak was kept apprised of the FDA inspection by the team Dvorak sent to handle the Dover inspection. ¶¶26-27. She explained that all communications with the FDA inspector during her visits were transcribed and transmitted

- 12 -

electronically to Warsaw and Dover conference rooms on a live feed. ¶27. CW1 indicated *that this live feed went directly to Dvorak's computer*. ¶27. CW2 confirms such a live feed would be normal protocol. ¶37. Thus, defendants were aware of the existence and nature of the violations well before the FDA Report was issued and well before their January 29, 2008 false statements.

### c. Zimmer's Massive OSP Problems Were Caused by Dvorak's Failure to Invest Capital in Quality Systems at Dover

Zimmer's OSP problems were a result of Dvorak's decision not to invest money in the quality systems at Dover, resulting in an antiquated facility with out-of-date processes. ¶¶22; 34. Newly added witness, CW16, adds new information that corroborates previous statements. ¶81. CWs 1 and 16 and confirm that it was Dvorak who had oversight of the Dover facility. ¶¶22, 81. CW16 also confirms that because of Zimmer's tight financial issues (*i.e.,* divisions overseen directly by Dvorak, including Dover, not hitting financial and/or investment targets), Dvorak chose not to invest money in the quality systems at Dover. ¶81. Because of the failure to invest money into Dover's quality systems, they were approximately 10 to 15 years behind the times. For example, Dover still used manual methods for application of silicon which, as discussed, caused OSP product quality deficiencies. ¶¶81, 119. CW16 elaborated that Dvorak was embarrassed by the state of the systems at Dover and as a result suppressed information about the status of the facility from others in the Company. ¶81. Finally, CW 16 averred that in early 2008 Dvorak was expecting warning letters from the FDA. As a result, he hired a specialist who had previously worked for Abbott Labs who was known for helping companies deal with and avoid warning letters from the FDA as the Head of Quality. ¶81.

**d.    The FDA Inspection, OSP Recalls, FDA 483
Observations and Antiquated Systems Concealed by
Defendants Were Material**

The Amended Complaint pleads with particularity that Zimmer's OSP and manufacturing issues were material to Zimmer and, if disclosed to investors, would have affected Zimmer's reputation in the worldwide orthopedic market as well as Zimmer's financial viability. OSPs were one of Zimmer's major products. In its 2007 Form 10-K, Zimmer declared itself the "global leader" in OSPs. Zimmer's OSPs were used by numerous hospitals and doctors throughout the U.S. and abroad during and after surgeries.

Defendants knew public disclosure of recalls and the discontinuation of OSPs due to quality-related problems would impact Zimmer's worldwide reputation as one of the global leaders in the field of medical device manufacturing. Defendant Dvorak conceded as much on January 29, 2008 when he told investors that Zimmer's quality products would help it maintain market share. Further, Zimmer operated in a tight market. As Deutche Bank's analyst, Tao Levy, in January 2008 pointed out the orthopedic market is dominated by 5 companies that control approximately 97% share. ¶113. Defendants knew any damage to Zimmer's reputation in such a concentrated market would impact the Company's credibility and reduce its ability to sell products successfully. ¶113.

Zimmer's financial health also directly depended upon revenue from OSPs. In 2006 and 2007, the two years prior to the Class Period (and the OSP recalls), sales of OSPs represented Zimmer's third highest revenue-producing segment. Furthermore, in 2007, net sales of OSP, (revenue from OSPs less cost associated with selling them) *alone* was approximately $234 million accounting for 6% of Zimmer's global net sales. ¶113.

- 14 -

The Dover plant was the main manufacturing facility for OSPs, accounting for 70% to 80% of Zimmer's OSP revenue.[6]  ¶113.  And, as the FDA observed, the recalled and discontinued Pulsavac Plus was Zimmer's "*highest volume [OSP] product.*"  ¶113.  CW1 corroborates the FDA report, explaining that Dover was the second largest revenue-producing facility at Zimmer, and the Puslavac line was a big seller for the Company.  ¶113.

