UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PLUMBERS AND PIPEFITTERS LOCAL  )
UNION 719 PENSION FUND, Individually )
and On Behalf of All Others Similarly     )
Situated,                                     )
               Plaintiff,               )
                                         )
     vs.                         )        1:08:-cv-01041-SEB-DML
                                       )
ZIMMER HOLDINGS, INC., DAVID C.   )
DVORAK AND JAMES T. CRINES,      )
               Defendants.         )

**ORDER DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT**

This cause is before the Court on Plaintiff's Motion for Leave to File Amended
Complaint [Docket No. 66]; and Plaintiff's Request for Oral Argument [Docket No. 76].
Plaintiff's Motion comes in response to this Court's December 1, 2009 Order [Docket No.
60] in which we dismissed the Complaint finding that it did not withstand scrutiny under the
heightened pleading requirements applicable in securities fraud litigation.  At that time, we
granted Plaintiff 45 days within which to seek leave to amend its complaint to conform to the
attendant ruling.  <u>Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer
Holdings, Inc.</u>, 673 F. Supp. 2d 718, 749-50 (S.D. Ind. 2009) ("<u>Zimmer I</u>").  Plaintiff has
now done so but Defendants oppose Plaintiff's request arguing that the Proposed Amended
Complaint ("PAC") fails to remedy the last complaint's deficiencies such that allowing
amendment would be futile.  Furthermore, they argue that the safe harbor provision of the

Private Securities Litigation Reform Act ("PSLRA") exempts their alleged misstatements from liability. For the reasons detailed in this entry, Plaintiff's Motion for Leave to Amend is <u>DENIED</u>.[1]

## **Factual Background**[2]

This lawsuit is a purported class action brought on behalf of investors in Zimmer Holdings, Inc. ("Zimmer") against the company, its Chief Executive Officer David C. Dvorak ("Dvorak"), and its Chief Financial Officer James T. Crines ("Crines") (collectively, "Defendants"). Plaintiff alleges that Defendants made fraudulent misrepresentations by omitting from public statements material information relating to two of Zimmer's revenue sources: (1) orthopedic surgical products ("OSPs") manufactured at Zimmer's Dover, Ohio ("Dover") facility; and (2) a hip replacement product referred to as the Durom Acetabular

---

[1]Plaintiff requested oral argument for the purpose of clarifying the issues before the Court. [Docket No. 76]. Because the written submissions by the parties were adequately developed, the Court was able to make the necessary rulings without need of oral arguments and, thus, Plaintiff's request is <u>DENIED</u>. Defendants requested leave to file a sur-reply in opposition to Plaintiff's Motion to Amend Complaint. [Docket No. 79]. Defendants argued that they required an opportunity to respond to "exaggerations," previously rejected legal arguments, and "inflammatory rhetoric" contained in Plaintiff's Reply brief. We find that none of these provides a basis for Defendants' sur-reply. Neither exaggerations or inflammatory rhetoric are sufficient reason to allow for further briefing on fully developed issues and Defendants' Response contained sufficient argument against allowing Plaintiff to re-argue issues previously before the Court. Thus, Defendants' request is <u>DENIED</u>.

[2]Many of the underlying facts of this case are detailed in the Court's December 1, 2009 Order [Docket No. 60]. However, given that the instant motion requires that we test the sufficiency of Plaintiff's factual allegations as a whole, we repeat those facts to the extent they are relevant and add those that are newly alleged here.

Component ("Durom Cup").[3]  Plaintiff further alleges that Defendants' earnings guidance was misleading in light of the information regarding these two revenue sources.  We begin our analysis by describing the allegedly misleading public statements before turning to Plaintiff's factual allegations regarding each of these revenue sources, as well as Defendants' alleged knowledge and the materiality thereof.

### I.        Alleged Misstatements

### A.        January 2008 Statements

On January 29, 2008, the beginning of Plaintiff's Proposed Class Period, Zimmer issued a press release informing the market that Zimmer expected net sales growth of 10-11% or sales of $4.287 million to $4.326 million for 2008.  PAC ¶ 102.  A conference call was held later that day.  During that call, Defendants Dvorak and Crines reiterated the positive growth guidance contained in Zimmer's press release through their elaborative statements and their answers to questions posed by analysts on the call.  Defendant Crines also specifically stated that Zimmer was expecting hip resurfacing to accelerate growth in the U.S. hip market.  PAC ¶ 105.  Dvorak also provided the following answers in response to analyst questions regarding the company's FDA inspections.

> Q:        That's helpful.  One question just on the regulatory front.  One of your
>           competitors has been hit by a couple of warning letters from the FDA

---

[3] In Zimmer I, we noted that the OSPs manufactured at Dover and the Durom Cup together accounted for approximately 6% of Zimmer's global business.  See  673 F. Supp. 2d at 724, n. 1.  Plaintiff's Proposed Amended Complaint alleges that OSP net sales alone accounted for 6% of the company's global net sales.  PAC ¶ 113.  Such a percentage is not provided with regard to Zimmer's Durom Cup but Plaintiff alleges that Zimmer's Durom Cup sales in 2007 constituted "tens of millions of dollars."  PAC ¶ 154.

over the last year or so and I was just wondering if you can give us any sense of maybe where you are in the cycle of inspections and over the past 12 months, where you stand with the FDA?

A:    We obviously have a variety of different facilities, as you know, Matt, and so as inspections are taking place on a rolling basis, Jim mentioned that we have initiatives under way to enhance further our quality systems, that's a significant priority for us as one would imagine and we're going to continue to improve those systems as we go forward. So it's an ongoing commitment in our area but one that we treat as a major premise to running our business.

Q:    All right, and you mentioned you talked about investing in compliance and systems. Do you currently have any issues with the FDA, any warning letters, that usually takes a few months for those to be posted, that they may have been issued or 483'ed?

A:    We don't have any warning letters at this point.

PAC ¶ 106.

Following this guidance, Zimmer's stock price increased from $68.08 to $77.03. PAC ¶ 259.

The next day, on January 30, 2008, Zimmer presented at the Wachovia Healthcare Conference. There, Defendant Crines reiterated the guidance provided the previous day. PAC ¶ 108. He also reiterated Zimmer's commitment to investing in and upgrading quality systems across Zimmer's facilities. PAC ¶ 110. Defendant Crines stated the following with regard to the hip market:

With what we have to offer, we do have a large diameter head metal-on-metal offering, [the Durom Cup]. Some of the feedback we're getting from the field would indicate that it is a bit challenging to implant, and there are some things we can do in the way of surgical technique training that ought to help us with that level of penetration.

***

Again, for that reason, we have a significant portion of our R&D spending

4

focused on maintaining and hopefully enhancing our leadership position in hip and knees across the world.

PAC ¶ 109. Defendants also stated the following with regard to their quality systems:

> Just touching on the infrastructure and operating initiatives we have underway, we announced yesterday that we're looking to expand our international manufacturing capacity by about 100,000 square feet. We are also centralizing our distribution operations in Europe. We are taking the opportunity, as we build out additional manufacturing capacity, to invest in and upgrade our quality systems infrastructure across all of our facilities. We're making some pretty significant investments directed at providing better support to our U.S. sales and distribution efforts, putting more instruments, more inventory out into the field, and also providing them with some more significant incentives particularly focused on that trauma product line.

PAC ¶ 110.

## B.      March and April 2008 Statements

On March 18, 2008, Zimmer participated in the Cowen and Company Health Care Conference during which Defendant Crines made the following statement:

> We manage over 130,000 SKUs. It's a very large and complex portfolio. We have manufacturing and quality systems infrastructure supporting the manufacturing, and delivery, and distribution of those devices around the world, and our products are sold in over 100 countries. And given the size and complexity to this portfolio, the company has recently undertaken a major investment initiative to upgrade manufacturing quality systems, IT systems, infrastructure, investments that we believe will put this company in a position to take full advantage of the growth opportunities that we see in this market in the years to come.

> * * *

> We also, as we look at our hip portfolio, recognize and would acknowledge that we have some challenges and opportunities.

> * * *

5

We have a large diameter head device that we have offered in the U.S. and we understand that there are some challenges, some technique challenges with that device. So there are some things that we need to do in terms of providing training to orthopedic surgeons and some things that we can do, as well, from a development perspective, to address some design differences with respect to our device and how it matches up with competitive devices. That's something that will take a bit longer. But certainly, the training is something that we can begin to address already in 2008.

* * *

We have, as we talked about on our fourth quarter call three, major priorities for 2008, the first of which is to meet or exceed our financial commitments for this year.

PAC ¶ 185.

On April 3, 2008, Zimmer issued a press release stating the following:

Zimmer Holdings, Inc. . . . announced today that it has taken a number of actions to improve quality systems at its Dover, Ohio facility, which manufactures Zimmer Orthopaedic Surgical Products (OSP).

The Company recently conducted a review of quality systems at the Dover, Ohio OSP facility and initiated voluntary product recalls of certain OSP products manufactured at the Dover facility that the Company has determined do not meet internal quality standards. In addition, the Company has voluntarily and temporarily suspended production and sales of certain OSP products manufactured at the Dover facility. The suspension will permit the Company to focus the OSP organization on the needed improvements to manufacturing and conduct enhanced quality training for employees.

The Company has notified the U.S. Food and Drug Administration (FDA), distributors and end-users of the recalls. These recalls do not affect the Company's core hip and knee implants business.

The OSP division produces a variety of patient care items used to support orthopaedic surgery, including disposables used in blood management, surgical
wound site debridement and cement accessories. In 2007, Zimmer reported

revenues from its OSP and Other product category of $234 million, less than half of which were generated by products affected by the recalls and suspension. These actions are expected to adversely impact 2008 OSP revenues by $70 to $80 million. Additional detail on the expected impact will be provided during the Company's first quarter investor conference call on April 24, 2008.