Defendants knew the impact quality issues would have on Zimmer's bottom line.  New witness, CW20, was responsible for, among other things, tracking daily U.S. sales of OSPs and other products on the Daily Sales Report.  ¶97.  The Daily Sales Report was e-mailed to CEO and defendant Dvorak, and CFO and defendant Crines first thing *every morning*.  ¶97.  Based on this information, defendants should have known before January 29, 2008 that 2008 diluted EPS would be adversely impacted by a minimum of $0.18-$0.20, a fact they did not announce until almost three months later on April 24, 2008.

In sum, the new facts alleged in plaintiffs' Amended Complaint establish that before the conference call on January 29, 2008, defendants knew the FDA Observations were serious and thereby material.  Defendants knew that the quality defects at Dover were hurting Zimmer's ability to generate revenue across the country.  Zimmer had *halted production* of Pulsavac 2 and 3 on *January 7, 2008* and *recalled* Zimmer's highest volume OSP product line, Pulsavac Plus, along with Plusavac 2, Pulsavac 3, Hemovac Autotransfusion Systems and Hemovac Infection Control Kits, by *January 24, 2008*.  As CW3 stated, the Pulsavac Plus recall alone involved a large volume of product – more than 800,000 units of Pusavac Plus were recalled from the field.  ¶40.

---

[6]       The only other facility producing OSPs was in Statesville, North Carolina.

These additional detailed allegations leave no doubt that the undisclosed problems at Zimmer's Dover facility were serious and clearly the type of information investors would want to know in light of management's positive guidance and false and misleading denial of any problems with the FDA.  Further, having spoken about defendants' "quality systems," defendants had a duty to tell all material facts that would paint an accurate picture of the Company's operations.  *World Access*, 119 F. Supp 2d at 1354-55.  A duty they breached.

### 2.    Defendants' March and April 2008 Statements Were Materially False and Misleading

On March 18, 2008, at the Cowen and Company Health Care Conference, Crines stated:  "the company has recently undertaken a major investment initiative to upgrade manufacturing quality systems." ¶188.  There was no mention of the FDA inspection, the specific quality issues at Dover, the halted and recalled OSP products, or that Zimmer would not meet its guidance given in January because of these issues.

Defendants did not even hint to investors about the massive issues at the Dover facility until April 3, 2008, when defendants misleadingly stated that "[t]he Company recently conducted a review of the quality systems at the Dover, Ohio OSP facility and initiated voluntary product recall. . . .  The Company has voluntarily and temporarily suspended production and sales of certain OSP products." ¶186.  Defendants also told the market that revenue would be adversely impacted by $70-$80 million.  *Id*.  Having chosen to raise this issue, defendants were required to disclose the whole truth.  *Ackerman v. Schwartz,* 947 F.2d 841, 848 (7th Cir. 1991); *Stransky*, 51 F.3d at 1331.  However, defendants again misled the market.  The review was not "recent" – the problems had been uncovered prior to January 29 and in some cases, years earlier.  Indeed, new information provided by CW1 and CW2 establishes that the quality defect trends at Dover were discussed in October 2007, when Dvorak's new hired Vice President of Quality came aboard.  ¶¶19, 20, 34.  Nor

- 16 -

did defendants disclose the FDA investigation, the 483s or the true impact these problems had on Zimmer's ability to achieve its guidance.  Defendants also successfully mislead investors into believing the impact on EPS would only be $0.03 to $0.05.

Less than three weeks later, on April 24, 2008, defendants announced that quality problems at the Dover facility would in fact adversely impact adjusted EPS by $0.18 to $0.20, albeit off-set by other facts.  ¶187.  Following this abrupt reversal, analysts questioned management's credibility:

> Question from an analyst: "Obviously on the fourth quarter call, you guys gave a very bullish report, a very bullish tone and ***yet when we look back at the timing of the FDA recall announcement as it relates to OSP***, that was sort of in ***full swing*** as you were giving that guidance but it wasn't disclosed, and now we're hearing that it's an $0.18 to $0.20 headwind for the full year.  ***I'm just wondering why didn't you disclose it on the first, on that call on the fourth quarter especially now knowing that it's going to be such a major headwind for the full year***?"  ¶3.