PAC ¶ 186. On April 3, 2008, Zimmer's stock declined by 1.4% but, according to Plaintiff, remained artificially inflated as the market was still unaware of the extent of the problems faced by the company. PAC ¶ 260.

On April 24, 2008, Zimmer issued a press release announcing its first quarter financial results as follows:

The Company updated its full year 2008 sales guidance and reaffirmed its earnings guidance. Reported sales for 2008 are expected to increase by 10 to 11% over the prior year. This sales guidance reflects a reduction in constant currency growth to 6 to 7%, countered by favorable foreign currency, now estimated at 4%. Full year 2008 adjusted diluted earnings per share are expected to be in the same range as previously issued guidance of $4.20 to $4.25. These estimates include the impact of previously announced actions at the Company's Ohio-based Orthopaedic Surgical Products operation. These actions are expected to adversely impact 2008 adjusted diluted earnings per share by $0.18 to $0.20, including $0.07 related to inventory charges, idle plant costs and other nonrecurring expenses. The Company expects this impact to be offset by reductions in planned operating expenses, share repurchases and other actions.

PAC ¶ 187.

During a conference call later that day, Defendant Dvorak stated the following:

We previously explained that we developed our guidance taking into account our assessment of the market and the ongoing opportunities and risks that could cause and impact our performance. Our outlook called for top line growth for the year of 10 to 11% net sales on a reported basis. As we indicated in our fourth quarter call, sales will be driven by new product introductions and further market penetration by key products launched in 2007 and this year,

as well as the positive effect of a weaker U.S. dollar abroad. Our guidance for top line growth remains in the 10 to 11% range on a reported basis. The previously announced impact on OSP revenues is expected to be offset by the positive effect of a weaker dollar. In addition, as the year began, we projected earnings per share between $4.20- and $4.25 based on those expectations. We've maintained that guidance today, after taking into account the negative financial impact we'll experience as a result of lost sales, inventory losses, and remediation costs in our OSP business. We have also now factored in the anticipated positive financial impact of a number of other planned actions that Jim will describe in detail which are expected to offer the negative impact of the OSP situation.

On our fourth quarter earnings call, Jim and I previewed a number of significant infrastructure initiatives that will position us to respond to the growing medical needs of an aging population. Chief among these are the investments we're making to ensure that we maintain state-of-the-art quality systems and processes in all of our business operations globally. Our ongoing commitment to quality will be unyielding as we continuously improve our quality systems. To that end, our infrastructure investment plans for 2008 are in part directed at opportunities to enhance quality systems across our entire manufacturing network and to ensure the quality systems and practices in all divisions meet or exceed our standards as well as those of agencies that regulate us. As a result of this endeavor, in the first quarter we initiated a comprehensive remediation effort at our OSP division in Dover, Ohio, including voluntary product recalls of certain OSP products, voluntary and temporary suspension of manufacturing and sales of certain products, facilities equipment and procedural upgrades, enhanced quality training for OSP employees, and appointment of a new Divisional President. While we're clearly disappointed by the OSP situation, we believe the actions we've taken demonstrate the seriousness with which we take quality systems matters and we're keeping the FDA informed of all of our actions.

PAC ¶ 188.

On that call, Defendant Crines also stated:

Now, I'd like to provide an update on guidance for 2008. As reported in our press release on April 3, OSP related actions are expected to adversely impact 2008 OSP revenues by 70 million to $80 million. These actions are expected to negatively impact 2008 adjusted earnings per share by $0.18 to $0.20

including $0.07 related to inventory charges, idle plant costs, and other nonrecurring expenses. Approximately $0.03 of the full year effect is reflected in our first quarter results. We expect this impact to be offset by reductions in planned operating expenses, share repurchases, and other actions.

PAC ¶ 188.

Defendant Dvorak also answered a question from an analyst on that call as follows:

Q:    Okay and then one other question I have and I'm just curious about the timing of things. Obviously on the fourth quarter call, you guys gave very bullish report, a very bullish tone and yet when we look back at the timing of the FDA recall announcement as it relates to OSP, that was sort of in full swing as you were giving that guidance but it wasn't disclosed, and now we're hearing that it's an $0.18 to $0.20 headwind for the full year. I'm just wondering why didn't you disclose it on the first, on that call on the fourth quarter especially now knowing that it's going to be such a major headwind for the full year?

A:    Yes. We had identified a particular recall problem and acted upon that promptly and obviously, the problem was much deeper than what we knew at the time of the call, so work was under way but the scope of that issue had not been defined as of the first quarter call, and so we've reported out on the magnitude of that issue as soon as it was defined, Bob.

PAC ¶ 189.  Following these statements, Zimmer's stock closed at $72.87, a 4.06% decrease.

PAC ¶ 261.  Still, Plaintiff asserts that Zimmer's stock was artificially inflated because Defendants falsely assured that the market and other actions could offset the hit related to the company's OSPs.  PAC ¶ 261.

### C.    May and June 2008 Statements

On May 6, 2008, Zimmer presented at the Deutsche Bank Health Care Conference where Defendant Crines stated:

We have talked in the past about a segment – subsegment of the hip portfolio

9

growing at a faster rate than the overall hip portfolio, that subsegment being the alternate bearing offerings that address the needs of a younger patient, where there's an expectation with, for example, the metal-on-metal offerings, that surgeons will be able to achieve better longevity with those devices. In our particular case, we have this Durom cup, which goes with out Metasul large diameter heads. That is our metal-on-metal offering here in the U.S.

And, as I'm sure many of you know, there have been questions raised by one surgeon in particular in the U.S. concerning high failure rates that he's experienced with about 165 patients, I believe, he has reported. He's had at least 10 early failures that he's referenced in a letter that he sent out to the Hip and Knee Society and another four patients that he believes he's going to have to revise. At this point I can tell you that we take these issues very seriously. We'll have a team of very senior research people meeting with this surgeon and getting – beginning to get access to data on these patients so they can begin the analysis of what may have led to the early failures that he's experienced with this device.

I will tell you that this device, this construct, has been in the market here in the U.S. since the second half of 2006. There are many surgeons that have had very good clinical results with this device. It's been in the European market for over three and a half years. There's independent registry data – as an example, the Swedish registry that's tracking over 200 patients and out three and a half years is reporting 99.5% survivorship with this device. So what was reported in this letter from this particular surgeon at this point I can tell you is somewhat isolated – it would appear to be somewhat isolated to this particular surgeon's experience.

I will also tell you that we did receive somewhat similar indications in the European market in the early part of 2007 with a couple of surgeons in France. We were able to trace their experiences to issues with the technique that they were using. This is a cup that once it's seated up into the acetabulum cannot be repositioned. And we have had situations where – this particular situation in France where a couple of surgeons had experienced early failures as a result of the technique that they were using where they were repositioning the cup after it had been seated up into the acetabulum. So we were able to address that particular issue with surgical technique training.

That's an issue I can tell you that we paid a lot of attention to here in the U.S. as this product has been launched into the U.S. There's a lot of information that's provided to our sales reps, training that's provided to our sales reps, so

they're able to convey to any surgeons that are using this device the importance of following the technique.

PAC ¶ 204.

Defendant Crines responded to analyst questions as follows:

Q: I mean, what struck me as we were digging over the weekend regarding this issue, and I had never heard of Dr. [Dorr] personally before, but we talked to a few surgeons over the weekend. Some of them refer to him as the father of hip arthroplasty. He's very well regarded. And it seems like from his letter, at least, that he did have an early dialog with Zimmer, and I don't know really what happened there, but felt that he needed to go out to the public. Do you care to get into the relationship that you have with this surgeon? I understand he is a consultant for Zimmer, a fairly well-paid consultant, or was.

A: Well, the issue – what we're focused on are the issues that he raises concerning his clinical experience. And, as I said, we take that very seriously. We're going to have a team of very senior people working with Dr. Dorr to get an understanding of what may have contributed to the failures that he has experienced. Concerning his motivation to address this issue the way that he has, that's not something I want to speculate on. You'd have to talk to Dr. Dorr. I understand in his letter, which I've seen, he references his prior experience with the InterOp cup. And those of you who don't know the story concerning the InterOp cup, that was a Centerpulse product that failed in large numbers of patients. And that may have – that experience that he had had back then – and that was as a result of a manufacturing issue with that cup – certainly may have weighed, I understand, from what he put in his letter, into his thinking behind putting a letter out to his peers.

Q: But as far as Zimmer is concerned, I mean, in terms of the product properly manufactured, working well with the proper technique, data out of Europe and out of Australian registries, no reason to pull this thing off the market. It's still a very good product.

A: We have no plans at this stage to recall this product.

Q: So to follow up on the prior question, so how does this play out now here in the U.S.? The letter goes – the surgeon, prominent surgeon, puts

out a letter to – gets sent out to his peers. I know it's early, but have you gotten any other feedback from surgeons, either positive or negative, that have actually seen that as well but just haven't talked about it yet?

A:     Well, at this stage I can tell you that we have received lots of calls, but it's – we need to give our technical people the opportunity to get in and get busy with Dr. Dorr and his partner in understanding, as I said, what may have led to and what may have contributed to the failures that he has experienced. And until such time as we can complete that analysis and respond to his letter with our findings, there's really – again, we have to – he's raising an issue, a clinical issue. We have to treat that very seriously, and we're not going to speculate on what might be leading to those failures until that analysis is completed. So there's not much that we can tell those surgeons.

PAC ¶ 205.

On May 12, 2008, Zimmer filed its Form 10-Q for 1Q08 stating as follows:

Durom® Acetabular Cups contributed to new product sales for the three month period ended March 31, 2008 and Durom-related procedures generally account for 5 to 10 percent of our hip sales in the U.S.; however, sales of this product during the remainder of 2008 may be adversely affected as a result of certain reports of unusually high rate of revision.

* * *

Gross profit as a percentage of net sales was 76.0 percent in the three month period ended March 31, 2008, compared to 78.3 percent in the same 2007 period. The primary contributors to the decrease in gross profit margin were the increase in period over period hedge losses, increased inventory charges due to the OSP related actions and an increase in excess inventory and obsolescence charges.