¶189.

As discussed, the Amended Complaint details with particularly that defendants knew about the major headwind and should have disclosed this information to the market in January 2008 and March 2008, but deliberately did not.

### 3.     Defendants Gave False Guidance and Deliberately Misled Investors About Material Problems with the Durom Cup

In its Order dismissing plaintiffs' Consolidated Complaint, the Court found plaintiffs failed to allege a duty to disclose, and held "materiality in the medical device and drug contexts depends to a large degree on the statistical significance, or conclusiveness, of the negative information available to the manufacturer."  Order at 38.  The Court cited cases for the proposition that "until a connection between [a medical device or a drug] and any illness could be made, we would not expect [defendant] to abandon its product on what, at the time, would have been speculation."  *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000) ("*Carter-Wallace II*"); *see also Oran v.*

- 17 -

*Stafford*, 226 F.3d 275, 284 (3d Cir. 2000); *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 2009 U.S. Dist. LEXIS 19701 (D. Minn. 2009).

The *Medtronic* Court held that "[s]tatistical significance, however,  is not a bright-line rule because materiality 'is a flexible, fact-based determination.'"  2009 U.S. Dist. LEXIS 19701, at *16 (quoting *In re Bayer AG Sec. Litig.*, No. 03 1546 WHP, 2004 U.S. Dist. LEXIS 19593, at *27 (S.D.N.Y. Sept. 30, 2004)).  Information may become material even in the absence of statistically significant evidence in light of other indications that the risk associated with adverse events is legitimate and serious enough to threaten sales.  *Id.*  In *Bayer*, the court, expanding on *Carter-Wallace's* "statistical significance" test, held that even if causation has not been established by statistical significance, if defendants know of issues from which it can be inferred they are "'sufficiently serious and frequent to affect future earnings'" then defendants have a duty to disclose. 2004 U.S. Dist. LEXIS 19593, at *25-*26 (citing *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 157 (2d Cir. 1998) ("*Carter-Wallace I*").  The Amended Complaint establishes defendants had such knowledge and, thus, a duty to disclose the known adverse facts about the Durom Cup, particularly where defendants made fraudulent half-truths about the product's "challenges."

> a. **The Durom Cup Was Material to Zimmer's Current
> and Future Revenue and to Its Survival in the Hip
> Implant Market**

The Amended Complaint establishes that any substantial decrease in the Durom Cup's sales was a serious threat to Zimmer's current and future earnings.  In a January 30, 2008 statement to analysts, Dvorak characterized Zimmer's reconstructive products, such as the Durom Cup, as a core business.  ¶103.  He also told the market that reconstructive products "produc[ed] the highest operating profit margins among [Zimmer's] products accounting for approximately 84% of 2007 sales."  ¶154.  Zimmer sold more than $629 million worth of hip products in 2007.  ¶154.  These sales included tens of millions of dollars from the Durom Cup.  ¶154.

- 18 -

The Durom Cup was not only material to Zimmer because it brought in tens of millions of dollars in sales, it was also the foundational product for the Durom hip resurfacing system in the U.S., which Zimmer desperately needed to garner market share. ¶155. In 2007, Zimmer was *No. 1* in the U.S. hip market with a 27% market share. ¶155. However, Zimmer was losing market share. ¶155. The sale of the Durom Cup in the U.S. was approved only for hip replacement procedures, whereas the fastest-growing market was the hip resurfacing procedure, an alternative to hip replacement. ¶155. Zimmer planned on FDA approval of the U.S. Durom Cup for resurfacing procedures in order to tap into the $400 million U.S. hip resurfacing market. ¶¶155, 175(e). Defendants knew that the Durom Cup's reputation was imperative to Zimmer's survival in the hip implant category, as it was already losing sales to other competitors who had FDA approved hip resurfacing systems in the U.S. ¶175. The lack of a hip resurfacing product in the U.S. was noted by analysts as the reason why Zimmer's growth in the hip market was below average. ¶175. Thus, defendants knew any adverse impact on the Durom Cup's reputation would impact the upcoming resurfacing system's pre-market approval with the FDA and accordingly, would have a substantial impact on Zimmer's future earnings. ¶¶175, 176.