* * *

We are conducting an on-going investigation into certain reports of an unusually high rate of revision of the Durom Acetabular Cup. We have not completed our review and analysis of the relevant data and we will continue to investigate to try to determine what factors may be contributing to these reports of a higher revision rate. Depending upon the outcome of our investigation, this matter could result in product liability lawsuits and claims,

safety alerts or product recalls which, regardless of their ultimate outcome, could have a material adverse effect on our business and reputation.

PAC ¶ 206. Subsequently, Zimmer's stock price dropped from $69.56 to $66.85. PAC ¶ 207.

On June 18, 2008, Zimmer presented at the William Blair & Company Growth Stock Conference where Defendant Crines stated:

We have, at the moment some challenges within our hip portfolio. I think most are aware of the letter that went out from an individual surgeon concerning our [Durom] cup product. That's our large diameter head, metal on metal offering that's going into again, this younger patient segment of the hip market. That is, I would acknowledge, probably the fastest growing segment of the hip market.

In this letter, the surgeon raised concerns, questions about this particular device and the experience that he has had with it. We have an ongoing investigation. Our technicians within our research organization are getting out and meeting with other users of this device and studying the results that those other users have had with this device. And as we work our way through this investigation, if we come across any issues or concerns with respect to patient safety, we'll take appropriate action.

At this time we have had no indication that there are any issues with patient safety. The investigation is still ongoing and we expect to be able to provide a more detailed update with respect to conclusions that the team reaches on our second-quarter investor call.

PAC ¶ 208.

Plaintiff alleges that the statements above were knowingly and materially false when issued because Defendants knew the guidance they were providing could not be met because of (1) undisclosed revenue losses and expenses stemming from the recalls and halts of production of OSPs at Zimmer's Dover facility and (2) undisclosed complaints that the company was hearing from surgeons regarding its Durom Cup product. Plaintiff's allegations

13

regarding each of these issues are set forth below.

## II. Issues at the Dover Facility

The Proposed Amended Complaint recounts alleged production problems at Dover, including product recalls and production halts, relying on statements from various confidential witnesses ("CWs"), the FDA Establishment Inspection Report ("the FDA Report"), and what Plaintiff characterize as "defendants' own belated admissions." Plaintiff contend that these allegations are sufficient to show that the costs of the OSP production halts and recalls and expenses related to updating the Dover facility were material problems that should have been accounted for and disclosed to investors.

OSPs are products, including joint, dental, or spinal implants, designed for use in orthopedic surgical procedures. PAC ¶ 15. Zimmer considered itself a "global leader" in OSPs because it was one of only five companies sharing 97% of the market for those products. PAC ¶ 113. Plaintiff alleges that OSPs were important to Zimmer because they were the third highest revenue source for the company. PAC ¶ 113. Furthermore, they assert that OSP net sales (revenue from OSPs less the cost associated with selling them) constituted $234 million in revenue and as such 6% of Zimmer's global net sales. Zimmer's OSP portfolio included the following products: the Pulsavac Plus Wound Debridgement System Fan Spray Gun ("Pulsavac Plus"), Pulsavac 2, Pulsavac 3, the Hemovac Infection Control Kit ("Hemovac Kit"), and the Hemovac Autotransfusion System. PAC ¶ 112.

Seventy to eighty percent of Zimmer's OSPs were manufactured at its facility in Dover, Ohio. PAC ¶ 113. Plaintiff alleges that Defendant Dvorak oversaw the Dover facility

and, according to CW 16, had made the decision not to invest money in quality systems at Dover.[4]  PAC ¶¶ 81, 114.  CW 16 averred that Dover's infrastructure "was 10 to 15 behind the times (i.e. antiquated) and caused embarrassment to defendant Dvorak . . . ."[5]  PAC ¶¶ 81, 114.  CW 2 and CW 1 both recounted a quality meeting held in October 2007 during which the declining quality trends at Dover were discussed.[6]  PAC ¶ 115.  Vice Presidents Hawkins and Carter, Defendant Dvorak's direct reports, attended this meeting.  PAC ¶¶ 115, 138.  Zimmer tracked all defective products opened during a surgery.  PAC ¶ 139.  Thus, Plaintiff argues that even before the January 2008 FDA investigation, the product recalls, and interruptions in production, Zimmer knew of the negative consequences of quality problems at its Dover facility.

On December 18, 2007, Zimmer notified the FDA of its plan to recall its Pulsavac Plus product, "the highest production volume product at Dover."  PAC ¶ 119.  According to the FDA Report, Zimmer began receiving complaints about the product in May 2007.  FDA Report at 21.  According to CW 1, it was Zimmer's corporate office that made the decision to recall the Pulsavac Plus.  PAC ¶ 122.  CW 3 agreed with CW 1 that Zimmer's corporate office was directly involved in the Pulsavac Plus recall and claimed that Defendant Dvorak

---

[4]CW 2 also averred that Zimmer had chosen not to invest in correcting quality defects at the Dover facility.  PAC ¶ 115.

[5]Quotations attributed to individual CWs are actually quotations to portions of the Proposed Amended Complaint attributed to those CWs.

[6]CW 10, a Director of Quality Assurance at Zimmer Corporate, corroborated the averment that management review meetings were held where quality issues and trends were discussed. PAC ¶ 139.

was also aware of the recall because the employees handling the matter reported directly to him. PAC ¶ 137.

On January 7, 2008, the FDA began an investigation at Zimmer's Dover facility. PAC ¶ 118. The FDA inspector was present at that facility on January 7-11, 16, 18, 25, 29, 2008. PAC ¶ 118. According to CW 1, a team was specifically assembled by Zimmer's corporate headquarters to "coach" Dover employees on speaking with the FDA investigator. PAC ¶ 132. Upon FDA investigation, the FDA inspector noted that assembly of the Pulsavac Plus product was manual, as opposed to automated, and that Zimmer had determined that the product leaked as a result of "too much silicone applied during assembly." FDA Report at 21.

According to CW 1, 483 observations were communicated to Zimmer during the first week of the Dover investigation, even though they were not formally issued until January 29, 2008. PAC ¶ 123. FDA inspector, Mary Storch explained that it is the FDA's practice to communicate observations as they are observed, rather than to wait until the end of an investigation. PAC ¶ 123. CW 1 averred "that it was very clear that Zimmer would receive 483 observations if not a warning letter after the week-long audit at Dover." PAC ¶ 122. CW 1 also stated that Defendant Dvorak was updated at least every other day on the status of the investigation and had live feed to his office computer of the communications between the FDA inspector and Zimmer employees.[7] PAC ¶¶ 122, 133.

Also on January 7, 2008, Zimmer halted production of its Pulsavac 2 and Pulsavac 3

_____

[7]CW 2 reiterated that it was Zimmer's practice to have live feed of the FDA investigation sent to some of its employees, including Defendant Dvorak. PAC ¶ 122.

products.  PAC ¶ 120.  These products were put together with the same manual silicone application process as the Pulsavac Plus.  PAC ¶ 120.

On January 11, 2008, Zimmer notified the FDA that it had recalled two lots of its Hemovac Kit in 2006.  FDA Report at 10.  As a result of the delay in notification of the recall, the FDA issued Zimmer a Form 483 observation.  Id.  According to the FDA Report, Zimmer's management told the FDA that the initial removal of the Hemovac Kit was not reported because Zimmer did not feel the risk was "that great."  FDA Report at 11.  The FDA inspector noted, however, that "it appeared [Zimmer] did not have sufficient evidence to support their decision not to report the field removal."  FDA Report at 11.  She further noted that Zimmer had already acknowledged the risk associated with the Hemovac Kit by reporting two Medical Device Reports prior to the product removal.  Id.  CW 1 averred that he had personally investigated serious complaints about the Hemovac Kits years prior to the FDA inspection.  PAC ¶ 126.  He stated that he learned after the FDA inspection that the report CW 1 had created during the investigation was not provided to the FDA inspector.  Id.

According to the FDA Report proffered by Plaintiff, Zimmer received complaints about its Hemovac Autotransfusion System between April 2005 and December 2006.  PAC ¶ 127.  The company had investigated the problem with the device but, according to the FDA inspector, had taken no further action.  FDA Report at 20-21.  On January 11, 2008, Zimmer did initiate a recall of certain manufacturing lots of the product.  FDA Report at 21.

On January 24, 2008, the FDA Report indicates that Zimmer was expanding the Hemovac Kit recall.  FDA Report at 21.  Also on that day, Zimmer expanded its Pulsavac Plus

recall to include the Pulsavac 2 and Pulsavac 3 products and informed the FDA that Zimmer had decided to discontinue production of those two products altogether. FDA Report at 22. The Pulsavac product recalls removed more than 800,000 products from the market. PAC 121.

The FDA Report also shows that the FDA inspector found "significant deficiencies" in Zimmer's Corrective and Preventative Action System ("CAPA") that "result[ed] in isolated and systemic failures." FDA Report at 5. "As a result device failures and/or defects were not captured as trends and the product continued to be produced and released." Id. Plaintiff alleges that Defendants were responsible for these deficiencies within its CAPA because the Code of Federal Regulations puts that burden on management with executive responsibility pursuant to 20 C.F.R. § 820.20. PAC ¶ 129.

According to CWs 1, 5, 9, and 14, production of disposable OSPs, such as the Pulsavac and Hemovac products, was shut down at Dover for a period in Spring 2008. PAC ¶¶ 31, 57, 78, 142. According to CW 14, this shut down followed a recommendation from Zimmer's quality department with which Defendant Dvorak agreed. PAC ¶ 78. CW 9 averred that he had learned of the plan to close the Dover facility in late February or March of 2008. PAC ¶ 57. CW 5 had learned of the shut down by March/April 2008. PAC ¶ 142. The Dover facility had not begun manufacturing again when CW 9 left Zimmer in May 2008. PAC ¶ 57.