In fact, defendants knew precisely how much Zimmer's current and future revenue would be impacted if the Durom Cup's sales were to be interrupted. CW10 stated that Zimmer's year 2008 fiscal forecast was based on the sales revenue in the United States from the Durom Cup's existing hip replacement technology *and* Durom Cup's hip resurfacing technology. ¶62. Yet, the Durom Cup had not been approved to sell as a hip resurfacing product. ¶175. Newly added witness, CW15, was a former Associate Director of Financial Planning at Zimmer's headquarters responsible for forecasts, budgets and planning from May 2008 to approximately fall 2009. ¶80. He prepared monthly forecasts covering the current month, the months in the remaining calendar year, as well as a five-year forecast. ¶80. These forecasts included forecasts by regions, product segment (*e.g.*, hips

- 19 -

and knees) and product brands (*e.g.*, Durom).  ¶80.  The forecasts CW15 prepared were distributed to the Operating Committee at Zimmer, which consisted of defendant Dvorak and his direct reports, including defendant Crines.  ¶80.  Defendants knew from these forecasts that Zimmer's guidance was dependent on revenue from the not-yet-approved Durom Cup hip resurfacing technology, revenue Zimmer would not receive if the Durom Cup issues were exposed.

> **b.    Defendants Knew that Warnings About the Durom Cup's Failure Would Result in a Material Loss to Zimmer's Current and Future Revenue**

Unlike *Medtronic, Oran*, *Carter-Wallace I* and *Carter-Wallace II*, where the defendants received random adverse reports and complaints about injuries that ***may*** have been linked to the use of their respective device or drug, the Amended Complaint establishes that defendants ***had conclusive evidence*** of the Durom Cup's implant failures which they deliberately sat on for months. After the Durom Cup was implanted, a large number of patients "experienced post-operative pain, dislocation, and loosening of the acetabular implant leading to revision surgery."  In 2007, Dr. Dorr, who was an expert in metal-on-metal hip implants, such as the Durom Cup, and was cited as the Clinical Technical Reference for the Durom Cup, notified Zimmer of a causal link between Zimmer's Durom Cup and the excruciating pain patients were experiencing after implanting the Durom Cup, resulting in revision surgery.  ¶¶157, 164.  Dr. Dorr told Zimmer that the Durom Cup should be pulled from the market.  ¶164.

Instead of acknowledging the Durom Cup's failure, defendants blamed Dr. Dorr's technique as the cause of revision in the patients.  ¶¶227, 265.  However, several facts undermined this false assertion.  Dr. Dorr helped develop the Durom Cup; Zimmer itself cited Dr. Dorr's articles in its Clinical Technology References; and Dr. Dorr's live surgical videos were used for training doctors at the Zimmer institute.  ¶55.  Dorr rejected defendants' assertion and put his professional reputation on

478683_1

the line in a letter to his colleagues which stated unequivocally: "I can assure you [the Durom Cup]
goes beyond technique."  ¶159.

It was not only Dr. Dorr who experienced failure with the Durom Cup, but other surgeons
too.  Newly-added witness, CW19, is a high volume orthopedic surgeon who performs 100-150
implants a year.  ¶92.  Beginning in May 2006, CW19 implanted 78 Durom Cups.  ¶92.  CW19's
Durom Cup implants resulted in a catastrophic failure rate – he was forced to revise 26, or 33%, of
the Durom Cups he implanted.  ¶92.  In 2007, CW19 contacted his Zimmer sales representative,
Mark Smith, to inquire if any other surgeons were encountering problems with the Durom Cup.  Mr.
Smith informed CW19 that he had talked to the Company and no other surgeons were encountering
problems with the Durom Cup.  ¶93.  All told, CW19 asked Zimmer three to four times in 2007 if
other doctors had experienced problems with the Durom Cup and, despite Dr. Dorr's complaints to
Zimmer, was told no.  ¶93.