Throughout the Class Period, various CWs noticed that a large number of OSP products were unavailable for sale to customers. PAC ¶¶ 141-143. CW 9, a Zimmer sales representative, averred that his total average monthly sales decreased by 30-50% in late

February/March 2008. PAC ¶¶ 57, 143. The reported growth in Zimmer's Other Surgical/OSP sales dropped dramatically from 2007 to 2008. PAC ¶ 144. In 2007, the average reported growth was 45.3%. That figure was only 11.6% by the end of 2008. PAC ¶ 144. CW 20, a Financial Analyst at Zimmer, stated that, as persons included on his distribution lists, Defendants Dvorak and Crines received daily sales reports each morning that would have shown no sales of the halted products. PAC ¶¶ 97-98, 140. CW 16 also averred that Dvorak hired a Head of Quality in early 2008, who was known as a specialist in helping companies avoid warning letters from the FDA. PAC ¶¶ 81, 135.

In sum, Plaintiff alleges that Zimmer had recalled and/or halted production of Zimmer's Pulsavac products and had expanded the recall of the Hemovac Kits and Pulsavac at the Dover facility no later than January 24, 2008. Compl. ¶ 131. Defendants were also aware that the FDA had observed "significant deficiencies" in Dover's infrastructure and systems that had resulted in "systemic failures." PAC ¶ 117 (citing FDA Report at 5). Thus, Plaintiff alleges that by the time Zimmer's 2008 guidance was issued (on January 29, 2008), Defendants knew the following: (1) that no revenue would be generated from the sales of its Pulsavac products or Hemovac Kits that had been manufactured at the Dover facility; (2) that Zimmer's expenses would increase as a result of the recalls and because of the need to update the Dover facility's quality systems; and (3) that the company would lose customers to competitor OSP suppliers. PAC ¶ 131.

Plaintiff alleges that knowledge of these facts rendered Defendants' January 29, 2008 guidance that the company was committed to "quality systems" and regarding the amounts

of growth and earnings per share ("EPS") knowingly false when issued. PAC ¶ 131. Plaintiff further alleges that maintaining the growth and EPS guidance in spite of the recall and suspension of products and the disclosed $70 to $80 million impact of those occurrences was misleading because the increased expenses and lost sales could not be off-set as Zimmer was claiming at that time. PAC ¶¶ 190, 194, 196.

## III.    Issues Related to Zimmer's Durom Cup

The Proposed Amended Complaint alleges that Zimmer was aware of various surgeons' concerns related to the design of its Durom Cup and that the company should have been more responsive to those concerns given those particular surgeons' prominence in their field and the lack of prior clinical testing of the Durom Cup in the United States. PAC ¶ 152. Plaintiff argues that this awareness rendered Zimmer's guidance beginning on January 29, 2008 and continuing throughout the proposed class period materially and knowingly false when issued.

As alleged in the proposed amended complaint, Zimmer's Durom Cup was one of Zimmer's reconstructive products and was approved in the United States for hip replacement procedures in 2006. PAC ¶¶ 153-154. In 2007, sales of the Durom Cup constituted "tens of million of dollars in sales" for Zimmer. PAC ¶ 154. Plaintiff alleges the Durom Cup was a "key product" for Zimmer because it was part of a hip resurfacing system that Zimmer hoped would allow it to tap into a $400 million U.S. market. PAC ¶¶ 155, 175(e). CW 10, Director of Quality Assurance at Zimmer's corporate headquarters from July 2002 through November 2007, advised that Zimmer attempted to bring the Durom Cup product to the U.S. market

through pre-market approval with the FDA. It was his understanding that this approval was expected by April or May of 2008 and that sales were expected to increase at that time. PAC ¶ 62.

Beginning in 2007, Zimmer received complaints from various surgeons regarding troubles they were experiencing with the Durom Cup. Dr. Lawrence Dorr, a surgeon who collaborated with Zimmer on the development of the Cup, was one of the surgeons who reported complaints with the product sometime during that year.[8] PAC ¶¶ 66, 82, 173. Dr. Long, a colleague of Dr. Dorr, also reported that he told Zimmer to redesign the Cup in 2007 after experiences similar to that of Dr. Dorr. PAC ¶ 166. Likewise, CW 19, another "high volume orthopedic surgeon," averred that he had to revise 26 of the 78 Durom Cups that he implanted since May 2006. PAC ¶¶ 92, 167. CW 19 allegedly contacted a Zimmer sales representative several times throughout 2007 to inquire as to whether other surgeons had encountered similar problems with the Durom Cup. PAC ¶¶ 93, 167. According to CW 19, he learned during a call with Zimmer's Senior Product Manager and VP of Research that the company had never performed clinical trials of the U.S. Durom Cup, a fact he regarded as highly alarming. PAC ¶ 96. Although the sales representative initially told CW 19 that no other surgeons were reporting problems, CW 19 eventually was told that he might want to speak with Drs. Dorr and Long about their experiences. PAC ¶ 93. Once CW 19 contacted

---

[8]Plaintiff's Proposed Amended Complaint devotes considerable discussion to Dr. Dorr's prestige and influence in the field of hip surgery. They note that Dr. Dorr has conducted more than 5,000 of these surgeries and is considered one of the most knowledgeable surgeons in that field. PAC ¶ 157. As a result of these qualifications, Plaintiff alleges that Dr. Dorr was in a "unique position" to observe trends or problems associated with the Durom Cup. PAC ¶ 161.

Dr. Dorr, he learned that Dr. Dorr had, in fact, experienced problems with the Durom Cup and that Zimmer had been unresponsive to his concerns. PAC ¶ 94.

CW 9, a sales representative for Zimmer in Minneapolis, averred that he was not required to advise other doctors of concerns about the Durom Cup or about Dr. Dorr's concerns and negative experiences with the product. He further averred that one of Zimmer's Vice Presidents, Eric Schroeder, advised him to tell those doctors that Dr. Dorr's findings had not been true. PAC ¶¶ 58-59. By March or April of 2008, CW 9 stated that there was a noticeable decrease of approximately 75% in orders for Durom Cups, which CW 9 attributed to doctors' concerns with the product. PAC ¶¶ 59, 200.

On April 22, 2008, Dr. Lawrence Dorr sent a letter to the American Association of Hip and Knee Surgeons ("AAHKS") explaining his concerns with Zimmer's Durom Cup. PAC ¶¶ 58, 160. That letter explained that, out of 165 hip surgeries performed by Dr. Dorr using Zimmer's Durom Cup, fourteen required revision. Pls.' Ex. F. Dr. Dorr wrote that Zimmer had been notified of his concerns but that the company had decided not to take the product off the market. Id. Finally, Dr. Dorr explained what he believed to be the Durom Cup's design defect, stating, "I can assure you that this goes beyond [surgeon] technique." Id. Analysts and the media took note of Dr. Dorr's letter and predicted that it might influence other surgeons not to use the Durom Cup. PAC ¶¶ 162-165.

In April or May of 2008, Zimmer launched an investigation into Dr. Dorr's concerns. PAC ¶ 82. CW 16 was a member of the crisis team assembled to locate evidence to support Zimmer's position that the product failures were due to surgeon technique, and not Zimmer's

product. PAC ¶ 82. CW 18 reiterated CW 16's account of activities by the crisis team assembled to handle the concerns regarding the Durom Cup. PAC ¶ 88. CW 16 worked closely with Defendants Dvorak and Crines to "handle the Durom Cup situation." PAC ¶ 82.

On May 18, 2008, Dr. Jon Maltry, another "high-volume surgeon," expressed his concerns regarding the Durom Cup during an interview for inclusion in a report issued by Deutsche Bank. PAC ¶ 171. Dr. Maltry stated that, of the approximately 67 Durom Cups he had used during surgeries, four had required revision. Id. Altogether, Plaintiff alleges that Drs. Dorr, Long, and Maltry along with CW 19 together installed more than 300 Durom Cups, of which more than 45 required revision surgery. PAC ¶ 172. As a result, these doctors stopped using the product. Id. A clinical study reported in an article dated September 2, 2009 showed that five surgeons (including Drs. Dorr and Long) had experienced a clinical failure rate of 23% associated with use of the Durom Cup in procedures from May 2006 through November 2007. PAC ¶ 183.

Aside from surgeon complaints to Zimmer, the FDA also received adverse event reports related to Zimmer's Durom Cup. PAC ¶ 182. By January 29, 2008, the FDA had received eighteen such reports and another six were received in February of that year. Id. By the end of 2008, more than 200 adverse events related to the Durom Cup were reported. Id.

Plaintiff alleges that Zimmer's guidance beginning on January 29, 2008 and continuing thereafter, was knowingly false when issued because the Defendants knew of these FDA complaints and knew as well that several prominent surgeons had expressed serious concerns about the Cup and the unusually high rate of revision surgeries that they were experiencing.

23

Plaintiff asserts that Zimmer knew that these problems posed a substantial risk to Durom Cup sales, which had been figured into the Company's fiscal forecast. PAC ¶ 176. Even when the Company acknowledged certain "challenges and opportunities" related to the Durom Cup, Plaintiff alleges that Defendants were trying to downplay the safety risks and financial consequences of the problems associated with the the product. Plaintiff alleges that this practice of non-disclosure continued until Zimmer recalled the Durom Cup and lowered its guidance on July 22, 2008. PAC ¶ 181.

### IV.     End of the Proposed Class Period

As mentioned above, on July 22, 2008 (the end of the proposed Class Period), Zimmer announced that it was suspending sales of its Durom Cup and cut its EPS guidance by $0.15 to $4.05-$4.10 and its sales growth from 10-11% to 8.5-9.0%. PAC ¶ 224. The company cited inadequate labeling instructions as the purpose of the recall. PAC ¶ 181. The company issued a press release stating as follows:

Durom Acetabular Component

Zimmer is temporarily suspending marketing and distribution of the Durom® Acetabular Component (Durom Cup) in the U.S. on a voluntary basis, while the Company updates labeling to provide more detailed surgical technique instructions to surgeons and implements its surgical training program in the U.S. The Durom Cup will continue to be marketed without interruption outside the U.S.