After repeated complaints, CW19 had a conference call with Zimmer's Senior Product
Manager Brian Parker and VP of Research Erin Johnson about the Durom Cup.  ¶93.  During the
conference call, he learned that Zimmer never performed any clinical trials of the U.S. Durom Cup.
¶96.  Instead, Zimmer relied on studies of Durom Cups used in Europe, Canada and Australia.  ¶¶96,
205.  However, these products were different.  ¶212.  Thus, defendants' attempt to deflect the
negative news about the Durom Cup was also false.  They were comparing apple and oranges.  ¶212.
As one analyst wrote:

> First, internationally, Durom is used in hip resurfacing plus, the US product has a
> different coating (it's thicker).  It may be subtle but it's a difference, thus
> international data is not 100% applicable. A problem with Durom Cup also means a
> problem with bringing a hip resurfacing system to the US, which means a long term
> competitive disadvantage.

¶217.

- 21 -

Dr. Dorr's colleague, Dr. Long and another surgeon, Dr. Maltley, also complained of cup loosening.  ¶¶166, 171.  In a 2009 paper entitled, "Failure of the Durom Metasul Acetabular Component," Dr. Dorr and his colleagues would document their clinical results – a 23% failure rate for cups implanted from May 2006 to November 2007 due to the faulty design of the Durom Cup. ¶183.  The study describes that many of the implanted cups had no fixation to the bone of the patient (a fact apparent to the doctors and Zimmer sales representatives present when revision surgery was performed) when describing why technique was not the issue.  ¶184.  The study also notes the U.S. design was different from the European design, concluding that reliance on failure rates in Europe is not accurate.  Moreover, between them, Dr. Dorr, Dr. Long, Dr. Maltry and CW19 performed well over 300 Durom Cup implants, a number far in excess of the 200 surgeries analyzed in the Swedish survey that defendants used to publicly defend the Durom Cup.  ¶172.  Having conceded 200 is a proper sample size, defendants cannot be heard to contend that the 300 surgeries with catastrophic failure rates was immaterial.  ¶204.  Defendants' failure to take action upon receiving these doctors' warnings is even more egregious in light of the fact that (1) *they had never clinically tested the U.S. Durom Cup* and (2) defendants knew the U.S. product was substantially different from the European Durom Cup that actually had been clinically tested.

### 4.    Based on Prior Experience, Defendants Knew Dr. Dorr's Warnings Were Material to Investors

Regardless of whether it was a product defect or technique issue, upon being notified of Dr. Dorr's warnings in 2007, defendants were well aware that because of his prominence and expertise (which they relied on in their own materials), warnings by Dr. Dorr would result in decreased sales of the Durom Cup and harm to the Company's reputation.  *Bayer*, 2004 U.S. Dist. LEXIS 19593, at *25-*26.

- 22 -

Dr. Dorr is no ordinary surgeon.  He collaborated on the development of the Durom Cup and during the Class Period was Zimmer's own consultant on metal-on-metal hip products.  He is a prominent and well-respected hip surgeon who has conducted more than 5,000 hip surgeries and is considered by some to be the most knowledgeable surgeon on hip implants.  Dr. Dorr, along with a colleague, is reported to have had more articles published on the clinical use of modern metal-on-metal hip implants than any other surgeon/researcher.

CW12, who worked at Zimmer for more than 20 years and was last Director of Computer Assisted Surgery, stated that Dr. Dorr is one the best orthopedic surgeons he has seen operate and that Dr. Dorr knows and understands more about hip joints than most surgeons.  ¶71.  In fact, Zimmer used live broadcasts of Dr. Dorr's surgeries to train its sales force and other surgeons at Zimmer's training institute.  ¶71.  Recently obtained evidence shows that since 2006, Zimmer used Dr. Dorr as a clinical reference for the Durom Cup's product insert, which contained information about the device, its size, and its functionality.  ¶55.  In other words, Dr Dorr was not just any surgeon warning Zimmer about its defective hip implant, but the one Zimmer referenced in explaining the product to other surgeons.