While many surgeons have had success implanting the Durom Cup since it was launched in the U.S. in 2006, a subset have reported cup loosenings and revisions of the acetabular component used in total hip replacement procedures. These results contrast with product experience in Europe, where post-marketing data continue to show excellent clinical outcomes since the product launched in 2003. Following a comprehensive review of clinical

24

experience and product conformance to specifications in the U.S. and Europe, Zimmer has found no evidence of a defect in the materials, manufacture, or design of the implant. The Company has identified that surgeons who regularly achieve the desired outcome with the Durom Cup consistently execute crucial technique steps and place the cup in a specific manner. Following its review, Zimmer has determined that revised surgical technique instructions and a surgical training program are required to more consistently achieve desired clinical results in the U.S. The Company has shared its review and conclusions with the U.S. Food and Drug Administration and will continue to update the Agency.

While the Company believes the likelihood of currently implanted patients requiring revision is low, Zimmer has sent a letter to U.S. surgeons advising them to stop implanting the Durom Cup, until the updated labeling is issued providing more detailed surgical technique instructions and they receive training. Additional information is being made available at www.zimmer.com.

Guidance

The Company is revising its guidance and expects full-year 2008 sales growth to be in a range of 8.5% to 9.0% over the prior year, which reflects constant currency growth of 4.5% to 5.0%. This compares with prior guidance of 10% to 11% reported and 6% to 7% constant currency growth over prior year. The adjustment to sales guidance includes a projected loss of $20 to $30 million in hip product sales pertaining to the Durom Cup in the U.S., weakness in U.S. Dental revenues and slower than anticipated uptake on certain new products. Adjusted diluted earnings per share for the full year are expected to be in a range of $4.05 to $4.10, as compared to prior guidance of $4.20 to $4.25. Revised earnings guidance gives effect to the reduction in sales from prior guidance as well as an increase in operating expenses associated with the global implementation of the Company's enhanced compliance program. Further details regarding the revised guidance will be discussed during tomorrow's investor conference call.

PAC ¶ 225.

On the same day the press release was issued, Zimmer sent a letter to surgeons advising them that "The results of our in-depth investigation have led us to conclude that additional surgical technique instructions and training are necessary in the United States, and we

strongly recommend that U.S. surgeons stop implanting the Durom Cup until receiving such training. . . . Revised product labeling to include more detailed surgical technique instructions will be the subject of a further communication to surgeons over the next several weeks." PAC ¶ 227.

Plaintiff alleges that, as a result of these disclosures, Zimmer's stock price declined from $70.88 to $66.01. PAC ¶ 226.

The next day, on July 23, 2008, Zimmer held a conference call with financial analysts. On that call, Defendant Dvorak stated:

> While many US surgeons have had success with the Durom Cup since its launch, a subset have experienced elevated revision rates. This observation clearly contrasts ongoing positive clinical experience in Europe, where the product has been available since 2003.
>
> We launched a rigorous investigation, which included a thorough review of manufacturing processes, design specifications, production documentation and clinical experience in the US and Europe. Based on the results of that investigation we will temporarily suspend marketing and distribution of the Durom Cup in the US.
>
> We will update labeling to provide more detailed surgical technique instructions to surgeons and prepare to implement a comprehensive surgical technique training program for the US.
>
> ***
>
> But we want to make sure that we are clear with our US surgeons that they should stop implanting the Durom Cup until we issue the updated labeling that provides more detailed guidance on surgical technique, and until they receive training.
>
> ***
>
> We made good progress during the quarter on our quality systems upgrades. With respect to our orthopedic surgical products operation in Dover, Ohio, our remediation plans continue as scheduled. And we expect to have most, if not all, of OSP products back in production by the end of this year, many in the

next two or three months.

***

I will now turn to our updated guidance for the full year 2008. Jim will provide more details momentarily. Due to the developments in the second quarter, including Durom, we are revising our expectations for 2008 fully full year sales growth to 4.5% to 5% constant currency.

We're also lowering our adjusted earnings guidance for the full year to be between $4.05 and $4.10 per fully diluted share.

Defendant Crines also stated:

> Sales of $1,080 million for the quarter represent an increase of 11.2% reported and 5.5% constant currency. These results, among other things, reflect the benefit of one additional selling day in the quarter compared to same period in the prior year, strong underlying unit growth in knees in all three of our operating segments, and lower OSP, Durom and dental product sales.

* * *

> In the US Durom Cup sales volume was off 26% from our first quarter in response to reports of loosenings and revisions. Durom Cup sales units outside the US grew by over 10% in the second quarter compared to same period prior year. These results, absent Durom-related losses, reflect steady growth across our primary hip portfolio, including porous primary stems and our Trilogy and TM Acetabular Cups.

* * *

> The OSP and other category was down 15.6% in the Americas, declined 26.8% in Europe, and was down 17.3% in Asia-Pacific compared with the prior year period.

* * *

> Now I would like to provide an update on guidance for 2008. We expect to deliver topline sales growth in 2008 of 8.5% to 9% compared to the original 10% to 11% range. And adjusted earnings per share in the range of $4.05 to $4.10.

> Our sales guidance anticipates approximately 4 points of growth to come from foreign currency, and therefore assumes a constant currency growth rate of 4.5% to 5%. The adjustment to our sales guidance includes a projected loss of $20 million to $30 million in hip products sales, pertaining principally to

27

Durom Cup in the US, weakness in US Dental revenues, and slower than anticipated uptake on certain new products, partly due to delays in offering training programs in support of the new products introductions.

PAC ¶ 229.

Defendant Crines, as well as Cheryl Blanchard, Zimmer's Chief Scientific

Officer, answered analyst questions as follows:

Q:   I was wondering maybe if you could spend a few minutes going through – you did mention as we move into 2009 some of the headwinds you are facing in '08 start to disappear. I was wondering if you could quantify the three main areas and the impact that you're seeing this year, and what percentage of that could disappear in '09?  I would love it if you could hit Durom, OSP and the compliance monitors.

A:   This is Jim [Crines]. First of all, with respect to – I guess will start with OSP.  As David indicated and I indicated in my comments, we're on schedule with our remediation efforts. Expect to be back in production of those patient care products between now and the end of the year. And have the opportunity to go back into the market as those products come back online.
Going into 2009 we would look to get back as much of that $70 million to $80 million [that] we lost as we possibly can. We wouldn't expect to get [it] all back. But we will certainly be back in the market with those products and pursuing opportunities to regain share in that segment.

Q:   What is the aggregate – what is the anticipated aggregate revision rate, early revision rate with the product, given the disparities in training? And how much reputational damage could do that cause, given the 13,000 implants that have taken place to date?

A:   It is very difficult for us to project out where we think those numbers are going to go eventually. What I can tell you is that we were able to discern [that] there were some specific elements of surgical technique and cup placement that are the items that really make the difference in terms of those clinical outcomes.  I think it is difficult to comment on the last part of your question, which is reputational damage. I think that will frankly be determined by the actions that we have taken today and our level of being proactive as we move forward, trying to work with surgeons to help them get through this difficult situation with their patients.

We absolutely recognize that for those patients that are involved that there will be some items that we will need to help them with, and we're going to be proactive about that.

Q:    Secondly on Durom, the $20 million to $30 million worth of sales, can you indicate how much that is in terms of annual sales? I think it is pretty much the entire amount.

A:    This is Jim [Crines]. With regard to Durom, as we indicated in earlier comments, it represents about 5% to 10% of our hip revenues in the US. It happens to be the case as well outside the US.

If you look at how, and we look at how that product was growing coming into the year, coming out of the first quarter before reports of loosenings and revisions, we were trending clearly to the high end of that range. And the $20 million to $30 million, again principally associated with Durom, does get you to two-thirds to the full amount. But as I indicated, with regard to the hip franchise there's also the impact that some disruption that training is having on the new products that we reintroduced in the hip portfolio, namely the M/L taper with Kinectiv and the Fitmore and the EPOCH devices, that we're focused on in the second half of year as well.

PAC ¶ 230.

Zimmer's stock price continued to fall following the company's Form 10-Qs for the second and third quarters of 2008, and Plaintiff alleges that the financial impact of issues with the company's Durom Cup and OSPs continued to affect the company adversely throughout 2009. PAC ¶¶ 236-240.

## Legal Analysis

Plaintiff seeks leave to file its Proposed Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a), which provides that leave to file an amended pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The United States Supreme Court has provided the following reasons that may justify the denial of such leave – "undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).  In this case, Defendants assert that allowing Plaintiff to file its Proposed Amended Complaint would be futile because, as we held with regard to its Original Complaint, it too fails to state a claim upon which relief can be granted.  A proposed amendment to a complaint is considered futile if the complaint would not survive a motion to dismiss.  Vargas-Harrison v. Racine Unified Sch. Dist., 272 F.3d 964, 974-75 (7th Cir. 2001).  Thus, in determining whether to grant Plaintiff's motion, we apply the same motion to dismiss standard as in Zimmer I, as provided below.

As in its Original Complaint, Plaintiff's Proposed Amended Complaint asserts violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.  PAC ¶¶ 278-284.  The legal standards applicable to these claims come from Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

In order to successfully assert a violation of § 10(b), a plaintiff must allege (and ultimately prove) the following six elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5)

economic loss; and (6) loss causation. <u>Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.</u>, 552 U.S. 148, 156 (2008) (citing <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005)). As we explained in <u>Zimmer I</u>, "Rule 10b-5 encompasses only conduct already prohibited by § 10(b) of the Exchange Act, and a private right of action for § 10(b) violations is implied in the words of the statute and regulation." 673 F. Supp. 2d at 731 (citing <u>Scientific-Atlanta, Inc.</u>, 552 U.S. 148, 156 (2008)). Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" Thus, "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws--here, a violation of § 10(b) and Rule 10b-5." <u>Pugh v. Tribune Co.</u>, 521 F.3d 686, 693 (7th Cir. 2008)(citing <u>Southland Securities v. INSpire Ins. Solutions</u>, 365 F.3d 353, 383-84 (5th Cir. 2004)).