DeutscheBank noted the importance of Dr. Dorr's complaints and influence on other surgeons' use of the cup: "[I]n our opinion, Dr. Dorr's comments will sway some surgeons away from Durom.  *While it's possible the problems are technique related, this may be irrelevant in terms of usage of Durom, again due to Dr. Dorr's influence.*"  ¶263.

In April 2008, frustrated with Zimmer's indifference to his warnings,  Dr. Dorr sent a letter to AAKHS on behalf of himself and his colleagues, warning his fellow surgeons about the Durom Cup's failures.  He also explained his reasons for doing so:

> *We have notified Zimmer.*  The FDA has been notified and we will notify them of our continued revisions.  The company does not believe it should pull the cup from the market so I am notifying all of my colleagues of our failure rate with this cup.  I

- 23 -

went through a similar scenario with the Sulzer cup failures where I was the only one experiencing revisions at the beginning and basically it was assumed that it was our technique.  I can assure you that this goes beyond technique.

Ex. F.

In his letter, Dr. Dorr explained the fixation surface on the cups was defective and that there was a circular cutting surface on the periphery of the cup that prevented the cup from fully "seating." ¶165.  He stated that ten revisions in 165 hips had been conducted and identified four additional hips that needed to be revised as a result of Zimmer's Durom Cup.  ¶160.  Later defendants would admit that this was an "***unusually high rate of revision***," they took "seriously."  ¶177.

Defendants knew from prior experience that the Durom Cup warning by Dr. Dorr was serious and, at a minimum, warranted an immediate investigation.  Zimmer had purchased the Durom Cup and the division that created it from Centerpulse (formerly Sulzer).  ¶¶158, 159.  Both Centerpulse and Dr. Dorr had extensive experience with a defective hip product that resulted in a billion dollars paid in product liability claims by Sulzer, who nearly went bankrupt as a result.  Defendant Crines knew of this problem, as he referred to it on a May 6, 2008 conference call.  ¶159.  Notwithstanding the accuracy of Dr. Dorr's Sulzer warning, defendants ignored his similar warning about the Durom Cup.

Indeed, despite the repeated private warnings, it was only when Dr. Dorr's warnings about the Durom Cup were expanded to his fellow surgeons that defendants conducted any investigation. Defendants in fact acknowledged in their July 22, 2008 letter to surgeons that they started the investigation after their last communication to the surgeons in May 2008 – an investigation of six weeks resulting in a recall of product based on the same warnings defendants had received in 2007. Newly-added witness, CW16, stated that defendants ignored Dr. Dorr's warnings for months.  ¶82. CW19 avers that he was told in 2007 by Zimmer that Dr. Dorr had no problems with the Cup.  ¶96. Likewise, CW9 was told when he was questioned about Dr. Dorr's concerns in February/March

- 24 -

2008 to tell surgeons they were untrue.  ¶59.  Despite this party line, there already was a noticeable decrease in Durom Cup sales – a decline that would have been depicted on the reports prepared by CW15 and given to the defendants.  When the Durom Cup issue began to publicly heat up in approximately April/May 2008, months after they had received Dr. Dorr's complaint, defendants launched an "investigation" into the Durom Cup.  ¶82.  Defendants Crines and Dvorak were present at the meetings and worked closely with CW16 who was a member of the Durom Cup crisis team. ¶82.  But, rather than ascertain the truth about the Durom Cup, the crisis team was tasked with searching for evidence to support the Company's position.[7]  ¶82.

Newly-added witness, CW17, corroborates CW16's account.  He learned Dr. Dorr told Zimmer of his experiences with the Durom Cup, including a high level of revisions, prior to the issuance of Dr. Dorr's April 22, 2008 letter.  ¶84.  CW17 explained that the best practice of a medical device company, such as Zimmer, would be to respond to doctors' concerns immediately, but Zimmer did not.[8]  ¶84.