In <u>Zimmer I</u>, we found two alternate bases requiring dismissal of Plaintiff's Original Complaint. First, we determined that, despite the fact that the majority of the complained of statements were pled with the requisite particularity, Plaintiff had failed to establish that the information omitted from the statements was material. As we explained in that entry, Plaintiff had not pled facts or circumstances that gave rise to a duty on the part of Defendants to have included the omitted information in the statements at issue. Second, we found that Plaintiff's Complaint failed to include particularized facts sufficient to create the requisite "strong inference" of scienter on the parts of Defendants. Because we find that Plaintiff's Proposed

Amended Complaint also fails to allege facts to establish the requisite strong inference of scienter with regard to any Defendant, we decline to consider the potential materiality of that information except to the extent that the discussion of the two issues overlaps.[9]

As we explained in <u>Zimmer I</u>, one of the heightened pleading standards in securities fraud cases is that a plaintiff must, "with respect to each act or omission, . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 673 F. Supp. 2d at 732 (quoting 15 U.S.C. § 78u-4(b)(2)). The Supreme Court has interpreted the term "strong inference" to mean "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 314 (2007). The Court explained further that in determining scienter, "courts must consider the complaint in its entirety," as well as judicially noticed documents and documents incorporated by reference into the complaint; "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>Id.</u> at 322-23. Moreover, the Court is directed to engage in a "comparative inquiry," . . . "tak[ing] into account opposing inferences." <u>Id.</u> That

---

[9]Having failed to establish the requisite strong inference of scienter on the part of either individual Defendant, we further find that Plaintiff has failed to establish Zimmer's corporate scienter. <u>See</u> <u>Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.</u>, 365 F.3d 353, 366 (5th Cir. 2004) (holding that, in determining corporate scienter, a court must look to the scienter of individual corporate officers).

required state of mind is recklessness[10] for statements generally, <u>Sundstrand Corp. v. Sun Chemical Corp.</u>, 553 F.2d 1033, 1044-45 (7th Cir. 1977), and, by virtue of the PSLRA's safe harbor, "actual knowledge" for statements that are forward-looking to be actionable. 15 U.S.C. §78u-5(c)(1)(B).

Plaintiff contends that its Proposed Amended Complaint offers additional bases giving rise to the requisite strong inference of scienter with regard to the falsity of Defendants' statements related to the OSPs at its Dover facility as well as the Durom Cup. We discuss Plaintiff's scienter allegations with regard to both its OSPs at the Dover facility and the Durom Cup in the paragraphs below.[11]

## A.    Allegations Relating to Problems at the Dover Facility

Plaintiff argues that Defendants were aware of serious problems at the company's Dover facility before the start of the Class Period. It asserts that this awareness rendered the January 29, 2008 press release knowingly false when it was issued and that subsequent statements were also false based on that knowledge. Plaintiff argues that the requisite strong inference of Defendants' knowledge of the Dover facility's deficient quality systems, multiple

---

[10]Recklessness is "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." <u>Makor Issues & Rights, Ltd. v. Tellabs Inc.</u>, 513 F.3d 702, 704 (7th Cir. 2008)(citation omitted).

[11]Plaintiff's Proposed Amended Complaint includes variations of allegations relating to both the OSPs and the Durom Cup that we rejected in <u>Zimmer I</u>. Specifically, Plaintiff have once again argued that the company's Sarbanes-Oxley certification (signed by Defendants Dvorak and Crines) as well as the Defendants' compensation structure support a strong inference of scienter. PAC ¶¶ 241-247. We again reject these allegations for the same reasons outlined previously. <u>See</u> <u>Zimmer I</u>, 673 F. Supp. 2d at 747-48.

33

product recalls and the consequences thereof is created based on allegations in the pleading that fall into the following categories: (1) Defendants' decisions and responsibilities related to the Dover facility; (2) Defendants' access to information regarding the Dover facility; (3) Defendants' subsequent statements. For the reasons detailed below, we are not so persuaded.

1.       **Defendants' Decisions and Responsibilities Related to the Dover Facility**

The Proposed Amended Complaint includes various allegations regarding decisions made by Defendant Dvorak or Zimmer generally that Plaintiff contends show Defendants' knowledge of material issues relating to the quality deficiencies at the Dover facility. The following are some examples of these allegations:

- Defendant Dvorak decided not to invest in quality systems at the Dover facility. PAC ¶¶ 5, 81.

- Prior to the FDA inspection, Defendant Dvorak (or his direct reports) and other executives attended meetings about OSP quality matters. PAC ¶¶ 24, 34, 81, 122, 134-135, 138.

- Defendant Dvorak hired a specialist to help the company avoid FDA warning letters. PAC ¶¶ 5, 81, 135.

- Zimmer's decision to "coach" a team of employees on what to say to the FDA inspector. PAC ¶¶ 24, 132.

In terms of their relevance to scienter, these allegations miss the mark. It is irrelevant that Defendant Dvorak or anyone else at Zimmer knew that an FDA inspection occurred, took actions to mitigate any consequences of that inspection, or that the company was concerned

with the quality of its OSPs. These facts are not inconsistent with the statements at issue. For example, on January 29, 2008, Dvorak stated that FDA inspections were "taking place on a rolling business" and that the company had "initiatives under way to enhance further our quality systems . . . and we're going to continue to improve those systems as we go forward." PAC ¶ 106. Plaintiff's allegations must go to prove that Defendants had knowledge that rendered their statements false, i.e. that the issues at Dover were so severe that the company would be unable to attain the guidance being issued. The allegations cited here by Plaintiff fall short of comprising any specific information known by any Defendant that would support that conclusion.

Plaintiff's Proposed Amended Complaint does include one notable allegation in this regard. According to CW 14, Dvorak "was informed that there were significant issues with the quality systems and that it was recommended by the quality department that the Dover facility be shut down until the problem could be satisfactorily addressed; Dvorak agreed to shut down the facility." PAC ¶ 78. Although the allegation that Dvorak was informed that there were "significant issues with the quality systems" is too vague to support an inference that any of his statements were false, the allegation that Dvorak agreed to shut down the facility cites to a specific issue of which Dvorak obviously would have been aware. However, CW 14 provides no specifics about the shut down, such as when it occurred, how long it lasted, or when and how Dvorak specifically was informed of the issue. Furthermore, other CWs who made reference to the shut down do not supply a more cohesive picture of the incident. See, e.g., PAC ¶ 31 (CW 1 learned of the shut down "after the FDA auditor left in

January 2008"); PAC ¶ 57 (CW 9 learned of the shut down in late February or March); PAC

¶ 142 (CW 5 learned of the shut down in March or April of 2008). In any event, on April 3,

2008, Zimmer issued the following statement:

> The Company recently conducted a review of quality systems at the Dover, Ohio OSP facility and initiated voluntary product recalls of certain OSP products manufactured at the Dover facility that the Company has determined do not meet internal quality standards. In addition, the Company has voluntarily and temporarily suspended production and sales of certain OSP products manufactured at the Dover facility. The suspension will permit the Company to focus the OSP organization on the needed improvements to manufacturing and conduct enhanced quality training for employees.

PAC ¶ 186. This disclosure weighs against the inference that the company was attempting

to keep the facts of a shut down away from investors or otherwise possessed the requisite

scienter as to the falsity of its factual assertions. Because we are required to "discount" to

some extent the allegations of confidential witnesses in any event, see Higginbotham v.

Baxter Intern., Inc., 495 F.3d 753, 757 (7th Cir. 2007), we hold that Plaintiff's allegations,

even if true, would not and do not suffice to create a strong inference that Defendant Dvorak

knew about the shut down of the Dover facility such that any of his subsequent statements

could be considered knowingly false.

### 2. Defendants' access to information regarding the Dover facility

Many of the new allegations included in Plaintiff's Proposed Amended Complaint

assert that Defendants received sufficient information to have put them on notice of quality

deficiencies at the Dover facility. The following are examples of such allegations:

- Defendant Dvorak and other top Zimmer corporate management had a live

36

feed transcript of Zimmer's communications with the FDA during the inspection from Dover transmitted to their office computers. PAC ¶¶ 5, 27, 37, 122, 133

- Defendant Dvorak was updated at least every other day about the FDA inspection of its systems at Dover by a team assembled by Zimmer's corporate office. PAC ¶¶ 5, 26, 122, 133.

- Defendants Dvorak and Crines received daily sales reports each morning that would have shown no sales of the halted products. PAC ¶¶ 97-98, 140.

As we explained in <u>Zimmer I</u>, "Plaintiff[s] must allege facts indicating that Defendants were actually aware of some serious problem." 673 F. Supp. 2d at 747. None of these allegations satisfy that requirement. Access to information is not the same as actually possessing the specific information and knowing it so as to render subsequent contrary representations false. <u>In re Harley-Davidson, Inc. Sec. Litig.</u>, 660 F. Sup.. 2d 969, 999 (E.D. Wis. 2009) ("not only is mere receipt of reports insufficient to establish scienter, the inferential leap required to tie these alleged facts to the conclusion that defendants acted knowingly or recklessly when presenting relevant information to the market is untenable given the heightened pleading standards."). Plaintiff's attempt to close this inferential gap with the allegation relating to the FDA's "practice" of informing companies of impending 483 observations before they are actually issued is unavailing. Regardless of FDA practice, there is no allegation that Defendant Dvorak or Defendant Crines (as opposed to CW 1 or some other Zimmer employee) actually knew that the company would be receiving 483 observations prior to the

date they were issued or that any such 483 observation that might issue would impact the company in a way that would matter to a reasonable shareholder.