---

[7]     Another newly added witness, CW18, explained that in late 2008 the Regulatory Compliance Department that handled all Durom Cup complaints determined that there had been issues with filing Medical Device Reports with the FDA.  ¶89.  CW18 explained that hard copies of the MDRs either had not been submitted to the FDA or had been sent to the wrong address.  ¶89.  CW18 personally began reviewing the complaints submitted, including closely reviewing Durom Cup complaints. ¶89.  CW18 elaborated that Zimmer had a pattern and practice of ignoring FDA regulations and patient safety.  ¶90.  Between April 2008 and December 2008, in preparation for an FDA inspection, the Company determined that the FDA had not been notified of 33 products where a recall determination had already been made.  ¶91.

[8]     CW17 further explained the significance of Dr. Dorr's warnings. Dr. Dorr has global and industry-wide influence in orthopedics.  ¶85.  He has 20 years of experience and has four fellows each year whom he trains and mentors, equating to influence over 80 doctors just from fellowships. ¶85.  Dr. Dorr also has influence over the numerous residents he has worked with, as well as a multitude of industry associations where he often speaks.  ¶85.  CW17 also explained Dr. Dorr's unique position as a high volume surgeon, performing more than 100 surgeries a year.  ¶86.  The majority of orthopedic surgeons conduct less than 12 surgeries a year.  ¶86.  Only a select few surgeons, such as Dr. Dorr, perform more than 100 hip surgeries a year.  ¶86.  Thus, Dr. Dorr, unlike

- 25 -

Before the crisis team's analysis was even completed, and not even 13 business days after Dr. Dorr's letter became public, defendants acknowledged on May 12, 2008 that "sales of the Durom Cup] during the remainder of 2008 may be adversely affected as a result of certain reports of unusually high rate of revision." ¶206. They told the market "[W]e have not completed our review and analysis of the relevant data and we will continue to investigate. . . .  Depending upon the outcome of our investigation, this matter could result in product liability lawsuits and claims, safety alerts or products recalls, which regardless of their outcome, could have a material adverse effect on our business and reputation." ¶206. This statement is directly contrary to the statements made six days earlier on May 6, 2008, that "[s]o what was reported in this letter from this particular surgeon at this point I can tell you is somewhat isolated to this particular surgeons' experience." ¶209.

In sum, the Amended Complaint alleges with particularity that defendants knowingly misled the market regarding their guidance and the Durom Cup and concealed material adverse information about CW19, Dr. Dorr's and other doctors' warnings and their product's failure. At the very least, the Amended Complaint provides enough detailed allegations regarding the Durom Cup that materiality cannot be decided as a matter of law. *Matrixx*, 585 F.3d at 1178 ("[T]he determination [of materiality] requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him.") (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988)) (second alteration in original, internal quotations marks omitted).  The Court should engage in fact-specific inquiry in assessing materiality.  *Id.*  Thus, "[d]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact." *Id.* (citations and internal quotation marks omitted, alteration in original).  "In doing so, [a court] must

---

the majority of orthopedic surgeons, can observe trends.  ¶86.  As a result, it was particularly important for Zimmer to pay attention to and respond to Dr. Dorr.

take the allegations in the complaint as true and construe them in the light most favorable to Appellants and determine whether the complaint 'fails to state a claim to relief is plausible on its face.'" *Id.* at 1179 (citation omitted). Following this test, it is clear the Amended Complaint alleges materiality of the Durom Cup issues with sufficient particularity. Further, defendants recklessly disregarded the material problems with the Company's Durom Cup when they issued guidance to the market and made affirmative statements regarding Zimmer's products. Thus, the Amended Complaint satisfies the §10(b) requirement. *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998).

### 5. Defendants' Quantification of the Fraud and the Market's Reaction Further Bolster Plaintiffs' Materiality Allegations

Analysts declared that Zimmer's undisclosed issues were material. Further, on April 24, 2008, when defendants partially disclosed adverse facts regarding Zimmer's OSPs and financial condition, Zimmer's stock dropped 4.06%, compared to a 0.64% increase in the S&P 500 and a $0.13% increase in the peer group. *Id.* At the pleading stage, an eventual drop of stock price upon revelation of truth "'truly is relevant to the likelihood of fraud.'" *Boston Sci.*, 523 F.3d at 90 (citation omitted); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) (Pre- and post-Class Period conduct may be relevant to "provide warrant for inferences" during the Class Period); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (same). Analysts contemporaneously characterized the news as a "major headwind" for the full year. ¶¶6, 189, 199.