### 3.    Defendants' Subsequent Statements

The Proposed Amended Complaint also includes allegations that Defendants Dvorak and Crines admitted knowledge of the FDA inspection and observations prior to January 29 based on statements by them on April 24, 2008 and May 6, 2008 acknowledging the recalls. PAC ¶¶ 146-147.  Specifically, Defendant Dvorak acknowledged, "As you said we had a recall in December.  There were other recalls subsequent to that event . . . .  Included in that time period was, as you know any time you make a recall there's likely to be an FDA inspection. There was an inspection.  There were some observations." PAC ¶ 146.  Similarly, on May 6, 2008, Defendant Crines stated that the FDA made "observations that "caused [Zimmer] some concern."  PAC ¶ 147.  Neither of these "admissions" says anything with regard to what either Defendant was aware of at the time of their January 29 statements and, furthermore, Defendants' openness in discussing the matter in April and May actually weighs against a conclusion of scienter on their part. See In re Nokia Corp. Sec. Litig., 1998 U.S. Dist. LEXIS 4100 at *38 (S.D.N.Y. March 31, 1998) (finding that voluntarily disclosing negative information "undercuts" allegation that defendants acted recklessly).

Besides these inadequacies in pleading scienter, Plaintiff has not overcome the deficiencies we noted in Zimmer I that weigh against an inference of scienter. First, an inference against scienter arises from Zimmer's investigations related to the issues at Dover. 673 F. Supp. 2d at 749.  As we explained previously, the company's investigation and

willingness to recall its products bely Plaintiff's claims that it was Defendants' objective to hide problems related to the Dover facility. Id. "The inference against scienter becomes even more 'cogent and . . . compelling' given the fact that Defendants made a timely disclosure of the results of these investigations." Id. Nothing that Plaintiff has included in its Proposed Amended Complaint negates that opposing inference. Second, Plaintiff has not overcome the opposing inference that arises from the relative insignificance of the OSPs at issue. Although Plaintiff has alleged that the OSPs and Other Products accounted for $234 million and 6% of the company's total sales, PAC ¶ 113, it appears that less than half of the products making up that category were affected by the recalls and suspension. PAC ¶ 186 ("In 2007, Zimmer reported revenues from its OSP and Other product category of $234 million, less than half of which were generated by products affected by the recalls and suspension.").

In sum, Plaintiff's proposed pleading fails to allege that any specific, negative information regarding the Dover facility was provided to Defendants Dvorak or Crines that was inconsistent with the company's statements during the proposed class period.

**B.     Allegations Related to Problems with the Company's Durom Cup**

Plaintiff argues that its Proposed Amended Complaint establishes a strong inference that Defendants knew that several prominent and experienced surgeons had serious complaints about the Durom Cup and that Defendants should have given those complaints special credence in light of Defendants' lack of clinical trials of the product in the United States. The allegations Plaintiff claims establish this knowledge are based on the following: (1) CW averments regarding declining Durom Cup sales; (2) Durom Cup's importance to the

39

company financially; (3) the presence of representatives of Zimmer at Durom Cup revision surgeries and Zimmer's practice of tracking faulty devices; and (4) Defendants' subsequent statements that the complaints were serious and the number of reports was "unusually high."

### 1. CW Averments Regarding Decreased Durom Cup Sales

Plaintiff argues that evidence of decreased sales of Durom Cups throughout the Class Period supports an inference of actual knowledge by Defendants of the extent of problems related to the Durom Cup. For example, Plaintiff's CW 9 averred that there was a noticeable decrease in the orders for Durom Cups by March/April 2008, which he attributed to the complaints voiced by doctors about the product. PAC ¶ 59. Specifically, CW 9 states that previously he/she sold approximately 20 Durom Cups a month but averred that sales had dwindled to approximately five Durom Cups a month by the March/April 2008 time period. PAC ¶ 59. Similarly, CW 15 averred that he/she sent financial forecasts to Defendants Dvorak, Crines, and others showing decreases in Durom Cup sales beginning in May of 2008. PAC ¶ 80. Finally, CW 20 averred that sales in hip replacements had decreased generally throughout 2007 and that there was a noticeable decline in 1Q08 as well. PAC ¶ 98. CW 20 believed that decline "would have been alarming to management." PAC ¶ 98. CW 20 created a spreadsheet called the Daily Sales Report that reflected this decline and e-mailed the spreadsheet to a distribution list that included Defendants Dvorak and Crines. PAC ¶ 97.

Again, as we noted in <u>Zimmer I</u>, Plaintiff "must allege actual knowledge by the defendant, not some second-hand belief that such knowledge existed . . . ." 673 F. Supp. 2d at 747 (citation omitted). Plaintiff's Proposed Amended Complaint embodies this continued

failure. Thus, CW 9's averment of decreased sales is entirely unconvincing as it speaks to only to that person's individual knowledge. Only CW 15 and 20 aver that the information regarding decreased Durom Cup sales was actually made available to Defendants Dvorak or Crines. However, the decreases that CW 15 referred to were not inconsistent with the company's disclosures at the time. As noted above, on May 12, 2008, Zimmer's 10-Q for 1Q08 stated: "Sales of the Durom Cup during the remainder of 2008 may be adversely affected as a result of certain reports of unusually high rate of revision." PAC ¶ 206. Furthermore, as discussed above in reference to Dover, availability of information does not necessarily establish that Defendants received that information and understood it so as to render subsequent contradictory statements knowingly false. See In re Harley-Davidson, Inc. Sec. Litig., 660 F. Sup.. 2d 969, 999 (E.D. Wis. 2009). Thus, CW 20's e-mailed spreadsheet showing decreased sales to a distribution list including Defendants would not support a finding of Defendants' scienter that their statements were false. Because Plaintiff has failed to allege any actual knowledge of decreased sales of Durom Cup by either Defendant, its allegations of scienter are insufficient to support a finding of scienter with regard to the falsity of their statements.

### 2. Durom Cup's Importance to the Company

Plaintiff also contends that the Durom Cup was of such importance to Zimmer that Defendants would have been aware of any complaints that posed a risk to its sale in the marketplace and, particularly, those made by "high volume orthopedic surgeons," like Drs. Dorr, Long, Maltry, and CW 19. Specifically, Plaintiff alleges that there were "tens of

millions of dollars" in sales of the Durom Cup in 2007 and that the product was the foundation for Zimmer's entry into a $400 million U.S. market. PAC ¶¶ 154-155. In essence, Plaintiff's theory is that, as a result of the materiality of the complaints about Durom Cup during the Class Period, e.g., the allegedly conclusive negative information threatening the integrity of the announced financials, Defendants would necessarily have been aware of the complaints.

Apart from our doubts regarding whether the complaints of the doctors can be considered material, we explained in <u>Zimmer I</u> that materiality in the medical device context depends largely on "the statistical significance, or conclusiveness, of the negative information available to the manufacturer." 673 F. Supp. 2d at 742. The Supreme Court has ruled that "the determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him." <u>Basic v. Levinson</u>, 485 U.S. 224, 236 (1988)(quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 450 (1976)). Thus, "[s]tatistical significance . . . is not a bright-line rule because materiality 'is a flexible, fact-based determination.'" <u>In re Medtronic Inc.</u>, 618 F. Supp. 2d 1016, 1024 (D. Minn. 2009) (quoting <u>In re Bayer AG Sec. Litig.</u>, No. 03 Civ. 1546 WHP, 2004 U.S. Dist. LEXIS 19593, at *27 (S.D.N.Y. Sept. 30, 2004). In <u>Zimmer I</u>, we held that Plaintiff had failed to establish the materiality of the complaints regarding the Durom Cup due to market analyses countering Dr. Dorr's complaints, Dr. Dorr's continued use of the Durom Cup despite negative experiences with the Cup, and the nature and infrequency of adverse FDA complaints all of which demonstrated that there was

no conclusive or statistically significant negative information available to Defendants at the time of their alleged misstatements. 673 F. Supp. 2d at 742-45.

On this point, Plaintiff devotes considerable discussion in its reply brief to <u>Siracusano v. Matrixx Initiatives, Inc.</u> 2005 U.S. Dist. LEXIS 41102 (D. Ariz. Dec. 15, 2005) *rev'd*, 585 F.3d 1167 (9th Cir. 2009), *cert. granted* 130 S. Ct. 3411 (2010). In <u>Matrixx</u>, investors brought a federal securities action against a pharmaceutical company and three of its executives for failing to disclose what the investors argued was material information regarding one of the company's drugs. The district court in Arizona dismissed the investors' complaint because there were insufficient allegations that defendants knew of a definitive and statistically significant link between the drug and a condition affecting patients' sense of smell during the Class Period that was "sufficiently serious and frequent to affect future earnings." The Ninth Circuit reversed, holding that the district court had erred in relying on the statistical significance standard because it found the standard in violation of the Supreme Court's rejection of "bright-line rules" for materiality determinations. 585 F. 3d 1167, 1178 (9th Cir. 2009). The Ninth Circuit court explained:

> The Supreme Court has rejected the adoption of a bright-line rule to determine materiality because "'[t]he determination [of materiality] requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him.'" Instead, courts should engage in a "fact-specific inquiry" in assessing materiality. Thus, "[d]etermining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'"
>
> In relying on the statistical significance standard to determine materiality, the district court made a decision that should have

> been left to the trier of fact. Instead, we agree with the approach
> of the court in <u>In re Pfizer Inc. Securities Litigation</u>, 584 F. Supp.
> 2d 621 (S.D.N.Y. 2008), where the United States District Court
> for the Southern District of New York rejected the defendant
> pharmaceutical company's argument that the plaintiffs failed to
> plead materiality, which was based on the contention that three
> studies revealing adverse effects of the company's drug were not

statistically significant. The court reasoned that it "cannot determine as a matter of law whether such links were statistically insignificant because statistical significance is a question of fact." Id. at 635-36.