Defendants also admitted that the problems with the Durom Cup were material in their 1Q08 Form 10-Q when they represented that they "could have a material adverse effect on our business and reputation." ¶¶206, 213, 236. Further, defendants conceded that Zimmer's issues with the Durom Cup contributed to a $0.15 reduction in 2008 EPS guidance. ¶¶10, 224. Finally, on July 23, 2008, when Zimmer further disclosed the financial impact of the Durom Cup and OSP issues on

- 27 -

Zimmer's 2008 EPS, the stock dropped 6.87% the next day.   ¶269.   These allegations bolster

plaintiffs' new detailed allegations and unequivocally establish materiality.

**III.     CONCLUSION**

      For all of the foregoing reasons, plaintiffs' Motion for Leave to Amend should be granted

and the Amended Complaint submitted herewith deemed filed.

DATED:  January 15, 2010               COUGHLIN STOIA GELLER
                                  RUDMAN & ROBBINS LLP
                             WILLOW E. RADCLIFFE
                             LUKE O. BROOKS
                             S. ASHAR AHMED


                                        s/ Luke O. Brooks
                                  LUKE O. BROOKS

                             100 Pine Street, Suite 2600
                             San Francisco, CA  94111
                             Telephone:  415/288-4545
                             415/288-4534 (fax)

                             Lead Counsel for Lead Plaintiffs Plumbers and
                             Pipefitters Local Union 719 Pension Fund, S.D.
                             Ind., No. 1:08-cv-01041-DFH-JMS

                             COHEN & MALAD, LLP
                             IRWIN B. LEVIN
                             RICHARD E. SHEVITZ
                             SCOTT D. GILCHRIST
                             One Indiana Square, Suite 1400
                             Indianapolis, IN  46204
                             Telephone:  317/636-6481
                             317/636-2593 (fax)
                             ilevin@cohenandmalad.com
                             rshevitz@cohenandmalad.com
                             sgilchrist@cohenandmalad.com

                             Liaison Counsel for Lead Plaintiffs

SUGARMAN & SUSSKIND
HOWARD S. SUSSKIND
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Lead Plaintiffs

478683_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 15, 2010.

s/ Luke O. Brooks
LUKE O. BROOKS

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail: lukeb@csgrr.com

478683_1

# Mailing Information for a Case 1:08-cv-01041-SEB-DML

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sayad Ashar Ahmed**
  COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
  aahmed@csgrr.com,JDecena@csgrr.com

- **Matthew Thomas Albaugh**
  BAKER & DANIELS - Indianapolis
  matthew.albaugh@bakerd.com,cheryl.lewallen@bakerd.com

- **Jill M. Baisinger**
  MORGAN LEWIS & BOCKIUS LLP
  jbaisinger@morganlewis.com

- **Luke Brooks**
  COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
  LukeB@csgrr.com,JDecena@csgrr.com

- **Troy S. Brown**
  MORGAN LEWIS & BOCKIUS LLP
  tsbrown@morganlewis.com

- **Scott D. Gilchrist**
  COHEN & MALAD LLP
  sgilchrist@cohenandmalad.com,jsmock@cohenandmalad.com

- **James H. Ham , III**
  BAKER & DANIELS - Indianapolis
  jhham@bakerd.com,brsmith@bakerd.com

- **Karen Pieslak Pohlmann**
  MORGAN LEWIS & BOCKIUS LLP
  kpohlmann@morganlewis.com

- **Willow E. Radcliffe**
  COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP
  wradcliffe@csgrr.com,jdecena@csgrr.com

- **Marc J. Sonnenfeld**
  MORGAN LEWIS & BOCKIUS LLP
  msonnenfeld@morganlewis.com

- **Paul A. Wolfla**
  BAKER & DANIELS - Indianapolis
  paul.wolfla@bakerd.com,betsy.smith@bakerd.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who
therefore require manual noticing). You may wish to use your mouse to select and copy this list into
your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`