<u>Id.</u> at 1178-79 (internal quotation marks omitted). The United States Supreme Court heard oral argument on this case on January 10, 2011, but has not yet ruled.

In light of the pendency of the Supreme Court's decision and its potential impact on the standard for determining materiality in the medical device context, we have not based our decision on the materiality, or lack thereof, of the complaints Zimmer received regarding its Durom Cup. Still, we note that the following weighs against such a finding. First, Plaintiff's references to both the market's reaction in response to the Durom Cup recall and the 2009 study published by Dr. Dorr are unavailing as they both constitute facts that could not have been known to Defendants' prior to the alleged misstatements. See <u>Zimmer I</u>, 673 F. Supp. 2d at 742, n. 24 ("proof of fraud by hindsight based on *post hoc* market reactions is not sufficient.") Second, despite the addition of the opinions of Drs. Long and CW 19 to those of Drs. Door and Maltry, Plaintiff has failed to allege any consensus or conclusiveness of opinion available to Zimmer at the time of its alleged misstatements. The experiences of four surgeons may prompt a company to investigate a product (as it did in this case) but can hardly be deemed conclusive negative information that if not properly taken into account would

make Defendants' statements materially false. As Defendants point out, more than 230 surgeons had undergone training related to the Durom Cup by the end of 2008. Defs.' Ex. 1 at 3. Likewise, while these surgeons' apparent prominence and the extent of their experience with the Durom Cup and other hip surgery products may have prompted the company to take their complaints more seriously, their alleged prominence simply does not offset the fact that Plaintiff has offered the experience of only four surgeons.[12] Third, market analyses available during the class period demonstrate the inconclusiveness of the information available at the time of Defendants' alleged misstatements. See, e.g. PAC ¶ 263 ("it's unclear if other surgeons have experienced this problem."); PAC ¶ 204 ("There's independent registry data – as an example, the Swedish registry that's tracking over 200 patients and out three and a half years is reporting 99.5% survivorship with this device. So what was reported in this letter from this particular surgeon at this point I can tell you is somewhat isolated – it would appear to be somewhat isolated to this particular surgeon's experience.")[13]; PAC ¶ 217 ("On an

---

[12]The Proposed Amended Complaint also devotes considerable discussion to what are, essentially, a series of reasons that Zimmer did take (or should have taken) the complaints of these doctors seriously, e.g. Dr. Dorr's credentials as a prominent surgeon in the field of hip surgery, his past experience with another company with a faulty hip replacement product, and the lack of clinical testing of the Durom Cup product in the U.S. While we have considered these allegations in determining whether the complaints of Drs. Dorr, Long, Maltry, and CW 19 constitute material information omitted, they do not constitute potential independent bases for materiality.

[13]Plaintiffs challenge the relevance of information related to the Durom Cup used in Europe because there were technical differences between the product used there and that used in the United States. As we explained in Zimmer I, however, Defendants were under no obligation to ascertain or report that the differences between the products was of consequence absent some allegation that Defendants disbelieved the truthfulness of their comparison. 673 F. Supp. 2d at 743, n. 25.

industry conference on May 14, Zimmer referred to its internal registry tracking 13 surgeons in the U.S. and cited 3 failures out of 480 patients (0.6% failure rate).").  This conflicting and inconsistent evidence undermines the conclusion that the doctors' opinions constituted conclusive, negative information that would be of significance to a reasonable shareholder.

Even if the allegations in Plaintiff's Proposed Amended Complaint sufficed to establish the materiality of the doctors' complaints, the conclusion that it fails to establish the strong inference of scienter required on the parts of either Defendant is inescapable.  Although Plaintiff alleges that Zimmer generally (or at least certain CWs) were privy to the doctors' complaints, the extent of the involvement alleged on the part of Defendants Crines or Dvorak is minimal and much too vague to support an inference of scienter.  For instance, Plaintiff alleges that, according to CW 16, Defendants Crines and Dvorak were present at management meetings in approximately April/May 2008 and worked closely with him "to handle the Durom Cup situation."  PAC ¶ 82.  This allegation falls conspicuously short of a claim that Crines or Dvorak were aware of any specific negative information that would make their subsequent contrary statements knowingly false.  The Seventh Circuit has directed that "the plaintiffs must create a strong inference of scienter with respect to each individual defendant." Pugh v. Tribune Co., 521 F.3d 686, 693-94 (7th Cir. 2008) (citing Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 710 (7th Cir. 2008)).  Plaintiff's Proposed Amended Complaint fails to do so with respect to the doctors' complaints about the Durom Cup. Furthermore, Defendants' public disclosures regarding issues with the Durom Cup weigh against an inference that their statements were knowingly false.  See Zimmer I, 673 F. Supp.

2d at 749. As early as January 30, 2008, Defendant Crines admitted, "Some of the feedback we're getting from the field would indicate that it is a bit challenging to implant . . . ." PAC ¶ 109. Then, on March 18, 2008, Defendant Crines publicly acknowledged:

> [W]e understand that there are some challenges, some technique challenges with [the Durom Cup]. So there are some things that we need to do in terms of providing training to orthopedic surgeons and some things that we can do, as well, from a development perspective, to address some design differences with respect to our device and how it matches up with competitive devices. That's something that will take a bit longer. But certainly, the training is something that we can begin to address already in 2008.

PAC ¶ 185. On May 6, 2008, following Dr. Dorr's April 22, 2008 letter, Defendant Crines stated that the company was taking Dr. Dorr's high failure rates "very seriously" and had already "received lots of calls" related to the letter. PAC ¶¶ 204-205. On May 12, 2008, as Plaintiff notes, a date "not even 13 business days after Dr. Dorr's letter became public," Defendants stated that "sales of [the Durom Cup] during the remainder of 2008 may be adversely affected as a result of certain reports of unusually high rate of revision." PAC ¶ 206. Thus, it is clear that the allegations contained in Plaintiff's Proposed Amended Complaint fail to create a strong inference of scienter on the part of either Defendant with regard to the doctors' complaints regarding the Durom Cup, much less the seriousness of those complaints.

### 3. Zimmer's Presence at Durom Cup Revision Surgeries and Its Practice of Tracking Faulty Devices

Plaintiff alleges that Defendants Dvorak and Crines were aware of the extent of the complaints regarding Durom Cup as a result of the presence of Zimmer's sales representatives

at many Durom Cup surgeries as averred to by CW's 4, 6, 8, 9, 12.  PAC ¶¶ 43, 50, 55, 56, 71.  These sales representatives "were present to answer questions, and ensure that the products opened during the procedures were the correct products and were sterile."  PAC ¶ 50.  In addition, CW's 6 and 12 aver that Zimmer kept a record of all defective products opened during a surgical procedure through "Product Experience Reports."  PAC ¶¶ 51, 73.  None of these allegations, jointly or severally, supports an inference of scienter on the parts of Defendants Dvorak or Crines.  Even if these sales representatives witnessed problems with the Durom Cup during surgery, there is no allegation that any of them filed a product experience report related to the incident, that Dvorak or Crines were apprised of any such incident, much less that any particular incident tracked would have been of significance to a reasonable shareholder.

### 4.    Defendants' Subsequent Statements

Finally, Plaintiff asserts that Zimmer's 1Q08 Form 10-Q, which stated that the company had received "reports of unusually high rate of revision" related to the Durom Cup as well as a May 6, 2008 acknowledgment that the company took Dr. Dorr's complaints "very seriously", support an inference of Defendants' scienter.  See PAC ¶ 177.  However, Plaintiff's allegations in this regard, once again, miss the mark.  Consistent with our prior discussion of Defendants' scienter with regard to the issues at Dover, Defendants' subsequent disclosures during the Class Period say nothing with regard to what either Defendant personally knew at some earlier period.  Furthermore, the openness with which the Defendants publicly discussed and acknowledged the Durom Cup matter as well as the

seriousness with which they took the matter weigh against any possible finding of scienter. See Zimmer I, 673 F. Supp. 2d at 749.

In sum, Plaintiff's allegations in the Proposed Amended Complaint fail to support a strong inference of scienter of material information regarding the Durom Cup that Defendants would have had a duty to disclose.

## Conclusion

In light of these rulings that Plaintiff's Proposed Amended Complaint fails to create the requisite strong inference of scienter required to maintain its §10(b) claim, dismissal of that claim as well as its related § 20(a) and Rule 10b-5 claims is warranted. We hold that to grant Plaintiff's Motion for Leave to File Proposed Amended Complaint would be futile. Therefore, leave to amend pursuant to Federal Rule of Civil Procedure 15(a) is <u>DENIED</u>. Accordingly, this case is <u>DISMISSED WITHOUT PREJUDICE</u> and a final judgment shall enter.

IT IS SO ORDERED.

Date:_____01/28/2011_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

49

Copies to:

Sayad Ashar Ahmed
ROBBINS GELLER RUDMAN & DOWD LLP
aahmed@rgrdlaw.com

Matthew Thomas Albaugh
BAKER & DANIELS - Indianapolis
matthew.albaugh@bakerd.com

Jill M. Baisinger
MORGAN LEWIS & BOCKIUS LLP
jbaisinger@morganlewis.com

Luke  Brooks
ROBBINS GELLER RUDMAN & DOWD LLP
LukeB@rgrdlaw.com

Troy S. Brown
MORGAN LEWIS & BOCKIUS LLP
tsbrown@morganlewis.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

Karen Pieslak Pohlmann
MORGAN LEWIS & BOCKIUS LLP
kpohlmann@morganlewis.com

Willow E. Radcliffe
ROBBINS GELLER RUDMAN & DOWD, LLP
willowr@rgrdlaw.com

Marc J. Sonnenfeld
MORGAN LEWIS & BOCKIUS LLP
msonnenfeld@morganlewis.com

Paul A. Wolfla
BAKER & DANIELS - Indianapolis
paul.wolfla@bakerd.com